# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                      Case No. 17-CR-201

DAVID E. POLNITZ, JR.,

        Defendant.

# REPORT AND RECOMMENDATION

**I.    Procedural History**

On November 21, 2017, the grand jury returned an indictment charging David E. Polnitz, Jr. with possessing a firearm after having been convicted of a felony and with knowingly and forcibly assaulting, impeding, intimidating, and interfering with a United States Postal Service Letter Carrier while he was engaged in the performance of his official duties through the use of a deadly and dangerous weapon. (ECF No. 1.) On February 8, 2018, Polnitz filed two motions: a motion to suppress physical evidence (ECF No. 8) and a motion to suppress statements (ECF No. 9.) The following day Polnitz filed an amended motion to suppress physical evidence. (ECF No. 10.)

Polnitz did not request an evidentiary hearing. He stated that, after conferring with counsel for the government, the parties do not see any material facts in dispute that would call for an evidentiary hearing. (ECF No. 9.) The court requested that Polnitz again confer with counsel for the government to confirm that the government agreed that no evidentiary hearing was needed for either motion, and both sides responded that they did not believe that an evidentiary hearing was required. (ECF Nos. 12, 13.) Therefore, both sides have waived any right they may have otherwise had to an evidentiary hearing.

II.     Facts

When Polnitz filed his motions he did not attach a copy of the police reports or body camera footage referenced in his motions. On February 12, 2018, the court ordered that he provide the court with the reports and the footage. (ECF No. 11.) He did so. Exhibit 1 consisted of several police reports, and Exhibits 2 and 3 were body cam footage taken during the encounter between the police, Polnitz, and his wife. The following facts come from the police reports and body camera footage, which the parties agree may serve as the exclusive factual basis for the court's resolution of the motions.

On June 27, 2017, in response to a complaint about the reckless use of a weapon, Milwaukee Police Officers Andrew Wilkiewicz and Marcel Stolz were dispatched to a United States Postal Office. A United States postal worker stated that at approximately

3:30 p.m. that day, while delivering mail in the 4600 Block of N. 35th Street, he observed a pitbull run directly at him. Fearing for his safety, he deployed his Mace and the dog ran back into the yard at 4631 N. 35th St. (Ex. 1 at 3.)

The postal worker continued with his route. While at 4735 N. 35th Street a white Dodge Caravan approached him. The driver, described as a black male in his late twenties to early thirties with a dark complexion, ear length dreadlocks, and "Pepsi" blue eyes, wearing a white T-shirt and orange basketball shorts (later identified as Polnitz) asked him if he had pepper sprayed his dog. The postal worker stated that he had, explained why, and told Polnitz to contact his employer. Polnitz responded, "Fuck that. I'll be back." (*Id*.)

The postal worker observed the Caravan drive south and park near 4631 N. 35th Street. He observed Polnitz get out of the Caravan and walk into the house at that address. He then saw Polnitz run toward him with his right hand in his shorts pocket, yelling, "Hey mailman." Polnitz told the postal carrier, "You're not gonna be delivering mail over here anymore." The postal worker asked if Polnitz was threatening him. Polnitz pulled a handgun from his pocket, pointed the gun at the postal worker and stated, "No, *this* is a threat." Polnitz then fled. (*Id*.)

Later that day, while it was still daylight, several law enforcement officers, including Stolz and Wilkiewicz, went to 4631 N. 35th Street to check for the suspect. (Ex. 1 at 6.) It is not entirely clear exactly how many law enforcement officers were present,

but the court counts at least five officers in the body cam footage. Upon arrival they saw a white Dodge Caravan parked in the rear of the residence. (*Id*.) Wilkiewicz knocked on the door of the house and a woman answered. (*Id*.) Wilkiewicz explained that the officers were there regarding an incident with a dog and that they "needed to talk to you guys to figure out what happened." (*Id*.) He said that there was "a male here who was involved somehow." When Wilkiewicz asked who else was inside the home and who drives the white Caravan, the woman stated that her husband and nephew were inside and her husband drives the vehicle. (*Id*.) Wilkiewicz asked her to have her husband come to the door.

When Polnitz came to the door Wilkiewicz gestured for him to come outside and stated, "Do me a favor and step out for me real quick." (Ex. 3 at 3:52.) Without pausing Polnitz stepped out of the house, at which time the officers placed handcuffs on him, telling him that they were going to put him in handcuffs until they figured out what was going on. (Ex. 3 at 4:02.) Stolz asked Wilkiewicz, "Does he fit the description?" Wilkiewicz answered, "Yeah." (*Id*.)

While Polnitz was in front of the house in handcuffs the officers asked him if he had any firearms or weapons on him. (Ex. 3 at 4:09.) Polnitz stated that he did not. (*Id.*) They then patted him down. (*Id*.) As they did, Polnitz stated that earlier he had had a water gun. (Ex. 3 at 4:21.) At that point Wilkiewicz told Polnitz that they were going to walk over to his squad car and talk. (Ex. 3 at 4:44.) On the walk to the car, with Polnitz

4

still in handcuffs, Wilkiewicz asked Polnitz if something happened earlier with his dog. (Ex. 3 at 5:01.) Polnitz responded that a mailman sprayed his dog and that he confronted the postal carrier and pulled a water gun that looked like a .45 on the postal carrier. (Ex. 3 at 5:18.) Wilkiewicz stated that he wanted to get Polnitz's story and that obviously Polnitz was aware why the officers were there. (*Id*.)

When Polnitz was put in the back of the squad car he asked if he was under arrest. (Ex. 3 at 8:00.) Wilkiewicz told him that he was. (*Id*.) While in the car Wilkiewicz asked, "You've been arrested before, obviously, are you a convicted felon?" (*Id*. at 9:21.) Polnitz responded, "Yes I am, that's why I got no guns." (*Id*.) Wilkiewicz asked, "There's nothing, no firearms in the house or anything like that?" (*Id*. at 17:10.) Polnitz responded, "I don't have a firearm, I am a felon, I cannot have a firearm, there should not be no firearms in the house." (Ex. 3 at 17:21.)

Wilkiewicz then asked if Polnitz would consent to a search of the residence. (Ex. 1 at 6.) Polnitz refused to consent. (*Id*.) Polnitz stated that he was willing to go to work to show Wilkiewicz the water gun. In response to Wilkiewicz's question of the color of the water gun, Polnitz responded that it is black and orange with a purple bottom. (Ex. 3 at 17:44.)

During this time Officer Stolz remained at the door of the house talking with Lorenzya Polnitz, Polnitz's wife. Stolz asked her if there were any firearms in the house. (Ex. 2 at 9:25.) He explained that if she did not allow them to retrieve the firearm they

5

would get a search warrant and the SWAT team would knock the door down and tear up the house to get the firearm. (Ex. 2 at 10:45.) Mrs. Polnitz eventually said that there was a shotgun and a .380 handgun in her bedroom. (*Id*. at 11:46.) She agreed to retrieve the handgun and did so, allowing an officer into the residence to take the handgun. (*Id*. at 24:01.)

### III. Analysis

**Statements**

Polnitz moves to suppress "all statements" he made during what he characterizes as "custodial questioning" on June 27, 2017, on the ground that he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to police initiating the questioning. (ECF No. 9 at 1.) Polnitz does not identify which specific statements he seeks to suppress. The court thus interprets the motion's reference to "all statements" to mean all statements Polnitz made to the police that are captured on the body camera footage that has been supplied to the court. The court is unaware of any other statements. Therefore, for example, if Polnitz made any statement at the police station he has not moved to suppress it.

Polnitz contends that he was in police custody once the police placed him in handcuffs. (ECF No. 9 at 4-5.) And, he argues, any statements he made thereafter were only in response to questions and statements made by Officer Wilkiewicz "that a

6

reasonable person would have expected to elicit an incriminating response." (ECF No. 9 at 5.)

In response the government separates statements made by Polnitz into two categories: those he made *before* he was told he was under arrest and those he made *after* he was told he was under arrest. The government disputes that Polnitz was in custody immediately upon exiting his house and being placed in handcuffs. It argues that, once Polnitz came out of his house, it was apparent that he matched the postal worker's description of the man who confronted him with a gun. As a result, the police "had reasonable suspicion to believe that Polnitz recently used a firearm to threaten a mail carrier." (ECF No. 17 at 9.) Thus, he was stopped for questioning under *Terry v. Ohio*, 392 U.S. 1 (1968). It argues that the *Terry* stop only turned into an arrest "during the walk to the squad car when Polnitz repeated the false exculpatory (sic) that he had only threatened the mail carrier with a water gun." (ECF No. 17 at 9.) It contends that all statements made by Polnitz prior to his arrest are admissible.

As to statements made by Polnitz after he was under arrest, the government argues that they were voluntary and not in response to any interrogation by the police or were in response to routine booking questions. As a result, none of the statements made by Polnitz while in custody should be suppressed. (ECF No. 17 at 11-13.)

"Any police interview of an individual suspected of a crime has 'coercive aspects to it.'" *J. D. B. v. North Carolina*, 564 U.S. 261, 268 (2011) (quoting *Oregon v. Mathiason*,

7

429 U.S. 492, 495 (1977) (per curiam)). But the prophylactic warnings created by the Supreme Court in *Miranda* "are not required merely because the person being questioned is a suspect or the focus of a criminal investigation." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012). "The privilege against self-incrimination is not imperiled by every conversation with the government. Instead, the concern in *Miranda* was with the inherently coercive nature of custodial interrogation. Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id.*

"'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). For example, a person may be detained during a *Terry* stop, *United States v. Patterson*, 826 F.3d 450, 457 (7th Cir. 2016), or during the execution of a search warrant, *United States v. Saadeh*, 61 F.3d 510, 520 (7th Cir. 1995); *United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994), and thus not free to leave but yet not be in "custody" for purposes of *Miranda*. *Patterson*, 826 F.3d at 455. A person is only "in custody" for *Miranda* purposes "if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *Id*.

Whether a person is in custody is assessed from the perspective of a reasonable person in the defendant's position. *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004). "Relevant factors include the location of the questioning, its duration, statements made

8

during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *United States v. Borostowski*, 775 F.3d 851, 859-60 (7th Cir. 2014). However, "there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (describing how the use of handcuffs, placing suspects in police cars, and drawing weapons does not necessarily render an investigatory detention an arrest).

The police officers went to 4631 N. 35th St. to look for the male who the postal worker told them returned to that address after pointing a gun at him. When Polnitz stepped out of the house the officers determined that he matched the description given to them by the postal worker. Since the postal worker said that the man that confronted him had a gun, it was reasonable for the officers to place handcuffs on Polnitz so that they could determine whether he was armed. When the officers asked Polnitz if he had any weapons or firearms on him, he said that he did not. And then as the officers patted Polnitz down he stated that earlier he had had a water gun. (Ex. 3 at 4:21.)

As stated above, whether Polnitz was at that moment in "custody" is assessed from the perspective of a reasonable person in his position. *Yarborough*, 541 U.S. at 663. All they had told Mrs. Polnitz up to that point was that they were there regarding an incident with a dog, that they "needed to talk to you guys to figure out what happened," and that there was "a male here who was involved somehow." The record

9

is silent as to whether Mrs. Polnitz passed any of that information on to Polnitz. All the officers had told Polnitz up to that point was that they were going to put him in handcuffs until they figured out what was going on. Under those circumstances, a reasonable person would have concluded that he was not yet in "custody" as that term is used for *Miranda*-warning purposes. Polnitz was detained under *Terry*. Thus, his statement to the police that he had earlier had a water gun, which he made very early in the encounter and while the officers patted him down, is admissible.

Wilkiewicz then told Polnitz that they were going to walk over to his squad car and talk. (Ex. 3 at 4:44.) Wilkiewicz did not take the handcuffs off of Polnitz. On the walk to the car Wilkiewicz asked Polnitz if something happened earlier with his dog. (Ex. 3 at 5:01.) Polnitz responded that a mailman sprayed his dog and that he confronted the postal carrier and pulled a water gun that looked like a .45 on him. (Ex. 3 at 5:18.)

Several facts indicate that this also was a non-custodial conversation. First, rather than taking place at a police station, the discussion took place in front of Polnitz's home in the daylight hours and in view of Polnitz's wife. *See Patterson*, 826 F.3d at 455. At no time did Wilkiewicz (or any officer) raise his voice; indeed, the discussion between Wilkiewicz and Polnitz very much resembled a conversation. *See United States v. Snodgrass*, 635 F.3d 324, 328 (7th Cir. 2011). At no time did any of the officers unholster his gun or, as far as the court can see from the video, even put his hand on his gun. *See*

*United States v. Salyers*, 160 F.3d 1152, 1160 (7th Cir. 1998). Polnitz was not told he was under arrest, and the amount of time that passed was very brief—just over a minute from the time when Polnitz first stepped out of his house to when this discussion took place.

The following facts arguably suggest that Polnitz *was* in custody at the time he talked with Wilkiewicz on the walk to the police car: several officers were still present, Wilkiewicz exercised control over Polnitz's movement by directing him to a police car, and Polnitz was still in handcuffs.

Considering all of the facts, although a close call, the court concludes that, at the time this brief conversation took place, although there was clearly a restraint on Polnitz's freedom of movement of the type typical in a *Terry* stop, there was not a restraint on Polnitz's freedom of movement of the degree associated with a formal arrest. Thus, Polnitz's statement that he had earlier pulled a water gun that looked like a .45 on the postal worker is also admissible.

The government concedes that the *Terry* stop "turned into an arrest during the walk to the squad car when Polnitz repeated the false exculpatory (sic) that he had only threatened the mail carrier with a water gun." (ECF No. 17 at 9.) Focusing *not* on whether a reasonable person in Polnitz's position would have concluded that he was in custody but rather on whether the *police* believed that Polnitz was at that point in custody, the government seems to be applying the wrong standard. *See Patterson*, 826

11

F.3d at 456 (describing a law enforcement officer's subjective belief about whether an individual is in custody or not as generally irrelevant to the custody determination for *Miranda* purposes). Nevertheless, the court will accept the government's concession for purposes of the motion to suppress that, once Polnitz repeated the story about having pointed a water gun at the postal worker, he was under arrest and in custody. As a result, at that point *Miranda* warnings were required before any interrogation could take place. *See Pennsylvania v. Muniz*, 496 U.S. 582, 600 (1990). The government argues that "[f]rom the time Polnitz was arrested until the end of the video, Officer Wilkiewicz asked routine booking questions or follow-up questions to Polnitz's voluntary statements" (ECF No. 17 at 11) and thus did not engage in interrogation. Accordingly, it argues, the statements made by Polnitz while in the squad car should not be suppressed. (*Id.*)

As stated earlier, Polnitz does not identify any particular "statement" that he made once he was in custody that he seeks to suppress. Once he was placed in the squad car he and Officer Wilkiewicz spoke for several minutes. Much of the conversation seems relatively benign, and the court is left to guess which statements he seeks to suppress. Because the motion seeks to suppress "all" statements, the court will address all statements made by Polnitz once placed in the squad car.

After Polnitz was, as the government concedes, in custody, he asked whether he was going to jail. In response Wilkiewicz stated that he was and asked, "You've been

arrested before, obviously, are you a convicted felon?" (Ex. 3 at 9:21.) Polnitz responded, "Yes I am, that's why I got no guns." (*Id*.) It may be that this was a routine booking question, but it was not asked in the booking context. And it went beyond a follow-up to Polnitz's question about whether he was going to jail and was clearly designed to elicit a response which, depending upon the answer, could be incriminating. Because Polnitz's statement was neither in response to a follow up to a voluntary statement made by Polnitz or in response to a routine booking question, it must be suppressed. Of course, that does not mean the government is precluded from establishing that Polnitz was a felon by means other than by his own admission that he was.

From about 9:30 to 15:40 in Exhibit 3, the conversation between Wilkiewicz and Polnitz consisted of general questions and observations that were not designed or likely to elicit an incriminating response. For example, Polnitz voluntarily stated (referring to his wife) that she didn't know he confronted the postal worker. They then discussed his kids, the responsibilities with certain breeds of dogs in Milwaukee, and when he will get out of jail. Wilkiewicz eventually stated, "We gotta do what we gotta do, you messed up, made an error in judgment and we'll talk about that more later." Throughout this time Polnitz was mumbling unintelligibly off and on. However, around 15:42 the following colloquy took place:

    Wilkiewicz:        So, you said it was a water gun, where is that water gun?

| | |
|---|---|
| Mr. Polnitz | At work . . . Salvation Army. |
| Wilkiewicz: | You work there? |
| Mr. Polnitz: | Yeah I drive the vans for them. |
| Wilkiewicz: | Is that the van you drive that white one back there? |
| Mr. Polnitz: | I drive like four vans. |
| Wilkiewicz: | So after the incident you went back up there and put it back? |
| Mr. Polnitz: | Yeah, that's why she didn't even know nothing happened … honestly I felt stupid after the fact, we had a couple words and I told him he was right and I drove off and went back to work … she didn't know I confronted him … wife called told him dog hurt … got home 4 or 5 … probably after that. |

(Ex. 2 at 15:42.) The question, "So you said it was a water gun, where is that water gun?" in addition to the follow up regarding the water gun, was designed to elicit an incriminating response. Therefore, the statements made in response to that question must also be suppressed.

Additionally, Wilkiewicz asked, "There's nothing, no firearms in the house or anything like that?" (Ex. 3 at 17:10.) Polnitz responded, "I don't have a firearm, I am a felon, I cannot have a firearm, there should be no firearms in the house." (Ex. 3 at 17:21.) Polnitz then refused Wilkiewicz's request for consent to search the house but stated he was willing to go to work to show him the water gun. Wilkiewicz asked what color the water gun was and Polnitz responds black and orange with a purple bottom. For the

same reasons above, the statements regarding Polnitz being a felon and describing the water gun must also be suppressed.

**Physical Evidence**

Polnitz moves to suppress the firearm retrieved by his wife from his house on the ground that his arrest in his home without a warrant was unlawful and that this unlawful arrest tainted the subsequent consent given by his wife. Specifically, he argues that the Fourth Amendment requires police to obtain a warrant in order to seize a person inside their home. He argues that the police "surrounded Polnitz's home and compelled him to exit[,]" not announcing their intention to arrest him. (ECF No. 10 at 5.) That rendered the subsequent arrest of Polnitz illegal. And that illegal arrest, he contends, tainted the subsequent consent from his wife to enter the residence and obtain the firearm.

The government responds that, because Mrs. Polnitz voluntarily gave police the firearm, the propriety of Polnitz's arrest is irrelevant. (ECF No. 18 at 5-7.) As to Polnitz's claim that his wife's consent was coerced by the officers' statement that, absent consent, they would obtain a search warrant which would be executed by a SWAT team, the government responds that a genuine threat to obtain a search warrant does not vitiate consent. (*Id.* at 7.) And given the information that the police had obtained from the postal worker and their conclusion that Polnitz matched the suspect described, the "threat" to obtain a search warrant was well-grounded.

Moreover, the government argues, the arrest of Polnitz was lawful. It disputes that the officers compelled Polnitz to step out of his house. He exited voluntarily in response to a polite request so that the police could determine whether he matched the description given to them by the postal worker. (ECF No. 18 at 8.) The officers did not "hide" their intent to arrest Polnitz when they asked him to step out of the house because they had not yet determined that they were going to arrest him; they first had to determine that he met the description of the suspect given to them by the postal worker. Once Polnitz voluntarily stepped outside and the officers determined that he was the person identified by the postal worker, they had probable cause to arrest him. By that point, Polnitz no longer benefitted from the heightened privacy interest in his home. (*Id*. at 10.)

The Fourth Amendment prohibits the police from making a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest. *Payton v. New York*, 445 U.S. 573, 576 (1980). An individual standing in the middle of an open doorway is outside rather than inside the home for purposes of the Fourth Amendment because the person is knowingly exposing himself to "public view, speech, hearing, and touch" as if in a public place. *United States v. Santana*, 427 U.S. 38, 42 (1976). However, a person does not surrender reasonable expectations of privacy in the home simply by answering a knock at the door. *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 690 (7th Cir. 2001). The right to be free from physical intrusion into the home by police officers

without a warrant seeking to effectuate an arrest is not absolute and can be waived by acquiescence to a slight entry. *Id*. But, without a warrant, when an individual stays inside the home behind a closed screen door the arrest may only be completed if the individual opens the screen door and steps outside of the home or acquiesces to a slight entry to complete the arrest. *Id*.

After the police asked Mrs. Polnitz to have her husband come to the door, Polnitz came to the door and, at Wilkiewicz's request, stepped outside. Citing *Flores v. Lackage*, 938 F. Supp. 2d 759 (N.D. Ill Mar. 31, 2013), Polnitz argues that the Fourth Amendment bars police officers from hiding their intentions in an effort to draw a suspect outside of the home to effect an arrest. (ECF No. 21 at 2.) *Flores* involved an officer reaching into the outer door of an apartment to seize a person to effectuate an arrest. 938 F. Supp. 2d at 770. The *Flores* court stated that someone who opens the door in response to a knock by the police "has not relinquished his right to close the door on unwanted visitors." *Id.* While answering a knock from police is not an invitation to the police to come into the house, a person who exits the home cannot simultaneously retain a privacy interest provided by his home. *See Sparing*, 266 F.3d at 690.

Polnitz states that the officers knew he was the person they intended to arrest as soon as he came to the door, but the body camera footage shows Polnitz stepping outside immediately upon coming to the door while the officers motioned for him to step outside. From the video it appears there was very little time for the police to make

17

a determination while Polnitz was still in the house as to whether he matched the description given to them by the postal worker of the person who pointed a gun at him. It was only after Polnitz stepped outside that Wilkiewicz stated that he matched the description given them by the postal worker. As discussed above, Polnitz was still not yet under arrest; he was only under arrest once he said he had pointed a water gun that looked like a .45 at the postal worker. Thus, Polnitz's arrest was not unlawful and necessarily did not taint Mrs. Polnitz's subsequent consent.

But even if the arrest was unlawful, that would not mean that the consent given by Polnitz's wife was tainted. Taint may be dissipated by: 1) the length of time between illegal police conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the illegal conduct. *Brown v. Illinois*, 422 U.S. 590 (1975).

Once Polnitz was in the police car the officers near the door discussed with Mrs. Polnitz their purpose for being there. In response to comments from Mrs. Polnitz about being confused as to what was going on the officers explained why they were there. (ECF No. 2 at 9:03-56.) Initially, Mrs. Polnitz was reluctant to allow them inside to retrieve the firearm despite officers warning her that if she did not cooperate they would get a search warrant and a SWAT team would break down the door and tear the home up. Ultimately she agreed to retrieve the firearm.

Based upon Polnitz's stipulation to the facts as depicted in the video and police reports, in addition to the fact that the police officers had probable cause that would

support a request for a search warrant, the statement regarding the SWAT team returning was not merely a pretext to induce submission and did not taint Mrs. Polnitz's consent. *See United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994) (discussing the propriety of police officers stating that they will obtain a search warrant when the intent to obtain a warrant is genuine). Furthermore, even if the conduct of the officers in motioning for Polnitz to step outside is close to the permissible line with respect to investigating an individual at his home, that action in no way rises to a "flagrant" level of illegal conduct such that Mrs. Polnitz's consent to retrieve the firearm was tainted. Polnitz stepped outside simultaneously with the officer's request. Any taint would have dissipated immediately.

**IT IS THEREFORE ORDERED** that Polnitz's Motion to Suppress Physical Evidence (ECF No. 8) is **denied as moot** based on the Amended Motion to Suppress Physical Evidence. (ECF No. 10.)

**IT IS FURTHER ORDERED** that Polnitz's Motion for Leave to File reply briefs (ECF No. 23) is **granted**.

**IT IS RECOMMENDED** that Polnitz's Motion to Suppress Statements (ECF No. 9) be **granted** with respect to: the statement, in response to the question whether he is a felon, "Yes I am, that's why no I got no guns;" the statements in the car discussing Polnitz's employment at Salvation Army and describing the "water gun" in response to the question of where the water gun is; and the statement in response to whether there

are firearms in the house, "I don't have a firearm … I am a felon … I cannot have a firearm … there should be no firearms in the house." In all other respects it is recommended that the motion be **denied**.

**IT IS FURTHER RECOMMENDED** that Polnitz's Motion to Suppress Physical Evidence (ECF No. 10) be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 26th day of April, 2018.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge