UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                         Case No. 17-cr-201-pp

DAVID E. POLNITZ JR.,

        Defendant.

**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION (DKT. NO. 24), GRANTING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (DKT. NO. 9), AND DENYING DEFENDANT'S AMENDED MOTION TO SUPPRESS PHYSICAL EVIDENCE (DKT. NO. 10)**

On April 26, 2018, Magistrate Judge William E. Duffin issued a report, recommending that this court grant in part and deny in part the defendant's motion to suppress statements. He further recommended that this court deny the defendant's motion to suppress physical evidence. Dkt. No. 24. Both the defendant (dkt. no. 28) and the government (dkt. no. 25) objected. Because the court finds that the defendant was "in custody" for purposes of Miranda v. Arizona, 384 U.S. 436 (1966) when multiple officers led the defendant in handcuffs on a walk to their squad car, the court will grant the defendant's motion to suppress regarding the statements he made on the walk to the squad car.

## I. Background

### A. Procedural History

On November 21, 2017, the grand jury returned a two-count indictment charging the defendant with one count of being a felon in possession of a firearm and one count of knowingly and forcibly assaulting, impeding, intimidating, and interfering with a United States Postal Service Letter Carrier. Dkt. No. 1. On February 8 and February 9, 2018, respectively, the defendant filed a motion to suppress statements, dkt. no. 9, and an amended motion to suppress physical evidence, dkt. no. 10. In the fact sections of the motions to suppress, the defendant wrote that "[t]hese facts are taken from the police reports and body cam footage of the police encounter with [the defendant]. Counsel for [the defendant] has conferred with counsel for the government and the parties do not see any material facts in dispute that would call for an evidentiary hearing on this motion." Dkt. No. 9 at 1, n.1; see also dkt. no. 10 at 1, n.1.

Three days later, Judge Duffin issued an order pointing out that the defendant had not provided the relevant police reports and body camera footage necessary to decide the motions. Dkt. No. 11. He ordered the defendant to provide that evidence to the court, and the government to opine on whether it believed an evidentiary hearing was necessary to decide either of the motions. Id. The government notified the court that it "[was] aware of no disputed material facts, and, therefore, agree[d] that no evidentiary hearing [was] necessary to resolve either of the pending suppression motions." Dkt. No. 13.

After Judge Duffin issued the April 26, 2018 report, dkt. no. 24, the government timely filed an objection, dkt. no. 25. On the day of the deadline for filing objections—after business hours—the defendant filed a motion asking the court for an additional two weeks to file *his* objections, without an explanation as to why he needed the additional time. Dkt. No. 26. The court granted the request, and the defendant objected on May 24, 2018. Dkt. No. 28.

B.    Facts

On the parties' representations, Judge Duffin found that "both sides have waived any right they may have otherwise had to an evidentiary hearing." Dkt. No. 24 at 2. Below is the fact section from his report and recommendation:

> On June 27, 2017, in response to a complaint about the reckless use of a weapon, Milwaukee Police Officers Andrew Wilkiewicz and Marcel Stolz were dispatched to a United States Postal Office. A United States postal worker stated that at approximately 3:30 p.m. that day, while delivering mail in the 4600 Block of N. 35th Street, he observed a pitbull run directly at him. Fearing for his safety, he deployed his Mace and the dog ran back into the yard at 4631 N. 35th St. (Ex. 1 at 3.)

> The postal worker continued with his route. While at 4735 N. 35th Street a white Dodge Caravan approached him. The driver, described as a black male in his late twenties to early thirties with a dark complexion, ear length dreadlocks, and "Pepsi" blue eyes, wearing a white T-shirt and orange basketball shorts (later identified as Polnitz) asked him if he had pepper sprayed his dog. The postal worker stated that he had, explained why, and told Polnitz to contact his employer. Polnitz responded, "Fuck that. I'll be back." (*Id.*)

> The postal worker observed the Caravan drive south and park near 4631 N. 35th Street. He observed Polnitz get out of the Caravan and walk into the house at that address. He then saw Polnitz run toward him with his right hand in his shorts pocket, yelling, "Hey mailman." Polnitz told the postal carrier, "You're not gonna be delivering mail over here anymore." The postal worker asked if Polnitz was threatening him. Polnitz pulled a handgun from his

3

pocket, pointed the gun at the postal worker and stated. "No, *this* is a threat." Polnitz then fled. (*Id.*)

Later that day, while it was still daylight, several law enforcement officers, including Stolz and Wilkiewicz, went to 4631 No. 35th Street to check for the suspect. (Ex. 1 at 6.) It is not entirely clear exactly how many law enforcement officers were present, but the court counts at least five officers in the body cam footage. Upon arrival they saw a white Dodge Caravan parked in the rear of the residence. (*Id.*) Wilkiewicz knocked on the door of the house and a woman answered. (*Id.*) Wilkiewicz explained that the officers were there regarding an incident with a dog and that they "needed to talk to you guys to figure out what happened." (*Id.*) He said that there was "a male here who was involved somehow." When Wilkiewicz asked who else was inside the home and who drives the white Caravan, the woman stated that her husband and nephew were inside and her husband drives the vehicle. (*Id.*) Wilkiewicz asked her to have her husband come to the door.

When Polnitz came to the door Wilkiewicz gestured for him to come outside and stated, "Do me a favor and step out for me real quick." (Ex. 3 at 3:52.) Without pausing Polnitz stepped out of the house, at which time the officers placed handcuffs on him, telling him that they were going to put him in handcuffs until they figured out what was going on. (Ex. 3 at 4:02) Stolz asked Wilkiewicz, "Does he fit the description?" Wilkiewicz answered, "Yeah." (*Id.*)

While Polnitz was in front of the house in handcuffs the officers asked him if he had any firearms or weapons on him. (Ex. 3 at 4:09.) Polnitz stated that he did not. (*Id.*) They then patted him down. (*Id.*) As they did, Polnitz stated that earlier he had had a water gun. (Ex. 3 at 4:21.) At that point Wilkiewicz told Polnitz that they were going to walk over to his squad car and talk. (Ex. 3 at 4:44.) On the walk to the car, with Polnitz still in handcuffs, Wilkiewicz asked Polnitz if something happened earlier with his dog. (Ex. 3 at 5:01.) Polnitz responded that a mailman sprayed his dog and that he confronted the postal carrier and pulled a water gun that looked like a .45 on the postal carrier. (Ex. 3 at 5:18) Wilkiewicz stated that he wanted to get Polnitz's story and that obviously Polnitz was aware why the officers were there. (*Id.*)

When Polnitz was put in the back of the squad car he asked if he was under arrest. (Ex. 3 at 8:00.) Wilkiewicz told him that he was. (*Id.*) While in the car Wilkiewicz asked, "You've been arrested before, obviously, are you a convicted felon?" (*Id.* at 9:21.) Polnitz

responded, "Yes I am, that's why I got no guns." (*Id.*) Wilkiewicz asked, "There's nothing, no firearms in the house or anything like that?" (*Id.* at 17:10.) Polnitz responded, "I don't have a firearm, I am a felon, I cannot have a firearm, there should not be no firearms in the house." (Ex. 3 at 17:21.)

Wilkiewicz then asked if Polnitz would consent to a search of the residence. (Ex. 1 at 6.) Polnitz refused to consent. (*Id.*) Polnitz stated that he was willing to go to work to show Wilkiewicz the water gun. In response to Wilkiewicz's question of the color of the water gun, Polnitz responded that it is black and orange with a purple bottom. (Ex. 3 at 17:44.)

During this time Officer Stolz remained at the door of the house talking with Lorenzya Polnitz, Polnitz's wife. Stolz asked her if there were any firearms in the house. (Ex. 2 at 9:25.) He explained that if she did not allow them to retrieve the firearm they would get a search warrant the SWAT team would knock the door down and tear up the house and to get the firearm. (Ex. 2 at 10:45.) Mrs. Polnitz eventually said that there was a shotgun and a .380 handgun in her bedroom. (*Id.* at 11:46.) She agreed to retrieve the handgun and did so, allowing an officer into the residence to take the handgun. (*Id.* at 24:01.)

C.     Judge Duffin's Report and Recommendation

    1.     *Motion to Suppress Statements*

Judge Duffin began by observing that the "prophylactic warnings" of Miranda concerned the inherently coercive nature of *custodial* interrogations; accordingly, "'a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required.'" Dkt. No. 24 at 8 (quoting United States v. Ambrose, 668 F.3d 943, 954 (7th Cir. 2012)). Judge Duffin explained that "a person is only 'in custody' for *Miranda* purposes 'if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest.'" Id. at 8 (quoting United States v. Patterson, 826 F.3d 450, 455 (7th Cir. 2016)).

Judge Duffin commented that relevant factors for the "in custody" determination included "'the location of the questioning, its duration, statements made during the interrogations, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning.'" Id. at 8-9 (quoting United States v. Borostowski, 775 F.3d 851, 859-80 (7th Cir. 2014)). He observed, however, that "'there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest.'" Id. at 9 (quoting United States v. Bullock, 632 F.3d 1004, 1016 (7th Cir. 2011)).

Turning to the facts of this case, Judge Duffin started with the fact that when the defendant "stepped out of the house" at 4631 N. 35th Street, the police officers determined that he matched the description of the man the postal worker had described. Id. Because the postal worker had informed officers that the suspect had a gun, Judge Duffin concluded that it was reasonable for officers to place the defendant in handcuffs while they determined whether he was armed. Id. The question at that point, Judge Duffin said, was whether a reasonable person in the defendant's position would have concluded that he was not free to leave. Id. Because the only thing the officers had told the defendant at that point is that they were cuffing him until they could figure out what was going on, Judge Duffin determined that a reasonable person would not yet have believed himself to be "in 'custody' as that term is used for *Miranda*-warning purposes." Id. at 10. Given that, Judge Duffin held

that the statement the defendant made while the officers were patting him down—that he had had a water gun earlier—was admissible. Id.

Next, Judge Duffin considered the statement the defendant had made to Wilkiewicz as they walked to the squad car; Wilkiewicz asked the defendant if something had happened earlier with the defendant's dog, and the defendant responded that a mailman had sprayed his dog and that he had pulled a water gun that looked like a .45 on the carrier. Id. Judge Duffin concluded that a reasonable person would not have considered himself in custody at this point, either. Id. Judge Duffin based this conclusion on the facts that (a) the discussion took place in front of the defendant's home, in broad daylight and in front of his wife; (b) Wilkiewicz did not raise his voice; (c) the exchange resembled a conversation; (d) none of the officers put a hand on their weapons; (e) none of the officers told the defendant he was under arrest; and (f) the conversation took place moments after the defendant stepped out of his house. Id. at 10-11. Judge Duffin conceded that this was a close call, noting that several officers were present at the time of the conversation, that Wilkiewicz was controlling the defendant's movements by directing him to the squad car, and that the defendant remained in handcuffs. Id. at 11. Judge Duffin came to the conclusion, however, that the defendant made the statement about pulling the water gun on the mail carrier under Terry-stop-like conditions, rather than conditions that would lead him to believe he was under formal arrest. Id.

The government conceded (under, Judge Duffin concluded, the wrong standard) that once the defendant repeated his assertion that he'd pointed the

water gun at the postal worker, he was in custody. Id. at 11-12. Judge Duffin accepted that concession, and determined that all statements from that point forward were made while in custody, and that, because the officers had not provided the defendant with his Miranda warnings, that statement, and all the statements the defendant made in the squad car, should be suppressed. Id. at 11-15.

2.  *Motion to Suppress Physical Evidence*

Regarding the defendant's motion to suppress physical evidence, the defendant argued first that the officers had unlawfully arrested the defendant (a prelude to the defense argument that the unlawful arrest of the defendant rendered his wife's consent to search the home involuntary).

Judge Duffin noted that "[a]fter the police asked Mrs. Polnitz to have her husband come to the door, [the defendant] came to the door and, at Wilkiewicz's request, stepped outside." Id. at 17. Judge Duffin remarked that "there was very little time for the police to make a determination while [the defendant] was still in the house as to whether he matched the description given to them by the postal worker of the person who pointed a gun at him." Id. at 17-18. In effect, he concluded—contrary to the defendant's assertions—that the officers did not have time to hide their intentions in order to draw the defendant out of his house. Id. at 18 (citing Flores v. Lackage, 938 F. Supp. 2d 759 (N.D. Ill. 2013)). Because Judge Duffin already had found that the officers did not arrest the defendant until after he stepped out of the house and told them he had pointed a water gun that looked like a .45 at the postal worker,

Judge Duffin concluded that the officers lawfully had arrested the defendant. Id.

Judge Duffin further reasoned that even if the officers *had* unlawfully arrested the defendant, the unlawful arrest would not have tainted Mrs. Polnitz's consent to search the home. Id. at 18-19. Judge Duffin observed that while Mrs. Polnitz initially appeared reluctant to consent to a search—despite officers warning her that if she did not cooperate they would get a search warrant and a SWAT team would break down the door and tear the home up— she ultimately agreed to retrieve the firearm. Id. at 18. Judge Duffin found that "the statement regarding the SWAT team returning was not merely a pretext to induce submission and did not taint Mrs. Polnitz's consent." Id. at 18 (citing United States v. Evans, 27 F.3d 1219, 1231 (7th Cir. 1994)). Finally, he reasoned that while the officers' conduct in motioning for the defendant to leave his home could be considered close to the line of permissibility, "that action in no way rises to a 'flagrant' level of illegal conduct such that Mrs. Polnitz's consent to retrieve the firearm was tainted." Id. at 19. He determined that the fact that the defendant immediately stepped outside dissipated any possible taint created by the request. Id. Judge Duffin recommended that the court deny the motion to suppress physical evidence.

D.    Government's Objections (Dkt. No. 25)

The government objected to the part of Judge Duffin's report that recommended that this court suppress the defendant's statement while in the squad car "describing the 'water gun' in response to the question of where the

water gun is[.]" Dkt. No. 25 (quoting dkt. no. 24 at 19). The government contends that the police officer's question of "so, you said it was a water gun, where is that water gun?" was a permissible follow-up question that the police officer could ask the defendant. Id. (citing Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir. 1990)). The government asserts that the defendant volunteered his earlier statement that he had a water gun, and that the "reasonable follow-up questions" should not have required officers to Mirandize the defendant. Id. at 3.

E.     Defendant's Objections (Dkt. No. 28)

The defendant objects to Judge Duffin's recommendation on the motion to suppress physical evidence, as well as his recommendation on the motion to suppress statements as it pertained to the defendant's statements (1) during the initial encounter with the officers outside the residence and (2) during the defendant's walk to the squad car. Dkt. No. 28.

## II.  Analysis

A.     Standard

Rule 59(b) governs dispositive motion practice initiated before magistrate judges. Fed. R. Crim. P. 59(b). Parties have fourteen days to file "specific written objections" to a magistrate judge's report and recommendation on a dispositive motion. Fed. R. Crim. P. 59(b)(2). When reviewing a magistrate's recommendation, the district judge must review *de novo* the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court can "accept, reject, or modify, in whole

or in part, the findings or recommendations made by the magistrate." 28 U.S.C.

§636(b)(1).

B.     Motion to Suppress Statements

The Fifth Amendment provides, in relevant part: "No person . . . shall be

compelled in any criminal case to be a witness against himself . . . ." U.S.

CONST. amend. V. In Miranda v. Arizona, the Supreme Court effectuated the

Fifth Amendment's privilege against self-incrimination in the context of

custodial interrogations, holding that

> the prosecution may not use statements, whether exculpatory or
> inculpatory, stemming from custodial interrogation of the defendant
> unless it demonstrates the use of procedural safeguards effective to
> secure the privilege against self-incrimination. By custodial
> interrogation, we mean questioning initiated by law enforcement
> officers after a person has been taken into custody or otherwise
> deprived of his freedom of action in any meaningful way.

Miranda v. Arizona, 384 U.S. 436, 444 (1966). In other words, "if the police

take a suspect into custody and then ask him questions without informing him

of the rights enumerated above, his responses cannot be introduced into

evidence to establish his guilt." Berkemer v. McCarty, 468 U.S. 420, 428

(1984). However, "[t]he privilege against self-incrimination is not imperiled by

every conversation with the government. Instead, the concern in *Miranda* was

with the inherently coercive nature of custodial interrogation. Accordingly, a

suspect must be both in custody and subjected to interrogation before *Miranda*

warnings are required." United States v. Ambrose, 668 F.3d 943, 954 (7th Cir.

2012). The Supreme Court put it this way:

> Two discrete inquiries are essential to the determination: first, what
> were the circumstances surrounding the interrogation; and second,

given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' line and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

Thompson v. Keohane, 516 U.S. 99, 112 (1995).

The defendant's motion alleges that the defendant was "in custody" at the time of all his statements. "[W]hether a suspect is 'in custody' is an objective inquiry," J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011), assessed from the perspective of a reasonable person in the defendant's position, Yarborough v. Alvarado, 541 U.S. 652, 663 (2004). It requires the court to ask whether a person "would have felt he or she . . . was at liberty to terminate the interrogation and leave." Keohane, 516 U.S. at 112. "'[S]ubjective views harbored by either the interrogating officers or the person being questioned' are irrelevant. The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." J.D.B., 564 U.S. at 271 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)).

"In determining whether a reasonable person in the suspect's shoes would have felt free to leave, we consider 'all of the circumstances surrounding the interrogation.'" United States v. Patterson, 826 F.3d 450, 455 (7th Cir. 2016) (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)). Relevant factors include: "(1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation; (4) any use of physical restraints during the interrogation; and (5) whether the

suspect was released at the end of the interrogation." Id. (citing Howes, 565

U.S. at 509). The Seventh Circuit has put a finer point on these factors, asking

> whether the encounter occurred in a public place; whether the suspect consented to speak with officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

United States v. Littledale, 652 F.3d 698, 701 (7th Cir. 2011).

The defendant says that "[t]he central problem with [Judge Duffin's] Recommendation is that it is based on an unrealistic 'reasonable person.'" Dkt. No. 28 at 6. He argues that "[a]t no point during [the defendant]'s encounter with officers was he free to disregard them," and that even if there was uncertainty about the defendant's custodial status, that uncertainty disappeared once Officer Wilkiewicz escorted the defendant to the squad car. Id. at 9. The defendant asserts that Judge Duffin erred in concluding that a reasonable person would not have believed himself to be in custody until the moments officers told him that he was in custody.

The defendant argues that he

> was removed from his home, which was surrounded by officers. He was handcuffed immediately. He was told where to move and where not to move. He was told he matched the suspect. He tried to obtain some personal property but was not allowed to do so. He was escorted, with his hands cuffed behind his back, and an officer grasping his arm. The officer told [the defendant] three times, that he was going to talk to him about what happened. The officer told [the defendant] twice that he was taking him to his squad. The officers outnumbered him significantly.

Dkt. No. 30 at 4 (internal citations omitted).

As the defendant notes: "Judge Duffin essentially broke the encounter with [the defendant] down into three separate parts: 1) the initial encounter between [the defendant] and the officers outside the residence; 2) the walk to the squad car; and 3) [the defendant's] statements inside the squad car after being told he was under arrest." Dkt. No. 28 at 5. The court will use that same format to consider the defendant's arguments.

1. *Initial encounter outside of residence.*

Regarding the factors the Seventh Circuit laid out in <u>Patterson</u>: The location of the initial interrogation of the defendant was right outside his front door, during the day. The duration of the interrogation was a few seconds, and it involved only a couple of questions—whether the defendant had any guns or weapons on him. The defendant made a couple of statements at this point. First, he responded to the questions, answering that he did not have any guns or weapons on his person. This was in response to direct questions by the officers—they asked if he had weapons on him, and the defendant answered that he didn't. After giving that answer, however, the defendant volunteered— without being asked any follow-up questions—that he had earlier had a water gun. The defendant was physically restrained at the time he made these statements—he was in handcuffs. And officers did not release him at the end of this short interrogation.

Regarding the factors the Seventh Circuit laid out in <u>Littledale</u>: The initial interrogation was out in the open, outside of the defendant's home, and thus occurred in a public space. While the defendant did not give explicit consent to

speak to the officers, he volunteered the information about having had a water gun earlier; that statement was not in response to any follow-up question by the officers. The officers did not tell the defendant that he was not under arrest, nor did they tell him that he was free to leave, but they *did* tell him that they were handcuffing him "until" they could figure out what was going on. This phrasing implied that there would be an end to the restraint. Contrary to the defendant's characterization, the officers did not move the defendant to another area. The defendant argues that he was "removed" from his house. The video does not support this characterization. The video shows that the defendant appeared at the door, Wilkiewicz gestured for him to come out, and said, "Do me a favor and step out for me real quick." Ex. 3 at 3:52. The defendant complied with that reasonable request. Complying with an officer's request is not the same thing as being removed from one's home by the police. There was a presence of other officers, although it is hard to say whether that presence was "threatening;" from what one can see on the body camera footage, the officers were just standing around. No officers yelled or displayed weapons or threatened physical force. Finally, none of the officers were using forceful or aggressive tones of voice at this point.

The court agrees with Judge Duffin's conclusion that, at this point, a reasonable person would not have believed that he was in custody. The officers politely (but firmly) asked the defendant to step outside, and he complied. The officers had told him that they were cuffing him until they could figure out what was going on. They had not taken him anywhere, and had asked him only

15

a couple of questions—both related to whether he had any guns on him. The defendant answered that question, then voluntarily added that he'd had a water gun earlier. The defendant was not "in custody" when he stated that he had earlier had a water gun.

　　2. *Walk to the squad car*

　　　　a. "In custody"

Next, Officer Wilkiewicz told the defendant that they were going to walk over to the squad car and talk. The body camera footage shows Officer Wilkewicz standing on the right side of the defendant, escorting him along the sidewalk toward his squad car, which is parked on the next block. Ex. 3 at 4:46-5:35. The walk takes approximately fifty seconds. Exhibit Two shows that a second officer walked behind the defendant and Officer Wilkiewicz on the way to the squad car. Ex. 2 at 4:42-4:45. As Officer Wilkiewicz walks the defendant towards the squad car, he asks the defendant whether something happened earlier that day with the defendant's dog. Ex. 3 at 4:50.

As the recommendation noted, the government conceded that the <u>Terry</u> stop turned into an arrest during the walk to the squad car. Dkt. No. 24 at 11 (citing dkt. no. 17 at 9). But the government did not concede that the defendant was in custody for the entire walk to the car; the government appears to have asserted that a non-custodial stroll became a custodial situation "when [the defendant] repeated the false exculpatory that he had only threatened the mail carrier with a water gun." Dkt. No. 17 at 9.

The court disagrees. The court concludes that the moment Officer Wilkiewicz told the defendant that they were going to walk over to the squad car, the situation changed. At that point, Wilkiewicz moved the defendant; that changes one of the factors. He directed the defendant's actions. In contrast to the request that the defendant do the officers a favor and step outside of the house, Wilkiewicz's statement that they were going to go to the car constituted a directive. Another officer joined the two on the walk—the defendant was not only handcuffed at this point, but flanked by two police officers. By this time, the officers knew that the defendant did not have any weapons; they had patted him down. At that point, the defendant reasonably could have concluded that he was not in handcuffs for a momentary pat-down; he now was in handcuffs because he was not free to leave.

The court is at a loss to figure out how part of the fifty-second walk to the squad car could have been non-custodial, and the other part custodial. What was it about the defendant's *second* statement about pulling a water gun that looked like a .45 on the mail carrier that converted a handcuffed, escorted, involuntary walk to the police car from a non-custodial situation into a custodial one? The court concludes that the defendant was in custody for the entire walk to the squad car.

### b. "Interrogation"

The next question is whether the statements the defendant made during that walk were in response to an interrogation. The court finds that they were.

> [T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where

> a suspect in custody is subjected to interrogation. 'Interrogation,' . . . must reflect a measure of compulsion above and beyond that inherent in custody itself.

Rhode Island v. Innis, 446 U.S. 291, 300 (1980). As the Seventh Circuit has put it:

> In *Rhode Island v. Innis* the Supreme Court explained that 'interrogation' refers to 'express questioning' as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. The test we employ in our application of *Innis* is 'whether a reasonable objective observer' would have believed that the law enforcement officer's statements to the defendant were 'reasonably likely to elicit an incriminating response.'

United States v. Swanson, 635 F.3d 995, 1002 (7th Cir. 2011) (citations omitted). By contrast,

> Volunteered statements of any kind are not barred by the Fifth Amendment. [Miranda, 384 U.S. at 478]. If a defendant makes a statement in response to words or actions by the police that do not constitute interrogation or if the defendant himself further initiates further communications, the police are not prohibited from 'merely listening to his voluntary statement.

United States v. Jones, 600 F.3d 847, 854-55 (7th Cir. 2010).

When Officer Wilkiewicz began walking the defendant to the car, he told the defendant that the other officers were going to talk to the defendant's wife. Ex. 3 at 4:47. As Officer Wilkiewicz and the defendant turned onto the sidewalk from the front stoop, the following exchange occurred:

| Wilkiewicz: | Alright. We're just gonna come to the car, we're gonna talk, I'm gonna figure out what's going on. Something happened with your dog earlier? |
| Defendant: | Yeah, the mailman sprayed my dog. |
| Wilkiewicz: | Right, that's what we're here about. Okay. |

18

| Defendant: | I confronted him, yeah. And I know, I pulled out the water gun on him. |
|---|---|
| Wilkiewicz: | Well, I want to get your story, okay. I want to get your story, but obviously, you have—you are semi- |
| Defendant: | It was like a .45, it looked like a .45 [unintelligible] |
| Wilkiewicz: | Okay, well obviously you're aware of why we're here, okay, so we're gonna talk— |
| Defendant: | [unintelligible – repeating story about mailman] |
| Wilkiewicz: | Right, well, like I said, you know, you can't be doing that, you can't be doing that. |

Ex. 3 at 4:50 - 5:40.

Officer Wilkiewicz's first question on the walk—"something happened with your dog earlier?"—was reasonably calculated to elicit an incriminating response. The question made clear that Wilkiewicz knew that something had happened earlier in the day, that it had involved the defendant's dog and that Wilkiewicz was trying to get information about that event. Even before that, while the defendant was still right outside the front door, the officers had discussed in his hearing whether he "fit the description," demonstrating that the officers had gone to the house trying to find someone who fit the postal carrier's description of the person who'd pulled the gun on him. The only reason Wilkiewicz could have had for asking whether something had happened earlier in the day involving the dog—and for all his statements and questions that followed during the walk to the car—was to try to elicit from the defendant incriminating statements about what had happened with the postal carrier.

The defendant was in custody during the entire walk to the car. Every statement he made on that walk was in response to interrogation. Because the officers had not given the defendant his <u>Miranda</u> warnings, the court finds that all the statements the defendant made on the walk to the car must be suppressed.

3. *Inside the squad car*

Judge Duffin concluded that once the defendant reached the car and the officers informed him that he was under arrest, the defendant was "in custody" for <u>Miranda</u> purposes. Dkt. No. 24 at 12. He identified three questions Wilkiewicz asked that were designed to elicit incriminating responses:

- Wilkiewicz asked, "You've been arrested before, obviously, are you a convicted felon?" The defendant responded, "Yes I am, that's why I got no guns."

- Wilkiewicz followed up by asking if the defendant had guns in his house, and the defendant responded, "I don't have a firearm, I am a felon, I cannot have a firearm, there should not be no firearms in the house."

- Wilkiewicz asked, "So, you said it was a water gun, where is that water gun?," and the defendant said that the water gun was at his job. After a few questions about the nature of the defendant's job, Wilkiewicz asked, "So after the incident you went back up there and put it [the water gun] back?" The defendant responded in the affirmative, indicated that his wife did not know what had happened, and provided other details. Wilkiewicz also asked the color of the water gun; the defendant answered that it was black and orange with a purple bottom

Dkt. No. 24 at 14.

Judge Duffin concluded that this court should suppress all the defendant's statements that followed these questions. The government objects, arguing that the court should not suppress the responses to the questions

about the location of the water gun and its color. Dkt. No. 25 at 2-3. The government characterizes these questions as "reasonable follow-up questions" to the defendant's first statement, in front of his house, that he earlier had a water gun. It likens the situation to one where the Seventh Circuit found that an officer's asking "who?" in response to an in-cutody suspect's volunteered statement, "I stabbed her," did not constitute interrogation. Id. at 3 (citing Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir. 1990)).

The facts of this case are different from those in Thieret. The defendant in that case was in custody when he volunteered, rather out of the blue and unrelated to what was going on at the time, that he'd stabbed "her." Thieret, 903 F.2d at 531. The defendant made that statement as the officer was asking him whether he was armed; the statement bore no relation to the question the officer had asked, and the Seventh Circuit noted that Miranda "does not apply to volunteered statements." Id. at 532 (citing Miranda, 384 U.S. at 478). The officer's immediate "who?", the Seventh Circuit concluded, was a "neutral response, intended to clarify Anderson's puzzling declaration; it was not coercive interrogation that *Miranda* seeks to prevent." Id. It was as if the officer's question constituted an "excited utterance" in hearsay parlance—he was taken aback by the seeming non-sequitur from the defendant, and sort of blurted out, "who?" Rather than deliberately asking a question with the intention of eliciting incriminating evidence, the officer was trying to place the unsolicited statement in context.

Unlike the officer in <u>Thieret</u>, Wilkiewicz had a context in which to place the defendant's statement that he'd had a water gun earlier. The officers had gone to the defendant's house precisely because the mail carrier had reported that someone had pulled a gun on him. The defendant—who matched the postal carrier's description—had volunteered that he'd had a water gun after the officers had asked him if he had any guns on his person. By the time the defendant was in the squad car and under arrest, Wilkiewicz knew that the defendant was claiming that the gun he'd pointed at the postal carrier was a water gun that looked like a .45. Wilkiewicz asked the questions in the squad car, not because the defendant had blurted out something that didn't make any sense, but because Wilkiewicz was trying to draw out further details of a story he believed to be false. That is the very definition of asking questions that one knows are likely to elicit an incriminating response.

The court agrees with Judge Duffin, and will suppress the statements the defendant made in the squad car.

> C.      <u>Motion to Suppress Physical Evidence</u>

The defendant objects to Judge Duffin's determinations that (a) officers did not unlawfully arrest the defendant and (b) that even if the arrest was unlawful, the defendant's arrest did not taint the defendant's wife's voluntary consent for officers to obtain the firearm. Dkt. No. 28 at 9.

> 1.   *Officers lawfully arrested the defendant.*

In his original motion to suppress, the defendant argued that the police unlawfully arrested the defendant, because they "essentially arrested him in

his home without a warrant." Dkt. No. 8 at 3. He asserted that some seven officers surrounded his home and "compelled" him to leave it, did not announce their intention to arrest him and did not have a warrant. Id. at 5. In his objection to Judge Duffin's recommendation, the defendant argued that "the combination of an overwhelming presence and the officers' withholding of their intentions to arrest [the defendant] rendered this arrest unlawful." Dkt. No. 28 at 11. The defendant made these arguments, not because he asked the court to invalidate the arrest, but because he argued that the *defendant's* unlawful arrest rendered *his wife's* consent involuntary.

At first glance, it was not clear to the court why the defendant insisted that the question of whether the officers lawfully arrested him was somehow related to the question of whether his wife's consent to search their home was voluntary. Whether the defendant's arrest was lawful or unlawful seemed, to this court, less relevant to the voluntariness of his wife's consent than the question of whether what Mrs. Polnitz observed the police doing with her husband influenced her decision to consent.

It appears, however, that the defendant's insistence that his arrest was unlawful is an attempt to take advantage of the Seventh Circuit law holding that "[c]onsent given during an illegal detention is presumptively invalid." See United States v. Cellitti, 387 F.3d 618, 622 (7th Cir. 2004) (citations omitted). The defendant appears to argue that if the officers illegally detained *him*, the presumption discussed in Cellitti arises applies to consent given by his *wife*. This argument, the court believes, misapprehends the Cellitti presumption.

As the facts of Cellitti and other cases demonstrate, that presumption arises when the person giving the consent is the person illegally detained. In Cellitti, police obtained consent from the defendant's fiancée after she had been "placed in handcuffs, driven to the police station, locked in a holding cell, and chained to a bench for several hours." Id. In United States v. Pedroza, 269 F.3d 821, 827 (7th Cir. 2001), the defendant consented to search after *he* was illegally detained. In United States v. Jerez, 108 F.3d 684 (7th Cir. 1997), the defendants consented to the search of their hotel room after the officers refused to leave it.

In each of these cases, the court deemed consent involuntary because law enforcement obtained consent from someone who, him- or herself, was being illegally detained. In this case, it was *the defendant* who was detained, not Mrs. Polnitz. *Mrs. Polnitz*, the person who gave the consent, never was detained (as the court will explain below in the discussion of the motion to suppress physical evidence). It seems that the defendant's linking of the question of whether the *defendant's* arrest was illegal with the question of whether *his wife's* consent to search was voluntary seeks to stretch the Cellitti presumption too far.

Regardless, Judge Duffin concluded that the defendant's arrest was lawful, and the defendant has objected to that conclusion. So the court will consider the issue.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures . . . ." U.S. CONST. amend. IV.  It is a "'basic principle of Fourth

Amendment law' that searches and seizures inside a home without a warrant

are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586

(1980) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 477-78 (1971)). On

the other hand, "police officers may constitutionally arrest an individual in a

public place (e.g. outside) without a warrant, if they have probable cause."

Sparing v. Vill. of Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001) (citing

United States v. Watson, 423 U.S. 411, 417-24 (1976)).

The defendant concedes that the "bright line" of whether one is inside or

outside of one's home, for Fourth Amendment purposes, "gets a bit murkier

when a person is inside the home and exits the home at an officer's request."

Dkt. No. 28 at 10. The defendant cites cases from the Third, Sixth, Ninth and

Tenth Circuits, as well as from the Eastern District of New York, for the

proposition that police cannot use overwhelming force outside a person's home

to compel them to exit. Id. at 11 (collecting cases). He also argues that police

cannot hide their intentions to arrest someone to trick them into stepping

outside the threshold of the home. Id. (citing United States v. Berkowitz, 927

F.2d 1376, 1386 (7th Cir. 1991)). In this regard, the defendant argues that the

officers did not need to have the defendant step outside in order to identify

him: officers had gone to the house the mailman identified, had seen the van

the mailman had described, and "when [the defendant] came to the door it was

apparent that he was the man the mailman described. He was a black male

with ear-length dreadlocks. His orange shorts were clearly visible through the storm door." <u>Id.</u> at 12.

The court agrees with Judge Duffin that the officers did not "hide" their intentions for the purpose of luring the defendant out of his home against his will. The defendant insists that the officers came to his home with the intent to arrest him. The evidence does not support that contention; it appears that the officers went to the residence to investigate the postal carrier's allegations.

More to the point, there is nothing in the record to support the defendant's allegation that the officers tried to "hide" whatever their intentions were. The officers first encountered the defendant's wife—she responded to their knock. They explained to the defendant's wife that they were there regarding an incident with a dog, and that they needed to talk to "you guys"—presumably the defendant and his wife—to figure out what happened. If the officers were trying to hide their intentions, they would have done better simply to demand to see the defendant, without explaining to the defendant's wife why there were there. Once the defendant appeared at the door, events unfolded very quickly—Wilkiewicz gestured and asked the defendant to do him a favor and step outside, the defendant complied immediately, and the officers told him they were cuffing him while they figured out what was going on. From the moment the defendant appeared behind the screen door until the moment the officers placed him cuffs, only seconds elapsed. The court agrees with Judge Duffin that there was hardly enough time for the officers to take action to

"hide" their intentions during those seconds, especially given that they'd already told the defendant's wife why they were there.

Nor does the court agree with the defendant that the officers used an "overwhelming" show of force to compel him to come out of his house. The defendant appears to base this assertion on the fact that there were more than one or two officers present at the defendant's home when these events took place (the body cam footage shows at least five; the defendant has argued there were seven). The mere fact that there were several officers present does not constitute an overwhelming show of "force." As was the case in United States v. Drayton, 536 U.S. 194, 204 (2002), "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." The video footage shows a cooperative encounter— Wilkiewicz politely gesturing to the defendant (who may well have known from his wife why the officers were there), asking the defendant to "do him a favor" and step outside, and the defendant complying.

The Seventh Circuit has held that similar but more intrusive facts would not violate the Fourth Amendment. In Sparing, the Seventh Circuit remarked that

> if the police go to an individual's home without a warrant, knock on the door, announce from outside the home that the individual is under arrest when she opens the door to answer, and the individual acquiesces to a slight entry to complete the arrest, the entry is reasonable under the Fourth Amendment and consistent with *Payton* [*v. New York*, 445 U.S. 573 (1980)].

Sparing, 266 F.3d at 690 (citing United States v. Berkowitz, 927 F.2d at 1387)). The court concluded that the officer in Sparing did violate the Fourth Amendment, however, because Sparing did not consent to a "slight entry;" he remained inside his home, behind a closed screen door, and the officer opened that door without consent. Sparing, 266 F.3d at 690. The court said that, with the defendant standing behind a closed screen door, inside the house, the arrest could have been completed only if the defendant "opened his screen door, and stepped outside of his home." Id. That is exactly what the defendant did here.

The court has found that it was not until Wilkiewicz started walking the defendant from his front stoop to the squad car that the defendant had reason to believe he was not free to leave. That took place outside the defendant's home, in public, in broad daylight, without threats or "overwhelming" force from the officers. The arrest was not unlawful.

2. *Mrs. Polnitz's consent was voluntary.*

The court has found that (a) the defendant was not unlawfully arrested, and (b) even if he had been, the unlawfulness of his arrest would not have given rise to a presumption that his wife's consent was involuntary. Now the court turns to the circumstances surrounding Mrs. Polnitz's consent. The defendant argues that "[w]ithin moments of [the defendant's] arrest, the officers began working on getting consent from Mrs. Polnitz . . . . The officers used deception to coax [the defendant] out of his home, then began threatening his wife." Dkt. No. 28 at 13-14.

28

The Fourth Amendment dictates that "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." Riley v. California, ___U.S.___, 134 S. Ct. 2473, 2482 (2014). "One such exception is voluntary consent to search." United States v. Thurman, 889 F.3d 356, 365-66 (7th Cir. 2018). "The Fourth Amendment requires that 'consent not be coerced, by explicit or implicit means, by implied threat or covert force,'" and its voluntariness "is a question of fact informed by the totality of circumstances." Id. Id. at 367 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973)). The Seventh Circuit has enumerated several criteria to guide the analysis, including:

> the person's age, education, and intelligence; (2) whether [s]he was advised of [her] constitutional rights, (3) how long [s]he was detained before [s]he gave [her] consent, (4) whether [her] consent was immediate or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when [she] gave [her] consent[1].

United States v. Johnson, 495 F.3d 536, 542 (7th Cir. 2007) (citing United States v. Sandoval-Vasquez, 435 F.3d 739, 744 (7th Cir. 2006). Voluntariness does not depend on the presence or absence of a single factor, however; the determination requires "careful scrutiny of all the surrounding circumstances." United States v. LaGrone, 43 F.3d 332, 334 (7th Cir. 1994). Where a defendant claims that the government coerced consent, the government bears the burden

---

[1] Again, if *Mrs. Polnitz* was in custody when she gave the consent, the Cellitti presumption would have applied.

of showing otherwise by a preponderance of the evidence. Thurman, 889 F.3d at 367.

The court does not have a full record as to Mrs. Polnitz's education and intelligence, but notes that from the video footage, she appears to be an adult, and appears fully capable of understanding what was going on with the police. Officers did not advise her of her constitutional rights, which arguably weighs against the voluntariness of her consent (although the court notes that because the officers were not investigating her or arresting her, it likely would not have occurred to them to advise Mrs. Polnitz of her Miranda rights). What transpired between Mrs. Polnitz and the officers on her front porch, however, weighs strongly in favor of a finding that her consent was voluntary.

At 5:40 in exhibit 2, Mrs. Polnitz steps out of the home to speak with officers. Ex. 2 at 5:40. Body camera footage shows that the officer with the body camera asks Mrs. Polnitz for her date of birth, where she lives, and if she knows why they're there. Id. at 5:40-6:06. Mrs. Polnitz begins smoking a cigarette. Id. The officer asks if she's aware that there was a run-in between her dog and the postal carrier earlier. Id. at 6:01. She answers yes, but that she didn't really know the details because she was on the phone with WE energies. Id. at 6:06-6:23. She explains that she had seen her dog rub her nose in the grass, as if the mailman had sprayed her or something. Id. at 6:23-6:45.

A second Milwaukee Police Officer appears at the front porch and asks Mrs. Polnitz to provide details about her dog; she responds and gives more information about where she saw the dog and the mailman during the

encounter. Id. at 6:45-7:42. Officers then ask Mrs. Polnitz whether she has paperwork for the dog, and inform her that the City of Milwaukee requires certain pre-requisites for pitbull ownership. Id. at 7:42-8:50.

Next, the second officer inquires: "what's going on with him today . . . the guy that's in my partner's squad car, what's going on with him today?" Id. at 9:00. She answers that she doesn't know, but hopes that the officers can let her know what is going on "especially with this kind of presence." Id. at 9:06-9:13. The second officer questions whether there are any firearms in the house and whether the defendant owns any firearms. Id. at 9:15. Mrs. Polnitz answers "no" to both questions. Id.

Following up on those responses, the second officer states, "well, that's kind of why we're here." Id. at 9:19. He goes on to explain that their investigation hinges on the belief that the defendant has a firearm and that "it's probably in your best interest to help us out, because we can help you out with a lot of things that are going on with that dog." Id. at 9:32-9:42. The second officer explains that the two plainclothes officers are federal law enforcement officers and that cooperation is in everyone's best interest because "we just want to recover that firearm." Id. at 9:42-10:20.

At this point, a postal inspector begins asking questions. The exchange is as follows:

| | |
|---|---|
| Postal Inspector: | Do you have a CCW? Do you have a carry and conceal? (Id. at 10:19-10:22) |
| Mrs. Polnitz: | No. (Id. at 10:23) |
| Postal Inspector: | Okay. (Id. at 10:24) |

31

Second Officer:     Is he a felon by any chance? (Id. at 10:24-10:25)

Mrs. Polnitz:       Yes. (Id. at 10:26)

Second Officer:     He is a felon? (Id. at 10:27)

Mrs. Polnitz:       Mmmhhmm. (Id. at 10:28)

Postal Inspector:   Are there any firearms in the house, uh, building? (Id. at 10:31-10:33)

Mrs. Polnitz:       Mmmhhmm. (Id. at 10:34)

Second Officer:     And where is that firearm located? (Id. at 10:36-37)

Mrs. Polnitz:       In my room. (Id. at 10:38)

Second Officer:     Okay, can we retrieve that firearm? If not, I'm going to have to get a search warrant for your premises. And then the SWAT team is going to come in, they're gonna knock that door down, and they're gonna tear up your house to get that firearm. And, I can sit here all night waiting for that search warrant to be signed by a judge. It's just easier to just fork over the firearm and we'll be out of your hair with everything. (Id. at 10:40-11:04)

Mrs. Polnitz:       I'm just trying to understand how the firearm that is here from my home would have been linked to my husband, who was at work. (Id. at 11:05-11:20)

Second Officer:     Okay, I'm gonna be honest with you because he pulled that firearm out on that postal worker for spraying the dog. That's what happened, that's why we're here. That's why the, uh, postal police are here too. That's why we're here. I'm not going to lie to you, I'm not going to bullshit you. That's why we're here. He pulled the gun out on the post off—he pulled the gun out on a federal employee. (Id. at 11:20-11:42)

Postal Inspector:   What type of firearms do you have? (Id. at 11:43-11:44)

Mrs. Polnitz:       I have a shotgun and a .38. (Id. 11:45-11:47)

Postal Inspector:   Okay. Okay. So, yea, we're gonna have to retrieve them and it's just easier if you hand them over—are they in your name? (Id. at 11:49-11:11:56)

| | |
|---|---|
| Mrs. Polnitz: | Mmhmm. (Id. at 11:57) |
| Postal Inspector: | Okay. So, uh, you have—you've registered them, you've purchased them? (Id. at 11:58-12:02) |
| Mrs. Polnitz: | Mmhmm. (Id. at 12:02) |
| Postal Inspector: | Okay. So, yeah, we need to get those firearms. So. (Id. 12:03-12:05) |
| Second Officer: | We'll give you a property receipt for the firearms. We'll give you all the necessary paperwork for you to retrieve those firearms once the case is done. Okay. If that's the easiest way to go, you can either, um, relinquish the custody of the firearms to us, or else we can get a search warrant for the premises and it's just a lot easier to give us the firearms, we'll give you a property receipt and it's—it's just pure cooperation on your part, based on the circumstances of what happened today. (Id. at 12:11-12:39) |
| Mrs. Polnitz: | That's why I'm confused. (Id. at 12:47-12:49) |
| Postal Inspector: | What are you confused about? (Id. at 12:50) |
| Mrs. Polnitz: | I'm confused about how he pulled a gun out on a postal service that's here, [unintelligible] here. (Id. 12:51-12:59) |
| Postal Inspector: | Yeah, we're confused about that too, because that's not a right thing to do. Okay. And so that's why we're here. If you could imagine no one wants a firearm pulled out on them—especially for protecting themselves. So, like the officer said, we'll retrieve the firearms, we'll give you a receipt, and then you can go through the paperwork to retrieve them back. If they're in your name and you legally possess them, then once it's determined, you'll be able to get your firearms back. (Id. at 12:59-13:28) |

At 13:32, Mrs. Polnitz takes a couple of steps towards the Postal Inspector and lights her second cigarette.

| | |
|---|---|
| Postal Inspector: | What's your name ma'am? (Id. at 13:33) |

33

| | |
|---|---|
| Mrs. Polnitz: | Lorenzya. (<u>Id.</u> at 13:35) |
| Second Officer: | The only firearm that we really need is the pistol because that's the weapon that was identified in the crime. I don't necessarily need your shotgun. (<u>Id.</u> at 13:37-13:45) |
| Postal Inspector: | And you yourself, you don't want to be involved in this. You seem like a reasonable person right now. So, if we just retrieve the weapon then we could go ahead and do exactly what we came here to do. So. It's no need to make a big deal out of this or get you involved in it at all. So, like he said, the shotgun is not the gun that's in question, it's the handgun. (<u>Id.</u> at 13:45-14:07) |
| Mrs. Polnitz: | I guess [unintelligible] (<u>Id.</u> at 14:10-14:12) |
| Second Officer: | So basically what's going to happen is, all the necessary—uh—reports are going to be written regarding the incident, what happened with the postal worker, um, your boyfriend—is that your boyfriend or your husband? (<u>Id.</u> at 14:15-14:24) |
| Mrs. Polnitz: | My husband. (<u>Id.</u> at 14:25) |
| Second Officer: | Your husband? (<u>Id.</u> at 14:26) |
| Mrs. Polnitz: | Mmhmm. (<u>Id.</u> at 14:27) |
| Second Officer: | Your husband's statement, everything—and what's going to happen is it just needs to be turned into to the district attorney, [unintelligible] the information and what goes on with the case and whether they want to push forward with the issue or not. So. And if they don't push forward with the issue, you get your gun back. Simple as that. I'm not here to take all your guns. I'm just here to take the gun in question. And I know you have an inherent right to defend yourself and to defend your household. That's why I'm not going to take the shotgun, I just want to take the pistol—the weapon in question. That's all I really want. Is that something you'd be willing to help us out with? (<u>Id.</u> at 14:27-15:02) |
| Mrs. Polnitz: | I would be, it's just... I'm just kind of stuck on how the pistol is the weapon in question. (<u>Id.</u> at 15:01-15:10) |

| | |
|---|---|
| Second Officer: | Well, this is an accusation that's being made by a postal worker. Apparently, your husband came up to him and made threats about spraying the dog on—and then he pulled the gun on him.  That's—That's—That's—and I-I-I highly doubt that a postal worker is going to make some sort of embellished story about this. All the guy's doing is out here delivering everyone's mail. And, you know, that postal worker has a right to defend himself against animals too. That's why they're issued pepper spray. Okay, and, you know, it's unfortunate that your dog got out. It happens. Okay. It happens. Alright. There's no doubt about it happens. So. The postal worker needed to defend himself by spraying the dog and it's unfortunate that your husband got upset about it. And you know, you know, kinda upset about it. And what happened, happened. That's all it is. It's not a big deal. You're not in trouble by any way, shape, or form. (<u>Id.</u> at 15:11-16:16:14) |
| Mrs. Polnitz: | Okay. (<u>Id.</u> at 16:17) |
| Second Officer: | Would you show this officer where the pistol is?  I don't want you coming out with a loaded gun is what I'm saying. Or are you going to bring it to me unloaded? (<u>Id.</u> at 16:28) |
| Mrs. Polnitz: | I can bring it to you unloaded. (<u>Id.</u> at 16:29) |

The officers, the postal inspector and Mrs. Polnitz then have a brief discussion regarding the logistics of how Mrs. Polnitz would bring them the pistol. Ex. 2 at 16:33-17:50. Mrs. Polnitz enters the house to retrieve the pistol. <u>Id.</u> at 17:50. The officers wait at the door, and after several minutes, the officer with the body camera knocks at the door. <u>Id.</u> at 22:28. About a minute and a half later, Mrs. Polnitz arrives back at the door and the body camera officer goes inside of her house to get the gun. <u>Id.</u> at 23:58. The officer retrieves the gun from inside Mrs. Polnitz's home, and asks her if she would be willing to

bring the bullets as well. Id. at 24:40. She says that she will bring them down, and the officer leaves the home. Id. at 24:50.

The context in which this exchange occurred is relevant. The officers spoke calmly, and did not use an aggressive tone. Mrs. Polnitz stood outside her front door, unrestricted; officers did not handcuff or physically restrain her. She smoked one or two cigarettes during the conversation. Mrs. Polnitz talked with the officers for some ten minutes, and during that time, she continued to ask them how it could be that the gun in her house could be the gun that the postal carrier claimed the defendant at pointed at him, when she believed that her husband was at work. Nothing about the body camera footage indicates that Mrs. Polnitz was cowed by the officers, or overwhelmed by them, or that she felt threatened by them. Mrs. Polnitz is arguing with the officers, not about whether to let them into her home, but about whether her husband could have done what the postal carrier accused him of doing, given that she believed that he was at work and the gun was at her house.

The officers did not detain Mrs. Polnitz, did not physically coerce her, and never placed her in custody, three factors which weigh strongly in favor of the voluntariness of her confession. As for whether her consent was immediate and whether it was prompted by repeated requests by the authorities, Mrs. Polnitz acquiesced to the officers' request to retrieve her firearms after about ten minutes of talking. At 5:40 of Exhibit 2, the officers begin their conversation with Mrs. Polnitz and by 16:17 of Exhibit 2 she states "okay," and the officers begin arranging the logistics of retrieving the gun.

36

The defendant argues that the second officer's statement that they would get a warrant and that the SWAT team would tear up the house crossed a line. The Seventh Circuit has held more than once that "the threat to obtain a search warrant, by itself, does not vitiate a voluntary consent[.]" <u>United States v. Talkington</u>, 843 F.3d 1041, 1049 (7th Cir. 1988); <u>United States v. White</u>, 979 F.2d 539, 542 (7th Cir. 1992). "A baseless threat 'to obtain a search warrant may render consent to search involuntary.' Yet when the officer's 'expressed intention to obtain a warrant is genuine, . . . and not merely a pretext to induce submission, it does not vitiate consent to search.'" <u>United States v. Hicks</u>, 650 F.3d 1058, 1064 (7th Cir. 2011).

The officers' "threat" to obtain a warrant was not baseless. Even without the defendant's statements to Officer Wilkiewicz on the walk to the squad car and in the car, the officers on the porch had probable cause to get a warrant. They had heard the defendant state, in response to being asked whether he had weapons, that he had had a water gun earlier in the day. Beginning at around 10:20 of Exhibit 2, Mrs. Polnitz admitted that her husband was a felon. Shortly after, she admitted that the couple had firearms in the house and that those firearms were located in her room. Once she made these admissions, the officers knew that the defendant had lived in a house with guns despite his felony conviction. It was only after Mrs. Polnitz made these admissions that the officer standing to the left of the officer with the body camera stated that the police could get a search warrant and that the SWAT team would tear up the house.

As to the statement about the SWAT team tearing up the house, and the officers being prepared to wait all night for a warrant, Mrs. Polnitz's responses belie the defendant's argument that she was overwhelmed by these threats. The officer made these statements between 10:40 and 11:04 on the video footage. At this point, rather than saying, "Oh, no—don't do that! I consent," Mrs. Polnitz begins to ask the officers how her husband could have pulled a gun that was currently in her home on a postal carrier when he was at work. The discussion goes on for another 5 minutes and 45 seconds—with Mrs. Polnitz lighting up a second cigarette as it progresses. And she agrees to turn over the gun, not after the officer mentions the SWAT team tossing the house, but after the officers explain to her why they believe it unlikely that the postal carrier made up the story of the defendant pulling a gun on him.

In sum, of all the <u>Johnson</u> factors, the only ones that weigh against a conclusion that Mrs. Polnitz's consent was voluntary is the fact that the officers did not advise her of her constitutional rights. All other factors—and the video footage—support Judge Duffin's conclusion, and this court's conclusion, that her consent was voluntary.

## III. Conclusion

The court **GRANTS IN PART** the defendant's motion to suppress statements as it pertains to the statements the defendant made on the walk to the squad car and the statements he made inside the squad car. Dkt. No. 9. The court **OVERRULES** the government's objections to Judge Duffin's

recommendation that the court suppress the statements made in the squad car. Dkt. No. 25.

The court **DENIES IN PART** the defendant's motion to suppress statements as it pertains to the defendant's statement that he'd had a water gun earlier, made during the pat-down on his front stoop. Dkt. No. 9.

The court **OVERRULES** the defendant's objections to the recommendation to suppress physical evidence. Dkt. No. 28. The court **ORDERS** that the defendant's motion to suppress physical evidence is **DENIED.** Dkt. No. 10.

Dated in Milwaukee, Wisconsin this 19th day of July, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**