UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )     Case No. 17-CR-201
                                   )     Milwaukee, Wisconsin
        vs.                        )     November 26, 2018
                                   )     10:10 a.m.
DAVID E. POLNITZ,                  )
                                   )     **VOLUME 1**
                    Defendant.     )
                                   )
----------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:      United States Attorney's Office
                               By: Benjamin Taibleson and Zachary
                               Corey
                               517 E. Wisconsin Avenue, Room 530
                               Milwaukee, WI 53202
                               Ph: 414-297-1700

For the Defendant
DAVID E. POLNITZ:              Federal Defender Services of
(Present)                      Wisconsin
                               By: Joshua Uller
                               517 E. Wisconsin Avenue, Room 182
                               Milwaukee, WI 53202
                               Ph: 414-221-9901
United States Postal
Inspector Daniel York


U.S. Official Reporter:    SUSAN ARMBRUSTER, RPR, RMR,
Transcript Orders:         Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

```
                    T-R-A-N-S-C-R-I-P-T   I-N-D-E-X
```
                                                        Page

OPENING INSTRUCTIONS:                                 20 - 31

OPENING STATEMENT BY MR. COREY:                       31 - 39

OPENING STATEMENT BY MR. ULLER:                       40 - 43

                        WITNESSES CALLED

Kevin Phillips

Direct Examination by Mr. Corey:                      43 - 59
Cross Examination by Mr. Uller:                       59 - 78
Redirect Examination by Mr. Corey:                    78 - 82
Recross Examination by Mr. Uller:                     82 - 82

Officer Andrew Wilkiewicz

Direct Examination by Mr. Taibleson:                  83 - 91
Cross Examination by Mr. Uller:                       92 -103
Redirect Examination by Mr. Taibleson:               104 -104
Recross Examination by Mr. Uller:                    104 -105
Re-redirect Examination by Mr. Taibleson:            105 -105

Officer Marcel Stolz:

Direct Examination by Mr. Taibleson:                 106 -113
Cross Examination by Mr. Uller:                           113
  -119

Officer Dawn Veytsman:

Direct Examination by Mr. Taibleson:                 120 -124
Cross Examination by Mr. Uller:                      125 -128

Pamela Taylor:

Direct Examination by Mr. Corey:                     128 -135
Cross Examination by Mr. Uller:                      135 -136

Jury Instruction Conference:                         145 -163

Verdict Conference:                                  163 -164

```
 1                THE CLERK:  Court calls Case Number 17-CR-201, United
 2       States of America versus David Polnitz, Jr..  Please state your
 3       appearances starting with the attorneys for the Government
 4       first.
 5                MR. COREY:  United States Attorney Zach Corey.
 6                MR. TAIBLESON:  And Benjamin Taibleson for the United
 7       States.  With us at counsel table is Daniel York, United States
 8       Postal Inspector.
 9                MR. ULLER:  Good morning, Judge.  David Polnitz
10       appears with Josh Uller.
11                THE COURT:  Good morning.  Good morning, Mr. Polnitz.
12                DEFENDANT:  Morning.
13                THE COURT:  First of all, let me ask whether or not
14       the parties are ready to proceed to trial?
15                MR. TAIBLESON:  Yes, Your Honor.
16                THE COURT:  Defense?
17                MR. ULLER:  Yes.
18                THE COURT:  Let me first share with you a little bit
19       of information.  I know you indicated you wanted to select one
20       alternate juror.  I guess that's a good thing because I guess
21       since it's the day after the Thanksgiving holiday and snow is
22       predicted, which hasn't yet shown up, we only had only 31 of the
23       47 venire persons to show up.  We got a really low turn out.
24                I think hopefully that will be sufficient to let you
25       all do what you need to do, but it's, obviously, a smaller
```

1  number than what we had anticipated.  I wanted to share all of
2  that with you, number one.

3        Number two, I know that the Wednesday before the
4  holiday, the Government filed a Motion to Compel, and the
5  defense responded.

6        The Government's motion indicates that because it was
7  filed following the open file policy, that the defense has an
8  obligation -- a reciprocal obligation.  And specifically, as I
9  understand it, the Government is asking the defendant to produce
10 prior statements of any defense witnesses.

11       The Government, as I indicated, cites to the
12 reciprocal discovery policy, which is part of the open file
13 discussion in Criminal Local Rule 12.  It also -- The Government
14 also references 26.2 of the Federal Rules of Criminal Procedure
15 and indicates that if I don't grant the Motion to Compel at this
16 point, that there has to be a break at some point to allow the
17 Government to review whatever statements are provided.

18       The defense responded and indicated that it is not
19 obligated under Rule 16 to turn over the information the
20 Government is asking for, and that in terms of Rule 26, while it
21 is required to turn over that information if a witness
22 testifies, it's required to turn it over only after that witness
23 testifies.

24       I think the law is pretty clear and straightforward on
25 this.  Rule 16 specifically excludes from the obligation to turn

4

over statements made by defense witnesses.  So that rule is not
of assistance, at least to the Government.  And 26.2, as the
Defense points out, requires of either party that they must turn
over those statements after the witness has testified if a
demand has been made by the party who didn't produce the
witness.

I realize I'm the last person who wants this thing to
drag on and take breaks that we don't need to take, but that's
what the rule says.  And it sounds like the defense is prepared
to comply with that rule if and when they put witnesses on the
stand.  Until that happens, I think that's what we're stuck
with.  I'm going to deny the Motion to Compel.

With regard to the voir dire, I put a draft of the
voir dire on the docket.  The only thing it didn't have included
in it Ms. Armbruster's name.  I wasn't sure who the court
reporter would be.  Now I know it's Ms. Armbruster.  I put her
name in my version.  So I just wanted to double check with you
to see if there are any corrections or modifications that you
were looking for in the script.

MR. COREY:  Your Honor, if I could turn your attention
to the top of Page 19.

THE COURT:  Nineteen.

MR. COREY:  And the United States requests a
clarification on element three of that jury instruction.  As it
was written and submitted to you, it says at the time--

```
 1            THE COURT:  I'm sorry, Mr. Corey, I was asking about
 2   voir dire.
 3            MR. COREY:  I'm sorry, I jumped ahead.
 4            THE COURT:  We'll get to jury instructions later.  I'm
 5   talking about the draft for this morning.  Anything that the
 6   Government has?
 7            MR. COREY:  No, Your Honor.
 8            THE COURT:  Mr. Uller, anything?
 9            MR. ULLER:  No, Judge.
10            THE COURT:  So is there anything else that the
11   Government can think of that we need to take up before we get a
12   jury panel in?
13            MR. COREY:  No.
14            THE COURT:  Defense?
15            MR. ULLER:  No, Your Honor, thank you.
16            THE COURT:  Then, why don't we try to get them in
17   here.  You all should have an exhibit list placed on your table.
18   As usual, I ask you all to keep up with the exhibits, and I'll
19   keep up with them, too.  And then we can double check with each
20   other make -- so we go along and make sure we have the same
21   thing.  Ms. Wroble, I'm sorry.
22      (Discussion off the record.)
23      (Back on the record.)
24            THE COURT:  One more juror showed up, so now we have
25   32.  I don't know if people keep trickling in.  Hopefully -- It
```

1   is snowing other places.

2       (Jury pool enters.)

3           THE COURT:  Good morning to all of you.  Welcome to

4   the federal courthouse.  I'm guessing some of you had to

5   actually drive through snow to get here.  Others of you drove

6   through nothing to get here.  The mysteries of Southeastern

7   Wisconsin.  All of you had to drive here the day after your

8   Thanksgiving Holiday, which you're probably still recovering

9   from.  So thank you all for being here.  It's important to the

10  parties.  It's important to the process that you're here.

11          My name is Pam Pepper.  I'm one of the District Court

12  Judges here in the building.  I will be presiding over this

13  trial.  Today we're beginning a criminal trial in a case called

14  United States v. David E. Polnitz, Jr., Case No. 17-CR-201.

15          To my right is Kris Wroble, my courtroom deputy.

16  She'll be helping me out during the trial.  To me left or

17  actually right in front of me pretty much is Sue Armbruster.

18  She's our court reporter, and you've also met our courtroom

19  security officer, Ed Graham, the man to go to with any needs you

20  may have.  I'm fully convinced Ed can solve any problem on the

21  planet if you give him enough time.

22          We hope to complete jury selection just as soon as

23  possible, possibly this morning.  But if at any point in time

24  during the process you need to use the restroom, you need water,

25  whatever, Ed's the person to talk to, and he'll help you out

1    with any issue during jury selection.

2            We start the jury process, as I indicated, with

3    selecting a jury.  For this trial, we'll be selecting 13 jurors.

4    There are several steps to the jury selection process.  The

5    first part of the process is called the voir dire.  During that

6    part of the process, I'll be asking you questions.  Your answers

7    to these questions will help the parties to get to know you and

8    to find out whether any of you have had any experiences or

9    feelings that might interfere with your ability to be fair and

10   impartial in this particular case.

11           This is a criminal case.  As I indicated earlier.

12   Every party in a criminal case has the right to a fair,

13   impartial and unbiased jury.  The jury selection process is

14   designed to preserve and ensure that right.  Each of us because

15   of our experiences, our background, our education, relationships

16   with others has developed certain attitudes, opinions,

17   philosophies, biases, sympathies, prejudices.  No two of us

18   think alike.  What we do, where we work, where we live, they all

19   tell something about who we are.  I'm going to ask you questions

20   about all those things.  The reason that we ask those questions

21   is so the parties and their attorneys can decide whether they

22   believe there's anything about you or your background or

23   experience that might influence you in the case.

24           In this country, we all have the right to believe

25   whatever we like and make decisions as we see fit.  Outside of

1   this courthouse, you can make decisions and judge people on any
2   basis you choose.  If that meant about wealth, occupation,
3   political party, religious affiliation, hair color, race, size,
4   sex, national origin, whatever you think is important.  As a
5   human being, I have very deeply held opinions, and I suspect you
6   all have them, too.  But I have taken an oath that says that as
7   a Judge, I will to the very best of my ability put my private
8   views aside and decide cases on the facts and on the law, not on
9   my personal views or biases.  If you are selected as a juror in
10  this case, you must take an oath to do the same thing.
11          The questions that the parties and I must answer in
12  jury selection are whether any of you have particular biases
13  such that you wouldn't be able to sit as a juror in this case.
14  That's what we're trying to find out.  So through your answers
15  to my questions, the lawyers and I get to know you a little bit
16  so that we can determine whether we believe you can be fair and
17  impartial in this case.  And you, of course, need to know a
18  little bit about the case so that you can make your own judgment
19  about whether you should sit as a juror in it.  As I tell you
20  what I believe the case is about, I ask you to think about
21  whether you feel that there's any reason that you should not
22  serve on this jury.
23          Many, if not all of us, have biases that we don't even
24  recognize, implicit biases.  I'm sure you heard that term.
25  We're influenced by information without even realizing it.  It's

9

1    hard to recognize these biases and to set them aside, but it

2    helps to be aware that while I don't believe that I am biassed

3    against a person of a particular gender or race or whatever, I

4    may unknowingly be influenced by those factors.

5         Being aware of that helps us guard against making

6    decisions based on those implicit biases.  I ask you to be aware

7    throughout the selection process.  And if you get picked for

8    trial, that you may be influenced by implicit or unconscious

9    biases and try to set those biases aside.

10        Now, the second part of the jury selection process is

11   the challenges for cause.  That means, that either one of the

12   lawyers can ask me to excuse a potential juror from service

13   because the lawyer believes that that juror cannot or will not

14   be fair and impartial in deciding the facts and applying the law

15   in this case.

16        A lawyer who wants to challenge a juror for cause will

17   provide me with the reasons that he wants or that he believes

18   that particular juror can't be fair and impartial.  I myself can

19   suggest excusing a juror if I believe that person's answers show

20   that he or she can't be fair and impartial to both sides.

21        The third part of the process -- That happens, by the

22   way, outside of the presence of the jurors.  The lawyers discuss

23   that with me privately.

24        The third part of the process involves what are called

25   preemptory challenges.  Each attorney gets a number of

10

1    preemptory challenges.  When a party makes a preemptory

2    challenge to a juror, that means the lawyer doesn't have to

3    explain the reason for the challenge.  The law allows parties to

4    use peremptory challenges to excuse jurors, not only to ensure

5    that there will be a fair jury, but also to ensure that each

6    side believes that the jury is a fair jury.  The lawyers will

7    make their challenges and discuss them with me outside of your

8    hearing.

9            I realize a lot of people are relieved if they don't

10   get selected to serve on a jury.  On the other hand, please

11   don't feel insulted or upset if you're excused from jury

12   service.  As I indicated, each of us has certain attitudes,

13   opinions, biases and so forth.  Each of us would find it hard to

14   be fair in a particular kind of case.  Even if I excuse you in

15   this case, you may be perfectly qualified to sit as a juror in

16   another case.  On the other hand, even if you end up on the jury

17   in this case, you may be excused from service some time in the

18   future on another case.

19           Now, for your general information, again the name of

20   this case is United States of America versus David E. Polnitz,

21   Jr..  I indicated earlier, this is a criminal case.  The party

22   who brought the lawsuit, the plaintiff, is the United States

23   Government.  The defendant is David E. Polnitz, Jr..

24           The case arose out of an Indictment.  Now, an

25   Indictment is a formal document that's used by the Government to

1    start a criminal case and to bring that case to court.  The
2    Indictment also advises, tells the defendant the nature of the
3    crime that the Government believes he's committed.  An
4    Indictment is not evidence against the defendant.  And the fact
5    that an Indictment exists does not give rise to an inference
6    that the defendant is guilty.

7         This Indictment contains two allegations or counts.
8    The first count of the Indictment alleges that on or around
9    June 27th of 2017, in the State and Eastern District of
10   Wisconsin, David E. Polnitz, Jr. illegally possessed a firearm
11   after previously being convicted of a crime punishable by
12   imprisonment for a term exceeding one year, and that's in
13   violation of Sections 922(g)(1) and 942(a)(2) of Chapter 18 of
14   the United States Code.

15        The second count alleges that on that same date
16   June 27, 2017, in the State and Eastern District of Wisconsin,
17   David E. Polnitz, Jr. used a deadly and dangerous weapon to
18   forcibly assault, impede, intimidate or interfere with the
19   United States Letter Carrier engaged in his officials duties.
20   That's in violation of Title 18 United States Code Section 11 --
21   I'm sorry, 111(a) and (b).

22        David E. Polnitz Jr. has pled not guilty to these
23   charges.  Because he has pled not guilty, the jury selected to
24   try this case must find the relevant facts and determine whether
25   those facts prove that David E. Polnitz Jr. is guilty of either

12

1    of the charges in the Indictment.

2           In a criminal case, the Government has the burden to

3    prove that the defendant is guilty, and the Government must

4    prove the defendant's guilt beyond a reasonable doubt.

5           I'm going to start this process by asking Ms. Wroble

6    to administer an oath to you in which you promise to answer the

7    questions that I ask you truthfully.  Your obligation to answer

8    truthfully is a powerful one.

9           At this point, the lawyers know very little about you.

10   And your answers to my questions help us determine whether

11   you're qualified to serve as a fair juror in the case.  It's

12   critical that you answer our questions candidly and completely

13   because your answers bear on the parties' right to a fair trial.

14   If you would prefer to answer a question outside the hearing of

15   your fellow jury panel members, please let me know, and you can

16   give your answers to the lawyers and to me privately over to the

17   side of the bench at sidebar.  Ms. Wroble, would you administer

18   the oath, please.

19      (Whereupon the jury pool was sworn in.)

20          THE COURT:  All right, thank you all.  Let me just

21   note as we go through the process, make it a little bit easier

22   for everybody, whenever you answer a question, we'll ask you to

23   give us your juror number, not your name, your juror number.  So

24   when you get ready to answer a question, raise your hand and say

25   yes to a question, I'll ask you to state juror number 27 or

juror number 4, just so we can keep up with who answers what
question.

So to start, the parties and I understand that jury
service disrupts your usual routine, just like snow does, and is
inconvenient to many of you.  But it is a service that our
Government asks of us as citizens, and it's critical to a fair,
just and legal system.  There are people that feel they are too
busy or are sick or they have a moral or religious objection to
serving, regardless of what the case is about or who the parties
are.  Those are not necessarily reasons for me or the parties to
excuse you as a juror.  But it is, in part, important for the
parties to know if you're not willing to serve.

(Voir dire of the jury panel.)

THE COURT:  Anybody in the box whose number got
called -- All your numbers were called?  All right.  Ms. Wroble,
can I ask you to swear in the jurors quickly?

(Whereupon jurors were sworn in.)

THE COURT:  All right.  Ladies and Gentlemen, for
those of you who didn't get selected today, keep in mind what I
said.  Doesn't have anything necessarily to do with your ability
to be a juror.  It just has to do with this case or who knows.
But thank you so much for taking the time to come down here this
morning.  If you all had not been here, this process could not
have taken place.  If you all had not been honest with us and
provided us with all the information provided, we couldn't have

done this.  Thank you for your service.  Enjoy the building on
the way out.  Drive safely to where you're going and hope to see
you in the federal building again soon.  Thank you.

        (Jury pool excused.)

            THE COURT:  Ladies and Gentlemen, for those of you on
the jury, welcome.  What I'm going to do -- Normally, I have a
set of instructions that I give you to kind of get you ready for
the trial, but I'm sure you're starving.  So what I propose we
do is break now, you all go and grab some lunch, and I'll give
you those instructions right after you return.

            The one instruction I do have to give you right now --
Actually, there are two.  Number one, if during your break you
happen to see any of the attorneys or the parties in the
hallway, on the elevator, anything like that, please don't
acknowledge them or speak with them, not even nod or say hello.
They don't either.  It's not because they are trying to be rude.
It's to make sure that everything is fair and impartial, so just
keep walking.  They'll keep walking and that ought to make
everything good.

            The other thing I will tell you is even though you
know almost nothing about this case, I'm going to ask you not to
talk about it at all either with each other or with friends and
family members.  You'll have an opportunity when the trial is
over to answer all those tempting questions that your friends
and family ask you like where are you, what are you doing,

1  what's it all about?  Right now, you can't talk to each other or

2  anyone else about the facts of the case.  Why don't we -- It's

3  ten minutes to 1:00 now.  Why don't I see everybody back -- Can

4  we come back by twenty minutes to 2:00?  I know that's not quite

5  an hour.  Maybe that will give us an opportunity to kind of get

6  going this afternoon on the evidence.  Everybody be ready to

7  come back at twenty to 2:00.

8       (Jury excused.)

9            THE COURT:  When we come back, I will try to move as

10  quickly as we can through the opening, the preliminary

11  instructions and give them those, and we'll be ready for opening

12  statements.  So if you some time over the lunch hour if you need

13  to set up the lectern the way you need to set it up, you should

14  probably take care of that over lunch, and we'll just try to get

15  going as quickly as we can after that.  Mr. Corey, anything from

16  the Government that we need to take care of?

17            MR. COREY:  Your Honor, if this is the appropriate

18  time, I had a comment on Page 19, the top of the preliminary

19  instruction.

20            THE COURT:  Of the preliminary -- Sorry, hang on a

21  second.  Okay.

22            MR. COREY:  Element three.  It currently reads at the

23  time of the assault, but the Government believes that it's

24  properly at the time of the incident or at the time of the

25  assault, impediment, intimidation or interference.

1          THE COURT:  You're right.  It should just say

2    incident.  That makes more sense.  Mr. Uller, any objection to

3    that, at the time of the incident, United States Postal Carrier

4    Kevin Phillips was engaged in performance of his official

5    duties?

6          MR. ULLER:  No objection.

7          THE COURT:  I'll change that to incident.  Thank you

8    for that, Mr. Corey.  Anything else anybody has seen with regard

9    to the preliminary instructions?

10          MR. COREY:  No.

11          THE COURT:  Mr. Uller, anything?

12          MR. ULLER:  No.

13          THE COURT:  All right.  Then, unless you all can think

14    of anything else we need to take up before we break for lunch.

15          MR. COREY:  Your Honor, sorry.  We had been discussing

16    when to read the stipulations.

17          THE COURT:  Yeah, so I guess question number one, are

18    you going to read it or do you want me to read it?

19          MR. COREY:  I guess we can read it.

20          MR. ULLER:  That's fine.

21          MR. COREY:  The Government's position would be the

22    stipulation about interstate commerce and the stipulation about

23    the one year punishable by a crime of more than one year.  We

24    can do that right away after openings if that's fine.  And the

25    stipulation regarding chain of custody, if the DNA forensic

1    analyst -- Do that right before she testifies.

2              THE COURT:  That's fine with me, unless Mr. Uller has

3    an objection.

4              MR. ULLER:  It seems odd to me to do a stipulation on

5    the gun when the gun hasn't been introduced into evidence yet.

6              THE COURT:  So you mean movement for interstate

7    commerce?

8              MR. ULLER:  Yeah, sure.

9              THE COURT:  We can do it at the time of the

10   introduction of whatever witness will introduce it.

11             MR. COREY:  That's fine.  I don't know if you want to

12   address the other stipulation we reached.

13             MR. ULLER:  There's another stipulation that the

14   Government and I have reached.

15             THE COURT:  Okay.

16             MR. ULLER:  I actually don't have the language, but it

17   relates to Exhibit 28, that the employment records in

18   Exhibit 28.  Again, I don't have the exact language.

19             MR. COREY:  Just to the authenticity of that.

20             THE COURT:  Which records, I'm sorry?

21             MR. ULLER:  In Exhibit 28, there are some employment

22   records from the Salvation Army.

23             THE COURT:  For some reason, my exhibit list stops at

24   12.

25             MR. ULLER:  Judge, I provided the Court last week with

18

1    a binder that had the defense exhibits.

2              THE COURT:  You did.  Those are different.  Okay.  I

3    didn't realize that.  Okay, Exhibit No. 28.

4              MR. ULLER:  I can get the Court a list.  I haven't

5    done that.

6              THE COURT:  So Exhibit No. 28, it is a stipulation as

7    to the authenticity of the employment records?

8              MR. COREY:  Yes.

9              THE COURT:  I assume that will be read at the time the

10   records are introduced?

11             MR. ULLER:  Yes.

12             THE COURT:  That's fine.  Okay.  Mr. Corey.

13             MR. COREY:  I'm sorry.

14             THE COURT:  Stop apologizing.

15             MR. COREY:  The only other thing we left unresolved

16   from -- Maybe, this isn't the time to take it up, is the second

17   bias jury instruction that the defense had proposed.

18             THE COURT:  For the closing jury instruction, and I

19   think what we should do is see where we get today and look at

20   our afternoon break and see if we need it to move forward.

21             MR. COREY:  My last item I had written down was just

22   requesting to sequester any witnesses.

23             THE COURT:  Exclude any witnesses so --

24             MR. COREY:  So that they are not in the back listening

25   to testimony.

                                                                    19

1          THE COURT:  That goes for both sides.  Obviously, any
2   witness who is not testifying, the witness room should be open.
3   They shouldn't be in the courtroom other than Inspector York.  I
4   don't know if he's testifying and Mr. Polnitz.  Any witness who
5   is not testifying should be back in the witness room until such
6   time as they get called into -- come into the courtroom to
7   testify.  Mr. Uller, anything that we haven't hit that we
8   should?
9          MR. ULLER:  No.
10          THE COURT:  Thank you all.  I asked them to be ready
11  in their chairs at twenty to 2:00.  Unless you have something
12  after lunch that you think we need to take up, if you can be
13  ready to go a couple minutes before that just so we can get
14  started.  Thank you all.
15      (Lunch recess taken.)
16      (Back on the record.)
17      (Jury enters.)
18          THE COURT:  Good afternoon, Ladies and Gentlemen.
19  Welcome back.  I hope you got a few minutes to grab some lunch.
20  As I indicated to you before you left, I have some instructions
21  to give you before we start, so I'm going to provide you with
22  those now.
23          Members of the Jury, we're now ready to begin the
24  trial.  I'm going to start by giving you some instructions to
25  help you better understand your functions as jurors and how you

1    should conduct yourselves during the trial.  I'm confident if I

2    spend just a few minutes with you now, you'll be able to

3    discharge your function as a juror more intelligently and more

4    effectively and will be able to reach a just verdict at the end

5    of the trial.

6          When I complete these opening statements, the

7    Government may make an opening statement.  And after that, the

8    defense may do so.  Neither party is required to make an opening

9    statement.  If the lawyers do make opening statements, what they

10   say in those statements is not evidence.  The statements are

11   introductions, roadmaps, to the evidence that the parties intend

12   to produce.

13         As I indicated during the jury selection process,

14   there are two charges or counts in the Indictment.  To prove the

15   defendant guilty of Count 1, the Government must prove each of

16   the following three elements beyond a reasonable doubt.

17         First, the defendant knowingly possessed a firearm.

18         And second -- I'm sorry, second, at the time of the

19   charged act, the defendant had previously been convicted of a

20   crime punishable by imprisonment for a term exceeding one year.

21         And third, that the firearm had been shipped or

22   transported in interstate or foreign commerce.

23         To prove the defendant guilty of Count 2, the

24   Government must prove each of the following three elements

25   beyond a reasonable doubt.

First, that the defendant forcibly assaulted, impeded, intimidated or interfered with United States Postal Service Letter Carrier Kevin Phillips with a deadly or dangerous weapon.

Second, the assault, impediment, intimidation or interference was done voluntarily and intelligently.

And third, that at the time of the incident, United States Postal Service Letter Carrier Kevin Phillips was engaged in the performance of official duties.

Now, evidence is the testimony of the witnesses given in court, both on direct and on cross examination, regardless of who called the witness; any exhibits that I may admit into the trial record; and any facts to which the parties have agreed or stipulated or which I direct you to find. Anything you may have seen or heard outside the courtroom is not evidence. You must decide the case based solely on the evidence offered and received at trial.

Normally, the Government presents its witnesses and the exhibits that support its case first. But sometimes we may have to make accommodations to accommodate a witness. If that happens in this case, I will alert you that a witness is testifying out of order. After the Government presents its case, the defendant may, but is not required to, present witnesses or present any evidence.

If the defendant presents evidence, the Government then may offer additional evidence to rebut the defendant's

case.  The party or the lawyer who called the witness to testify first asks that witness questions, and then the opposing party may cross examine that witness.

At times during the trial, one of the lawyers may object to another lawyer's efforts to introduce evidence.  That is okay.  It is part of the lawyer's job to object if the lawyer believes that I shouldn't admit the evidence.  I don't allow the lawyers to argue about objections to evidence in your presence. I'll base my rulings solely on the law, which is why you, jurors, aren't involved in that process.  You must not infer from any ruling that I make or from anything that I say during the trial that I hold any views for or against either party.

During the trial, I will sustain objections to questions, which means I won't allow the witness to answer.  Or if the witness has already answered, I will instruct you that you must disregard the answer and dismiss it from your mind.

You should not draw any inference from unanswered questions, and you may not consider that testimony in reaching your decision.  That is because the law requires you to make your decision based solely on the competent evidence that is in front of you.

If somebody were to ask me what a jurors most important function is, I would say, without hesitation, that it's to weigh the credibility or the believability of the witnesses.  You cannot intelligently discuss a verdict without

first collectively discussing the testimony that you heard.  It is the most important thing for you to consider as you listen to the testimony of the various witnesses whether they are believable, but I urge you not to prejudge the credibility of a witness until you have heard all the testimony in the case.

In judging credibility of witnesses, you should remember that if the witness's testimony doesn't match the facts as they occurred, it could be because the witness is lying or because the witness didn't accurately see or hear what the witness is testifying about or because the witness's recollection of the event is faulty or because the witness did not give clear testimony.

There is no magical formula for evaluating the witness's testimony; however, you should bring with you to the courtroom all your experiences and your background from your own lives.  In everyday life, you determine for yourselves whether what other people say to you is reliable or not.  The same tests that you use in your everyday life are the tests which you apply in your deliberations here.  Whether a witness has an interest in the outcome of the case; the bias or prejudice of a witness, if there is any; the witness's demeanor and behavior on the stand; the opportunity that the witness has to observe the facts; and how probable the witness's testimony is when you view it in light of all the other evidence in the case.

These are all important factors to consider when you

1    determine the overall weight and credit that you give to that
2    witness's testimony.  If it appears that there's a discrepancy
3    in the evidence, you will have to consider whether there's a way
4    to reconcile that apparent discrepancy.  If that's not possible,
5    you must determine which of the conflicting versions you will
6    accept as appealing to your good judgment and common sense.
7            Now, as I told you before, this is a criminal case.
8    There are three critical rules that you must follow in a
9    criminal case.
10           First, you must presume that the defendant is innocent
11   of each charge, unless and until the Government proves that he
12   is guilty of that charge.  The defendant begins the trial with a
13   clean slate.
14           Earlier I mentioned that the defendant had been
15   charged in an Indictment.  The Indictment is a formal document
16   that brings a criminal case into federal court.  It contains
17   allegations.  It is not evidence or proof of the defendant's
18   guilt or anything else.  You must presume the defendant innocent
19   of the charges in the Indictment, unless and until the
20   Government proves him guilty of them.
21           Second, the burden remains with the Government
22   throughout the trial.  It never shifts to the defendant.  In
23   other words, a defendant does not have the burden to prove his
24   innocence or to present any evidence or to testify on his own
25   behalf.  In fact, because a defendant has an absolute right not

1  to testify, to remain silent, the law prohibits you from

2  considering the fact that the defendant may not testify in

3  arriving at your verdict.

4          Third, the Government must prove the defendant's guilt

5  as to each charge beyond a reasonable doubt.

6          Now, as far as your own conduct during the trial, I

7  must caution you, as I did before, that you may not discuss this

8  case either among yourselves or with anybody else during the

9  trial.  In fairness to the parties, you must keep an open mind

10  throughout the trial reaching your conclusion only during final

11  deliberations after all the evidence is in and you have heard

12  the attorneys closing statements and any instructions that I

13  give you on the law.

14          Only then will you be in a position to intelligently

15  and fairly exchange your views with the other jurors in trying

16  to reach a decision.  It is a normal human tendency to talk with

17  people with whom you come into contact everyday about what is

18  going on in your life.  I appreciate it's tempting when you go

19  home in the evening to discuss this case with your spouse or

20  significant other members of your household or your friends.  Do

21  not give in to this temptation.  Do not let any third party

22  discuss the case with you in your presence.  If anybody tries to

23  talk with you about the case, despite your telling them not to,

24  you should report that fact to me through Mr. Graham as soon as

25  you're able to.

1          Also, during the time that you serve on this jury,
2    don't speak, whether in or outside the courtroom, with any of
3    the parties or their lawyers or any of the witnesses.  I don't
4    just mean you can't talk to them about the case because I told
5    you before you can't speak to them at all, not even to pass the
6    time of day.  They won't talk to you either.  If they see you in
7    a hallway or on the sidewalk, they will not greet you or
8    acknowledge you.  They are not being rude.  They are following
9    my instructions, just like you follow my instructions, to ensure
10   that absolute impartiality that they are entitled to from you as
11   jurors.

12         Because you will be deciding the case solely on the
13   evidence received, along with my instructions and the law, you
14   must not make any independent investigation of the facts or the
15   law.  This means, for example, that you mustn't read or listen
16   to media accounts, including anything that may be on social
17   media.  You cannot visit a location that you hear about during
18   the testimony or conduct experiments.  You can't Google or
19   otherwise look up things that you heard about the trial on line
20   or research anything you've heard about in books or magazines or
21   any sources.

22         After the parties have introduced all the evidence and
23   both parties have rested or finished presenting their cases, the
24   parties will have an opportunity to present you with closing
25   arguments, sometimes called summations.  I'll talk more about

27

the function of a closing argument after you've heard all the evidence. But for now, I'll tell you while the closing arguments are very important, they are not evidence, and you are not bound by them.

The function of a closing argument is to give you -- give the parties an opportunity to explain their view of the evidence and to tell you what conclusions they believe you should draw from that evidence.

After the attorneys finish their closing statements, I will instruct you on the rules of law applicable in the case, and then you'll go back to the jury room, and you'll deliberate.

Your function as jurors is to determine what the facts are and to apply the rules that I give you to those facts.

The conclusion you reach will be your verdict. You will determine what the facts are from all the testimony that you hear and from the exhibits that I've admitted into evidence. You are the sole and exclusive judges of all the facts, not me, not the lawyers, not anyone else. I will make every effort to preside impartially during this trial and not to express any opinion concerning the facts. If from something that I say or do you believe that I've expressed an opinion, you must disregard it. Any views that I have on the facts are completely irrelevant.

I do caution you that under your oath as jurors, you are duty bound to accept the rules of law that I give you,

whether you agree with them or not.  As the sole judges of the
facts in this case, you must determine which of the witnesses
you believe, what portion of their testimony you accept, and
what weight you attach to it.

Now, I mentioned before, we have an official court
reporter, Ms. Armbruster, who's making a record of the trial,
but she does not type up a transcript of each day's testimony or
afternoon's testimony.  You won't have transcripts available to
you when you are deciding the case.

If you'd like to, you may take notes to help you
remember what the witnesses said.  If you do take notes, please
keep them to yourself until you and your fellow jurors go back
into the jury room at the end of the case to decide the case.
Don't let note taking distract you so that you don't hear other
answers by other witnesses.

When you leave the courtroom during breaks, you'll
leave your notebooks on your chairs, and Mr. Graham will collect
them and make sure they are there for you when you come back.
We will provide you with those notebooks once the opening
statements are finished and pens if you decide you want to take
notes.

Notes are not entitled to any greater weight than the
memory or the impression of each juror as to what the testimony
may have been.  Whether you take notes or not, each of you must
form and express your own opinions as to the facts of the case.

29

If you do not take notes, you should rely on your own memory of
what was said and don't be overly influenced by the notes of
other jurors.

Finally, a few comments on the hours.  I've already
told you this morning during jury selection what those are.  If
we go over until tomorrow, we will start around 9:00.  We'll
take an afternoon break today.  We'll try to finish some time
around 5 o'clock.  It's very important like you were today when
you came back from lunch, that you be prompt.  We'll also try to
be prompt.  I know we kept you waiting for a few minutes after
you got back.  We'll try very hard not to do that.

I don't expect there will be publicity of this case.
You should avoid any coverage of it.  If you glance at something
and you think it's about the case, you should not read it or
have anything to do with it.  Mr. Graham has already told you
about the facilities back there and hopefully about lunch.  We
do not allow smoking in the building.  This is a non-smoking
building.  If you are a smoker, you'll have to do it outside and
do it during the breaks I allow for everyone else.

One thing I want to make sure that you know is that
from here on out, you cannot come back into the courtroom.  You
can go in the jury room, but you can't come back in the jury
room unless Mr. Graham is with you.  There are times when you
all are back in the jury room, and we're doing business here.
That wouldn't be appropriate for you to come in.

30

1          For some reason if you need to be in the courtroom,
2     let Mr. Graham know.  And finally, of course, if for any reason
3     you need to communicate with me, let Mr. Graham know, and you
4     can do it through him.
5          That concludes my opening instructions to you.  So
6     with that, I think we're ready to proceed with the attorneys.
7     Mr. Corey, Mr. Taibleson, I'll turn to you and ask if the
8     Government wishes to make an opening statement?
9          MR. COREY:  Yes, Your Honor.
10          THE COURT:  All right.
11          MR. COREY:  On June 27, 2017, the victim in this case,
12     United States Letter Carrier Kevin Phillips, was doing his job.
13     He was delivering mail when a man who was African American with
14     a dark complexion, ear-length dreadlocks and eyes that were
15     Pepsi blue -- they were royal blue like a Pepsi can --
16     confronted him, threatened him and pointed a gun at him, but not
17     just any gun, a particular type of firearm that the victim,
18     Kevin Phillips, will testify was a black .380 semi-automatic
19     handgun.
20          After the threat, the victim, Kevin Phillips, spoke
21     with law enforcement.  And using that information, Milwaukee
22     Police Officers knocked on the door of a specific residence,
23     4631 N. 35th Street, and out came a man who is African American
24     with a dark complexion, ear-length dreadlocks and eyes that were
25     royal blue like a Pepsi bottle.  That man is the defendant in

1    this case, David Polnitz.

2           Minutes later, at the request of law enforcement, the

3    defendant's wife went into the house and retrieved a firearm and

4    turned it over to law enforcement.  But she didn't just retrieve

5    any firearm, she retrieved a particular color of a firearm and a

6    particular type of firearm, and that was a black .380

7    semi-automatic handgun, the same color and same type that the

8    victim will tell you he was threatened with here today.

9           So this case is about a specific location, 4631 N.

10   35th Street.  It's about a man with a memorable appearance,

11   royal blue eyes and his use and possession of a particular gun,

12   a black .380 semi-automatic handgun.

13          My name is Zachary Corey.  I am a United States

14   Assistant Attorney, and my colleague, Ben Taibleson, and I

15   represent the United States.  It's the Government's burden to

16   prove beyond a reasonable doubt the two charges that you heard

17   the Judge instruct you on earlier.  The United States will meet

18   this burden and prove those two counts beyond a reasonable doubt

19   by calling five witnesses.

20          First, the United States will call the victim in this

21   case, United States Letter Carrier Kevin Phillips.  The victim

22   will testify that June 27, 2017 started out like every other

23   workday for him.  He was doing his job.  He was delivering mail

24   on the north side of Milwaukee.  He will testify that he'd been

25   delivering mail on this particular route for months, and he was

1  delivering mail six days a week, so he knew the addresses,
2  houses and neighborhood quite well.

3         As he neared 4631 N. 35th Street, a pit bull ran
4  directly towards him.  He feared for his safety, and then he
5  used his United States Postal Service issued dog spray to spray
6  the pit bull to stop its advance.  The victim, Kevin Phillips,
7  then continued to do his job delivering mail until several
8  minutes later, a white Dodge Caravan approached him.  The car
9  was driving south on North 35th Street, and a driver who the
10 victim, Mr. Phillips, will tell you had a memorable appearance.
11 He had ear-length dreadlocks.  He had a dark complexion, and he
12 had royal blue eyes.  He pulled up near the victim, and he asked
13 the victim if the victim had sprayed his dog.  The victim, Kevin
14 Phillips, said, yes, he did.

15        The man driving the Dodge Caravan told Mr. Phillips he
16 would be back.  The victim in this case, Kevin Phillips, will
17 identify the driver of the Dodge Caravan as the defendant in
18 this case, Mr. Polnitz.

19        The victim, Kevin Phillips, then watched that white
20 Dodge Caravan drive south and park near a specific address, 4631
21 N. 35th Street, the very same address whose yard he had just
22 seen the pit bull run from.

23        Several minutes later the victim, Kevin Phillips, was
24 at his mail truck when he saw that same man, Mr. Polnitz, who he
25 saw driving the Dodge Caravan run towards him with his hand in

33

```
 1    his pocket.  He was running from the direction of that
 2    residence, 4631 N. 35th Street.

 3          As the defendant, Mr. Polnitz, approached the victim,
 4    Kevin Phillips, he confronted the victim about spraying his dog.
 5    The defendant, David Polnitz, threatened the victim and pulled
 6    out a small, black semi-automatic handgun from his pocket.  He
 7    then pointed that firearm directly at the victim, Kevin
 8    Phillips.  The victim in this case, Kevin Phillips, will testify
 9    that he knows about guns, and he legally owns a gun for his
10    safety.  Using this knowledge, he will tell you that the
11    particular gun he saw was a black .380 that the defendant in
12    this case, David Polnitz, pointed at him.

13          After the confrontation, the victim, Kevin Phillips,
14    will testify that he saw the defendant, David Polnitz, retreat
15    south in the direction of 4631 N. 35th Street and head up the
16    steps towards that house.

17          The victim, Kevin Phillips, returned to the post
18    office, reported the incident, and the Milwaukee Police
19    Department was contacted.  At this time, two officers, Officer
20    Andrew Wilkiewicz and Officer Marcel Stolz, met with the
21    defendant and took a statement from him.  Using the information,
22    they obtained from the victim, Kevin Phillips, our second
23    witness, Andrew Wilkiewicz, will testify that he and his partner
24    went directly to that specific location, 4631 N. 35th Street,
25    and knocked on the door.
```

1          Shortly thereafter, a man came out who is African
2    American, who had a dark complexion, had ear-length dreadlocks
3    and eyes that were royal blue.  It was the defendant in this
4    case, Mr. Polnitz.
5          You will see a photo of Mr. Polnitz taken shortly
6    after he was arrested, and you will see a dark complexion,
7    ear-length dreadlocks, but most importantly, you'll see those
8    blue eyes.
9          While Officer Wilkiewicz was arresting Mr. Polnitz,
10   our third witness, Officer Stoltz, spoke with the defendant's
11   wife, Ms. Polnitz.  Ms. Polnitz agreed to retrieve a small
12   handgun she said was at the house.  The handgun she retrieved
13   was a particular type of gun.  It was a black .380 firearm, the
14   exact color and the exact caliber that the victim, Kevin
15   Phillips, will testify that he was threatened with that day.
16         She also retrieved bullets.  Later that evening,
17   Officers Wilkiewicz and Stolz met with the letter carrier, Kevin
18   Phillips, and showed him a photo array of six photographs.  They
19   explained to him that in these six photographs, there may be a
20   picture of the person that they had arrested, but there may not
21   be.  One by one they handed the photographs to the victim, Kevin
22   Phillips.  They told him to sign and date the picture that was
23   the man that pointed the gun at him.
24         The victim in this case, Kevin Phillips, looked at all
25   six photographs.  He signed a photograph, he dated a photograph,

1    and that photograph was of the defendant in this case, David
2    Polnitz.

3            This case is about a specific address, 4631 N. 35th
4    Street; a man with a memorable appearance, royal blue eyes; and
5    his use and possession of a particular firearm, a black .380
6    semi-automatic handgun.  This is not a case where, for instance,
7    evidence such as DNA or fingerprints were found.

8            The Government's final two witnesses, one who tested
9    for fingerprints and the other who looked for DNA, will tell you
10   it is actually relatively unusual to find usable fingerprints
11   for DNA.

12           The United State's fourth witness is Forensic
13   Investigator Dawn Veytsman.  She will testify that she attempted
14   to lift fingerprints from the firearm, the bullets that were
15   retrieved from the house, but there were not any that can be
16   used.  She will explain just because there were not any usable
17   fingerprints on the gun, that doesn't mean nobody ever touched
18   the gun.  In fact, it's relatively rare to obtain a usable
19   fingerprint from a gun due to a variety of circumstances.  And
20   based on her experience, she will testify that fingerprints are
21   only recovered about 10 percent of the time.  In other words,
22   nine out of ten times they do not find a usable fingerprint.

23           The United State's final witness is Pamela Taylor, and
24   she works as a Senior Forensic DNA Analyst at the Wisconsin
25   State Crime Lab.  Her lab received three swabs of potential DNA

1    from the firearm, and none of the swabs had sufficient DNA to

2    form a comparison.  She will tell you the lack of DNA, usable

3    DNA on a gun doesn't mean that nobody ever touched the firearm.

4    And, in fact, is relatively rare to obtain usable touch DNA

5    because of a variety of factors.

6           Before I finish my opening statement, it will be

7    helpful to briefly go over the two crimes that the defendant,

8    Mr. Polnitz, was charged with and exactly what the Government

9    must prove beyond a reasonable doubt for you, the jury, to find

10   him guilty on both counts.

11          As the Judge explained, in Count 1, Mr. Polnitz is

12   charged with possession of a firearm after having been convicted

13   of a crime punishable by more than a year in prison.

14          Second, the second crime he's charged with, as you

15   heard earlier, is intimidating, interfering, impeding or

16   assaulting a federal letter carrier with a deadly or dangerous

17   weapon.

18          Now, I'll explain the elements, meaning the particular

19   things that the United States must prove beyond a reasonable

20   doubt for you to convict Mr. Polnitz of each count.

21          Turning to Count 1.  In the United States, it is

22   illegal for certain groups of people to possess firearms.  One

23   of those groups is people who have been convicted of a crime

24   that is punishable by more than one year in prison.  So the

25   first count charges that Mr. Polnitz illegally possessed a

firearm after having previously been convicted of a crime
punishable by a term exceeding one year. There are three
elements to the crime.

First, the defendant knowingly possessed the firearm
on or about June 27, 2017.

At the time of the charged act, which is the
possession, the defendant was a person who had been previously
convicted of a crime punishable by imprisonment for a term
exceeding one year.

And third, that the firearm was shipped in interstate
commerce. All that third element means was just that the
firearm at issue came from a different state before it was
possessed in Wisconsin.

The parties, meaning the United States and the
defendant, Mr. Polnitz, have stipulated, and that just means
agreed, to the second and third elements. That means that the
parties have agreed that Mr. Polnitz has previously been
convicted of a crime punishable by more than a year and also
that the firearm at issue was shipped from a different state
into Wisconsin before it was possessed. So that means the only
question left for you to decide in Count 1 is whether
Mr. Polnitz, the man with the memorable appearance, royal Pepsi
blue eyes, possessed the particular firearm, the black .380
semi-automatic handgun that was recovered from the specific
address, 4631 N. 35th Street, on June 27, 2017.

38

1          So turning to the second count.  The second crime that

2     Mr. Polnitz is charged with is the crime of assaulting,

3     impeding, intimidating, interfering with a federal officer with

4     a deadly or dangerous weapon.  In order for you to find

5     Mr. Polnitz guilty of that crime, you must find that the United

6     States has proved all three of these elements beyond a

7     reasonable doubt.

8          The defendant, Mr. Polnitz, forcibly assaulted or

9     impeded or intimidated or interfered with letter carrier Kevin

10    Phillips with a deadly or dangerous weapon.

11         The assault, impediment or intimidation or

12    interference was done voluntarily, intentionally.

13         And third, at that time, Kevin Phillips was engaged in

14    the performance of his official duties.

15         The evidence presented through our five witnesses will

16    prove beyond a reasonable doubt that the defendant, Mr. Polnitz,

17    with his royal blue eyes used a particular gun, a black .380

18    semi-automatic handgun that was recovered from a specific

19    address, 4631 N. 35th Street, and used it to assault, interfere,

20    intimidate and impede Kevin Phillips, the victim in this case,

21    in his official duties as a letter carrier.

22         As you listen to the testimony today, we ask that you

23    pay attention and use your common sense as you're instructed and

24    also weigh the credibility of the witnesses.  And at the close

25    of the evidence, USA Taibleson will return in closing argument

1    and ask you to return a verdict of guilty on both counts.  Thank
2    you.

3            THE COURT:  Thank you, Mr. Corey.  Mr. Uller, would
4    you like to present an opening statement?

5            MR. ULLER:  I do, Judge.  On June 27, 2017, David
6    Polnitz was at work at the Salvation Army when he got a call
7    from his wife asking him to come home.  She told him that the
8    mailman had sprayed their dog.  Mr. Polnitz came home.  On his
9    way home, he encountered the mailman.  He stopped.  He asked the
10   mailman if the mailman had sprayed the dog.  The mailman told
11   him he did spray the dog.  The two men argued about it.
12   Mr. Polnitz walked away and went home.  When he got home, things
13   were calm.  The dog, Denise, had been given a bath.  Its eyes
14   had been washed out.  The dog was fine.

15           Mr. Polnitz and his wife had an 8 day-old child.  The
16   baby was sound asleep in the home.  The power, which had
17   previously gone out earlier in the day, had been restored.
18   Things were calm.  Seeing everything was fine, Mr. Polnitz left
19   and went back to work until he left for the day at about 4:28
20   p.m.

21           About 4:20 p.m. that same day, a 911 call came in from
22   the Milwaukee area post office.  A supervisor there called to
23   report that one of their mailmen, Kevin Phillips, had been
24   assaulted by a man with a firearm for spraying the man's dog.
25   At that time, he indicated that the incident had occurred about

1    ten minutes earlier.

2           The Milwaukee Police Department's response to this
3    seemingly serious call was to arrive to the post office over
4    three hours later to begin investigating.  They interviewed
5    Mr. Phillips.  He gave them an account.  You heard the
6    Government indicate his view of what he's likely to say.  I
7    anticipate he's going to come in here, take that witness stand
8    behind me and tell you a story similar to what Mr. Corey just
9    relayed.

10          Specifically, he'll testify that there was this second
11   encounter where he will, I suppose, indicate that my client,
12   Mr. Polnitz, pulled out a gun on him.  So the police then went
13   to Mr. Polnitz' house.  They arrested him.  They spoke to his
14   wife.  They determined that she had two guns in the home, a
15   shotgun and a handgun.  They weren't interested in the shotgun.
16   They allowed her to keep the shotgun in the home, and they
17   retrieved the handgun.  So then at this point, the case was
18   closed.

19          By waiting for over three to four hours to get to the
20   scene of this incident, this argument, police didn't speak to a
21   single witness.  Confrontation happened in broad daylight in the
22   middle of a street in a busy residential area.  The question for
23   you in this trial is going to be whether that second encounter
24   ever happened.

25          We will present evidence to show you that it did not

happen.  You will hear from a neighbor, one of the neighbors

that the police didn't take the time to look into and talk to.

His name is Kevin Higgins.  He will tell you he doesn't know

Mr. Polnitz, didn't know Mr. Polnitz back then, but he was out

walking his dog when he observed Mr. Polnitz and the mailman

arguing, and he'll say this was an animated, heated argument on

both sides.  Foul language was used, some F-bombs were dropped,

but then Mr. Polnitz walked away and it was over.  He'll tell

you he was there.  He never saw Mr. Polnitz pull the gun.  He

never saw him come back to the area at a later point and

continue the argument or reengage with Mr. Polnitz.  He'll tell

you the incident described by Mr. Phillips just didn't happen.

You'll also here from Mr. Polnitz' wife, Lorenzya

Polnitz.  She'll tell you what happened when her husband, David,

came home.  She'll tell you how calm things were.  She'll tell

you the baby was asleep, that the dog was fine, that Mr. Polnitz

was calm, calm enough to leave and go back to work.

The scene Ms. Polnitz' describes is going to stand in

stark contrast to this one of raging anger that the Government

wants you to believe.  This isn't a complicated case.  It's not

a who done it.  The question is, whether the crime alleged ever

even happened.

Now, a few people have made up their minds.  I think I

heard the word victim probably 25 times in Mr. Corey's opening

statement.  That's for you to decide.  You are the ones who

decide whether a crime has been committed.  It's their job to
prove that.  The key word here is prove.

In our system of justice in this country, we don't
convict people simply because someone says a crime happened.
People are convicted when the Government is able to prove that
the crime happened, and that is done with evidence.

Proof and evidence are the two things I ask you to
look for.  You're going to hear the evidence.  You will decide
whether the crime happened.  When I come back up here after all
the evidence has been presented, I'll talk to you about some of
these things.  I thank you for your patience.

THE COURT:  Thank you, Mr. Uller.  Mr. Corey,
Mr. Taibleson, call your first witness.

MR. COREY:  The United States calls Kevin Phillips.

Kevin Phillips, being first duly sworn to tell the
truth, the whole truth, and nothing but the truth, testified as
follows:

THE COURT:  Sir, I will ask you to take just a moment.
That microphone will adjust, so you have to speak right into it.
So if you'll kind of position yourself a little bit so you're
speaking right into it.  That will be very helpful.  Thank you.

THE WITNESS:  No problem.

THE COURT:  Mr. Corey.

**DIRECT EXAMINATION BY MR. COREY:**

Q.  Please state your name spell the last for the record.

43

```
1   A.   Kevin Phillips, P-h-i-l-l-i-p-s.

2   Q.   Mr. Phillips, where do you work?

3   A.   United States Postal Service.

4   Q.   How long have you worked there?

5   A.   Five years.

6   Q.   And what is your job there?

7   A.   To deliver mail, packages, make sure people get their mail

8   on time.

9   Q.   And are those your duties?

10  A.   Yes.

11  Q.   And in the course of your duties on June 27, 2017, were you

12  delivering mail?

13  A.   Yes.

14  Q.   And were you delivering mail in the 46 and 4700-block of

15  North 35th Street?

16  A.   Yes.

17  Q.   And how long had you been delivering mail to this route?

18  A.   I had just got on that route after February, so about five

19  months.

20  Q.   And how many days a week were you delivering mail?

21  A.   About six days a week.

22  Q.   So how well did you know the addresses and names on that

23  route?

24  A.   Pretty well.

25  Q.   On that day, were you delivering mail in the 4600-block?
```

```
1    A.  Yes.

2    Q.  Did something unusual happen?

3    A.  Yes.

4    Q.  Could you explain that to the jury, please.

5    A.  On that particular day, I was trying to arrive to 4631.

6    After leaving 4614, across the street, I notice a lady, a young

7    woman standing on the porch.  I seen a child come from behind

8    her.  Then after that, a large animal come from behind her.  And

9    before I even got all the way up the steps, I'm like, ma'am,

10   could you grab your dog.  She gave the dog a command.  The dog

11   looked at her, looked at me and be lined towards me.  So I had

12   pulled my dog spray out, had my bag in front of me, and I

13   sprayed the dog in the face.  The spray is a deterrent to get

14   the dog away from me, so I could get to the vehicle safely, and

15   the dog just ran off.

16   Q.  And you said 4631, was that on North 35th Street?

17   A.  Yes.

18   Q.  At the time the dog -- Do you know what type of dog it was?

19   A.  It was a pit bull.

20   Q.  And did you fear for your safety at that time?

21   A.  At that time, yes.

22   Q.  And what yard did you see it run out of?

23   A.  4631.

24   Q.  Before that day, had you ever used your dog spray on this

25   route?
```

1    A.  Not on that route.

2    Q.  And is your dog spray issued by the United States Postal

3    Service?

4    A.  Yes.

5    Q.  Is it the same as mace or pepper spray?

6    A.  No.

7    Q.  Could you explain how it's different?

8    A.  Mace and pepper spray actually burn your eyes for about 15

9    to 20 minutes, depends on how much you use.  Dog repellant only

10   lasts five minutes.  It's just a deterrent to get the dog away.

11   It's supposed to irritate their nose and their eyes.

12          MR. COREY:  Permission to approach the witness,

13   please?

14          THE COURT:  You may.

15   Q.  Mr. Phillips, do you recognize the photograph that I put in

16   front of you?

17   A.  Yes.

18   Q.  What is that photograph?

19   A.  This is the photograph of the house where the dog came out

20   from the back.

21   Q.  That's 4631 N. 35th Street?

22   A.  Yes.

23   Q.  Is that a fair and accurate representation of that house on

24   that day?

25   A.  Yes, it is.

|    |                                                                     |
|----|---------------------------------------------------------------------|
| 1  | MR. COREY:  Move to admit Exhibit 5.                                |
| 2  | THE COURT:  Five?                                                   |
| 3  | MR. COREY:  Yes.                                                    |
| 4  | THE COURT:  Mr. Uller.                                              |
| 5  | MR. ULLER:  No objection.                                          |
| 6  | THE COURT:  Without objection, I'll admit Exhibit 5.               |
| 7  | MR. COREY:  Permission to publish?                                 |
| 8  | THE COURT:  Yes, you may publish.                                  |

Q.  So that's the house we've been discussing?

A.  Yes.

Q.  So after you sprayed the dog, what happened?

A.  I continued to deliver to 4700-block because I didn't even
get them their mail.  I proceeded to do the 4700-block.  I get
to the uneven side of the street, a gentleman pulls up, why you
spray my dog?  As I stated to him, your dog was loose, I asked
the lady to stand there because she had the dog.  The dog be
lined toward me, I just sprayed the dog.  If you have any
questions or concerns, you can call the post office, and they'll
explain to you what's the next step you can do.

Q.  And earlier you said you had not delivered the mail to 4631
N. 35th Street; is that correct?

A.  That's correct.

Q.  And was -- You said a man approached you when you were in
the next block north of the 4700-block?

A.  Yes.

```
 1   Q.  Was he on foot?

 2   A.  No, he was in a white caravan.

 3            MR. COREY:  Permission to approach, Your Honor?

 4            THE COURT:  Yes.

 5   Q.  Mr. Phillips, I've placed in front of you two photographs.

 6   Do you recognize those photographs?

 7   A.  Yes.

 8   Q.  Could you describe what's in those photographs?

 9   A.  Picture of a van, a front and the back.

10   Q.  Is that the white Dodge Caravan you saw that day?

11   A.  I believe so.

12            MR. COREY:  Move to admit 2 and 2-B.

13            THE COURT:  Before we do that, Mr. Corey, could you

14   find out what's in what picture?  I'm asking if, perhaps --

15            MR. COREY:  Sure.

16   Q.  What's in photograph 2?

17   A.  Photograph 2 is the picture of the van placed at the back of

18   the residence.

19   Q.  And what's in photograph 2-B?

20   A.  License plate.

21            THE COURT:  Okay.  Mr. Uller, any objection?

22            MR. ULLER:  No.

23            THE COURT:  Without objection, I'll admit Exhibits 2

24   and 2-B.

25            MR. COREY:  Permission to publish?
```

48

1          THE COURT:  Yes, you may.

2    Q.  So I've just published Exhibit 2.  Is that -- That's the

3    picture of the van?

4    A.  Yes.

5    Q.  And now I've just published 2-B, and that's the back of the

6    Dodge Caravan?

7    A.  I believe so, yes.

8    Q.  How many people were in the Dodge Caravan?

9    A.  Just him.

10   Q.  When you were speaking with him, did he ever get out of the

11   Dodge Caravan?

12   A.  Not at that time.

13   Q.  Could you please describe the appearance of the person

14   driving the vehicle?

15   A.  Tall, slender male, kind of medium build guy, a beard, short

16   dreadlocks and royal blue contacts.

17   Q.  Did anything strike you as memorable about his appearance?

18   A.  The contacts.

19   Q.  Why is that?

20   A.  I never seen a black man wear royal blue contacts.

21         MR. COREY:  Permission to approach?

22         THE COURT:  Yes.  You don't need to ask me in the

23   future, Mr. Corey.

24   Q.  I placed in front of you a photograph.  Do you recognize the

25   man in the photograph?

49

```
1    A.   Yes.

2    Q.   Is that the man -- Who is that man?

3    A.   That's the man that approached me.

4    Q.   Is that the man driving the white Dodge Caravan?

5    A.   Yes, it is.

6    Q.   Is that a fair and accurate representation of him on that

7    day?

8    A.   Yes.

9    Q.   Is there anything that stands out to you about that picture?

10   A.   Just the contacts.

11            MR. COREY:  Move to admit Exhibit 3.

12            THE COURT:  Three.  Mr. Uller?

13            MR. ULLER:  No objection.

14            THE COURT:  Without objection, I'll admit Exhibit 3,

15   and you may publish.

16   Q.   Just for the jury now that they've seen this, that's the man

17   driving the Dodge Caravan that day?

18   A.   Yes.

19   Q.   I've now placed another photograph in front of you.  Do you

20   recognize the man in that photograph?

21   A.   Yes.

22   Q.   Is that the same man who was driving the Dodge Caravan?

23   A.   Yes.

24   Q.   That is a fair and accurate representation of him that day?

25   A.   Yes, it is.
```

```
 1              MR. COREY:  Move to admit Exhibit 4.
 2              THE COURT:  Any objection?
 3              MR. ULLER:  No objection.
 4              THE COURT:  Without objection, I will admit Exhibit 4.
 5    You may publish.
 6    Q.  Do you see the man from -- in the photograph from the Dodge
 7    Caravan in the courtroom today?
 8    A.  Yes.
 9    Q.  Where is he?
10    A.  He is sitting next to his defense attorney.
11    Q.  And how do you recognize him?
12    A.  His face.
13    Q.  Does he have the same hair he had at that time?
14    A.  No, he doesn't.
15    Q.  Can you see his eyes?
16    A.  Yes, I can.
17    Q.  Are they royal blue?
18    A.  No, they're not.
19    Q.  But you still recognize him?
20    A.  Yes.
21    Q.  How do you recognize him?
22    A.  He's got a scar on his face.
23        (Reporter asks to repeat the answer.)
24    A.  He's got a scar under his eye almost.
25    Q.  So what do you recall in that -- When the defendant was
```

1    driving the Dodge Caravan, what happened next?

2    A.  As he rode up on me, I explained to him once before about

3    what the process he needed to do since I sprayed his dog.  He

4    said he'll be back.  I said, I'd still be delivering mail.  As

5    I'm leaving 4709, I hear someone saying, hey mailman.  As I'm

6    approaching my truck to do my next split --

7    Q.  Mr. Phillips, if I could stop you there.  You said he never

8    left the Dodge Caravan in that first encounter?

9    A.  Right.

10   Q.  And did you watch this Dodge Caravan drive anywhere?

11   A.  No.

12   Q.  After that first encounter?

13   A.  He just went up the street.

14   Q.  And so then what happened next?

15   A.  As I proceeded to finish delivering the mail, I see the

16   white van down the street, but I don't see him never get out the

17   vehicle.  I just see somebody running toward me.

18   Q.  Could you tell where the white van was parked?

19   A.  It could have been parked in front of 4631 in that general

20   region.

21   Q.  So it was parked in that general region?

22   A.  Uh-huh.

23   Q.  And you saw a man you said running towards you?

24   A.  Yes.

25   Q.  So he was running north on North 35th Street?

1    A.  Yes.

2    Q.  Could you describe the man?

3    A.  Tall, slender, medium build, beard, contacts, dreads,

4    shorter length dreadlocks.

5    Q.  How long were the dreadlocks?

6    A.  Couldn't have about no more to his ears.

7    Q.  And what did he say to you as he was running?

8    A.  Hey mailman, could I talk to you?  Sure.  What the fuck you

9    spray my dog for?  I said, I sprayed your dog because your dog

10   was loose.  What, you don't like dogs?  I don't know you or your

11   dog, so I'm not fix' n to try to play devil's advocate with your

12   dog.  I don't deal with dogs that I don't know.  I stated to

13   him, could you, like, back up a little bit because you making me

14   nervous.  Fuck that, you ain't going to be delivering no mail

15   here.  Is that correct, you getting a P.O. Box?  You're not

16   going to tell me where I can and cannot go.

17   Q.  Did he ever threaten you?

18   A.  Not at that time.

19   Q.  Did he ever pull a gun on you?

20   A.  Not until he started walking away.

21   Q.  Could you explain what happened then?

22   A.  He said, you ain't going to bitch ass be delivering no mail

23   here no more.  I'm like, okay, so you must fix' n to get a P.O.

24   Box or something.  No, I ain't fix' n to get nothing.  You ain't

25   going to be delivering no mail.  So you threatening me?  No,

1    this is a threat.  As he's backing away, he's doing like this

2    with a firearm.

3    Q.  And he took out a gun?

4    A.  Uh-huh.

5    Q.  And pointed it at you?

6    A.  Yes.

7    Q.  Could you tell what color the gun was?

8    A.  It was black.

9    Q.  Could you tell what type of gun it was?

10   A.  A small gun.

11   Q.  Did you know the caliber?

12   A.  I think probably been a .38.

13   Q.  When he was initially talking to you, confronting you, how

14   close did he get to you?

15   A.  About three feet.

16   Q.  And as he was backing away and pulled out the firearm, how

17   far away was he from you?

18   A.  I'd say about seven feet.

19   Q.  Mr. Polnitz, do you own guns?

20   A.  Yes.

21   Q.  Do you know about guns?

22   A.  Yes.

23   Q.  Do you have friends who own guns?

24   A.  Yes.

25   Q.  Do you discuss guns with those friends?

54

1    A.   Yes.

2    Q.   Could you -- Could you see down the barrel of the gun?

3    A.   Yes.

4    Q.   Could it have been a water gun that he pointed at you?

5    A.   No.

6    Q.   How do you know that?

7    A.   A water gun has is pea hole.

8    Q.   It has a small pea opening?

9    A.   Yes.

10   Q.   That gun didn't have a small opening?

11   A.   No, it didn't.

12          THE COURT:  Mr. Corey, I assume that item of evidence

13   has been locked and unloaded?

14          MR. COREY:  Yes, Your Honor.

15          THE COURT:  I was just going to ask that myself.

16   Q.   I've placed in front of the witness what has previously been

17   marked as Exhibit 7.  Do you recognize that type of gun?

18   A.   Yes, I recognize the type of gun.

19   Q.   Is that the type of gun that the defendant in this case

20   pointed at you?

21   A.   It could have been something similar to that.  It was about

22   that size.

23   Q.   And you didn't actually read the serial number from the gun?

24   A.   No.

25   Q.   So what happened after the second confrontation?

                                                              55

A.  Second confrontation after he said all that, it was like,
you going to pull a gun on a federal employee?  That's when he
took off running.

Q.  Where did he run?

A.  Back toward 4631.

Q.  Did you actually see him go in the residence?

A.  No.

Q.  What did you see?

A.  I seen him run up the steps.

Q.  And 4631, that's the same address the pit bull came from?

A.  Yes.

Q.  Did you finish your -- Did you have additional mail to
deliver at this time?

A.  Yes.

Q.  What did you have left to do that day?

A.  I had 3500-block of Hampton to finish.

Q.  And during this confrontation, was it day or night?

A.  Daylight.

Q.  And it was -- Was it sunny out?

A.  About 5 o'clock in the afternoon, the evening.

Q.  Are you sure on the time?

A.  Positive.

Q.  Mr. Phillips, did you meet with officers later that evening?

A.  Yes.

Q.  And what happened?

1    A.   The police came down to our station, gave my statement, went

2    back to the residence along with the postal inspector.

3    Q.   And did someone call 911?

4    A.   Yes.

5    Q.   Do you remember who did?

6    A.   My supervisor.

7    Q.   What did you tell -- Did you give the description of the

8    address to them?

9    A.   Yes.

10   Q.   Did you give the description of the suspect?

11   A.   Yes.

12   Q.   Did you give the description of the gun?

13   A.   Yes.

14   Q.   So later that evening, did you meet with law enforcement?

15   A.   Yes, they came to my house around close to midnight.

16   Q.   And what happened then?

17   A.   He pulled a lineup.  We did a lineup right there on the

18   street.

19   Q.   And if you could turn to the photographs that I've placed in

20   front of you.  Could you look and see if this looks like the

21   people that were the photographs that were placed in front of

22   you?

23   A.   Yep, yes.

24   Q.   And at the end, there should be a paragraph -- a paper that

25   says Supplementary Report on Photo Array Identification Form.

1    Do you see that?

2    A.  Yes.

3    Q.  Do you see some instructions that are written there?

4    A.  Yes, I do.

5    Q.  Do you remember the officer reading those to you?

6    A.  Yes.

7    Q.  And did they tell you to sign a particular photograph if it

8    was the person who pointed the gun at you?

9    A.  Yes.

10               MR. COREY:  Move to admit Exhibit 13.

11               THE COURT:  Thirteen?

12               MR. COREY:  Yes.

13               THE COURT:  Mr. Uller.

14               MR. ULLER:  No objection.

15               THE COURT:  Without objection, I'll admit Exhibit 13.

16               MR. COREY:  Permission to publish?

17               THE COURT:  You may.

18   Q.  Can you see what I've put on the screen in front of you?

19   A.  Yes.

20   Q.  It says there's six photographs and one of them may or may

21   not be the person who pointed the weapon at you?

22   A.  Yes.

23   Q.  And you were to look at the photographs one at a time?

24   A.  Correct.

25   Q.  And you signed one of those photographs?

```
 1    A.   Correct.

 2    Q.   Was that the photograph that you signed?

 3    A.   Yes.

 4    Q.   Is that your signature and the date?

 5    A.   Yes.

 6    Q.   How sure were you that that was the person that pointed the

 7    firearm at you?

 8    A.   100 percent sure.

 9    Q.   And in Exhibit 13 that I just showed you, the signature is

10    on the back of that photograph, correct?

11    A.   Correct.

12    Q.   The gun you were threatened with, was it a semi-automatic

13    weapon?

14    A.   It's hard to say, I never fired it.

15              MR. COREY:  No further questions.

16              THE COURT:  Thank you, Mr. Corey.  Mr. Uller, do you

17    have any questions for Mr. Phillips?

18              MR. ULLER:  I do.

19    **CROSS EXAMINATION BY MR. ULLER:**

20    Q.   So as a mailman, you're given a route?

21    A.   I'm not given a route, I pick a route.

22    Q.   And at this time, you say that had been your route since

23    about February?

24    A.   Uh-huh.

25    Q.   And 4631 N. 35th Street is part of that route, right?
```

59

```
 1    A.   Yes.

 2    Q.   It's sort of right in the middle of that route?

 3    A.   Correct.

 4    Q.   You kind of start over onto the east end around 32nd?

 5    A.   Uh-huh.

 6    Q.   And going west to about 39th?

 7    A.   Yes.

 8    Q.   And I guess a southern end, so it's about seven blocks,

 9    right?

10           THE COURT:  I'm sorry, Mr. Uller.  Mr. Phillips, I am

11    going to have to ask you to say yes or no.  And if you could

12    skooch the mic in front of you.  I'm sorry, Mr. Uller.

13    Q.   So 35th is, obviously, right kind of in-between 32nd and

14    39th?

15    A.   Yes.

16    Q.   And then on the southern end, you're starting around

17    Glendale?

18    A.   Yes.

19    Q.   And you go about four blocks north, is that about right?

20    A.   Yes.

21    Q.   So there's the 3500-block of, you know, 35th Street or

22    4600-block, right?

23    A.   Yes.

24    Q.   That's the 4700-block?

25    A.   Yes.
```

60

```
1    Q.  And then you hit Hampton, right?

2    A.  Yes.

3    Q.  And Hampton's kind of a main thoroughfare?

4    A.  It's a main street.

5    Q.  It goes east/west?

6    A.  Yes.

7    Q.  And then you go a block north of that to start?

8    A.  Yes.

9    Q.  So it's about three blocks north to south?

10   A.  Yes.

11   Q.  And about seven blocks east to west?

12   A.  Yes.

13   Q.  And that's -- That had been your route for this period of

14   time?

15   A.  Correct.

16   Q.  And again 35th Street is kind of right dead smack in the

17   middle of that, isn't it?

18   A.  Yes.

19   Q.  And you -- When this was your route, you would get to work

20   at about 7:30 in the morning, right?

21   A.  Correct.

22   Q.  And you usually finished your route by about 3 o'clock,

23   right?

24   A.  Correct.

25   Q.  And that's June 27th?
```

61

```
 1   A.   Correct.

 2   Q.   You encountered the pit bull at 4631 N. 35th Street?

 3   A.   Yes.

 4   Q.   You sprayed the dog?

 5   A.   Yes.

 6   Q.   That was the first time you ever used your dog spray as a

 7   letter carrier, was it not?

 8   A.   No.

 9   Q.   It was not your first time?

10   A.   No.

11   Q.   You recall telling the police when you talked to them that

12   it was the first time you had ever used it?

13   A.   No.

14   Q.   You say you've been a letter -- You're still employed by the

15   postal service?

16   A.   Correct.

17   Q.   And you say now you've been there about five years?

18   A.   Yes.

19   Q.   This was about a year-and-a-half ago, right?

20   A.   Correct.

21   Q.   So you were about three-and-a-half into your -- three years

22   into your job with the postal service at this point?

23   A.   Correct.

24   Q.   Did you ever report using your dog spray on other dogs to

25   your employer?
```

```
 1   A.   We don't have to.

 2   Q.   And you don't have a dog, do you?

 3   A.   No.

 4   Q.   Do you have any pets?

 5   A.   No.

 6   Q.   Do you have family that has pets?

 7   A.   No.

 8   Q.   You're familiar where people who have pets tend to be

 9   attached to their pets?

10   A.   Yes.

11   Q.   Some people view them as members of their family?

12   A.   They are members of the family.

13   Q.   And when you were confronted by the dog's owner that you had

14   sprayed, it was apparent to you that this individual was upset,

15   correct?

16   A.   Correct.

17   Q.   And he was upset with you, right?

18   A.   Correct.

19   Q.   Now, it's not -- You said you picked your route, right?

20   A.   Uh-huh, yes.

21   Q.   It's not an ideal situation to have to encounter someone

22   who's angry with you for spraying their dog on a daily basis, is

23   it?

24   A.   Not really.

25   Q.   And you indicate this is six days a week that you're out
```

```
 1   there delivering mail?

 2   A.  Yes.

 3   Q.  After June 27th, you were assigned a new route, weren't you?

 4   A.  Yes.

 5   Q.  You remained in the same district, right?

 6   A.  Yes.

 7   Q.  Same office?

 8   A.  Yes.

 9   Q.  That post office is on Teutonia?

10   A.  Teutonia and Florist.

11   Q.  You were given a route a few miles north of Mill Road,

12   correct?

13   A.  Correct.

14   Q.  And after June 27, 2017, you never had to go deliver mail to

15   the 4600-block of North 35th Street ever again, did you?

16   A.  No.

17   Q.  Now, you're no longer at the route, the second route that

18   you had after this incident?

19   A.  Correct.

20   Q.  You're not even in this -- out of that post office, are you?

21   A.  The zip code, yes.

22   Q.  So you operate out of the same post office on Teutonia?

23   A.  No, I'm on Fred John.

24   Q.  That's on, like, 92nd and Silver Spring?

25   A.  Correct.
```

```
1   Q.  That's probably five miles west of your old post office,
2   correct?
3   A.  Correct.
4   Q.  Now, you indicate that you had one more block of mail to
5   deliver after the encounter with the mailman(sic), right?
6   A.  Correct.
7   Q.  And you delivered that mail, right?
8   A.  Correct.
9   Q.  Did you when you had this route have, I guess, a pattern
10  that you -- you know, a route that you took within your route?
11  A.  Over time.
12  Q.  So was there -- What was your path?
13  A.  Come in in the morning, set a route.  If I have to set
14  another route, that means I'm going to be out there later, like
15  two hours extra on my route because I'm setting another route
16  and I'm breaking it out to give other carriers so they can have
17  overtime.  On this particular day, I had broke another route
18  down, got out there about 11:00.  I'm pretty accurate with my
19  delivery, so I tried to get basically done before 5 o'clock, so
20  I can go home and just be with my son.
21  Q.  And so you've talked a little bit about this encounter now
22  with Mr. Polnitz, right?
23  A.  Uh-huh, yes.
24  Q.  And you see him the first time he's in his vehicle?
25  A.  Yes.
```

```
1    Q.  And does he get out of his vehicle?

2    A.  No.

3    Q.  And so he's talking to you from the vehicle, and he's

4    yelling at you basically?

5    A.  He's not yelling, he's basically saying why did I spray his

6    dog.  And I explained to him in the calmest manner I'd ever been

7    in why I sprayed his dog.  At first, I thought he was calm, too

8    until I saw he come back later on.

9    Q.  How much time passed between the first encounter and when

10   you saw him the second time?

11   A.  Like four minutes.

12   Q.  And you're still in the same block at this point?

13   A.  Yes.

14   Q.  And that's the 4700-block?

15   A.  Yes.

16   Q.  But I guess the southern end of the 4700-block?

17   A.  Yes.

18   Q.  And you say in this encounter, he's running towards you,

19   right?

20   A.  Yes.

21   Q.  And you've described it as a full-speed run, correct?

22   A.  No, I call it as a light jog.

23   Q.  You're saying now it's a light jog?

24   A.  Correct.

25   Q.  Do you remember telling the police that he ran full speed
```

66

1    towards you?

2    A.  I don't recall.

3    Q.  So it's been about 18 months since the incident.  Do you

4    think your memory was better on June 27th or today?

5    A.  On June 27th.

6    Q.  So if you had said that he was running full speed on June

7    27th, do you think that's more likely?

8    A.  More or less.

9    Q.  And he comes at you again talking about the same thing, why

10   did you spray my dog, why did you spray my dog.  And you

11   indicate that he then told you, you're not going to be

12   delivering mail here anymore?

13   A.  That's correct.

14   Q.  You asked him if that was a threat?

15   A.  Correct.

16   Q.  And he walked away?

17   A.  Started walking away, turned around and said, no, this is a

18   threat.

19   Q.  You indicate that's when he pointed the gun at you?

20   A.  Correct.

21   Q.  And he then turned around and ran away?

22   A.  Jogged away.

23   Q.  Okay.  Do you remember telling the police that he ran full

24   speed?

25   A.  Yes.

```
1    Q.  So were you lying to the police when you said he ran full
2    speed or --
3    A.  Could have been a jog.  My definition of running and jog is
4    two different things.  I'm a heavy guy.  I don't run full speed.
5    I'm going to jog.  He's a slender guy.  His jog could have
6    turned into a run.
7    Q.  Okay.  So what's full speed to you, a jog?
8    A.  Like heavy breathing.  He wasn't heavily breathing when he
9    walked up to me.
10   Q.  Now, and then you went on and you got in your car?
11   A.  My vehicle.
12   Q.  And your vehicle was parked kind of right on the corner of
13   Courtland and 35th?
14   A.  Yes.
15   Q.  And so then you went, you drove off in your car?
16   A.  The postal vehicle?
17   Q.  Yeah.
18   A.  Yes.
19   Q.  Your postal vehicle, that's the mail vehicle that's provided
20   to you by the postal service?
21   A.  Correct.
22   Q.  And you went and continued delivering mail?
23   A.  Correct.
24   Q.  You didn't call 911?
25   A.  I called my safety captain.
```

```
1    Q.   Pardon me?
2    A.   I called my safety captain.
3    Q.   Who's your safety captain?
4    A.   His name is Quincy Miller.
5    Q.   You didn't call 1911?
6    A.   My supervisor called 911 once I came back to the station.
7    Q.   There's no postal service policy that says if you're in
8    danger that you don't call 1911, is there?
9    A.   No.
10   Q.   You know what 911 is?
11   A.   Uh-huh.
12   Q.   You -- after -- You indicate that my client was -- had a gun
13   pointed at you.  Did you tell him to go ahead and shoot you?
14   A.   I don't recall.
15   Q.   Do you remember telling the police that you told him to go
16   ahead and shoot you if he was going to pull a gun out over a
17   dog?
18   A.   I don't recall.
19   Q.   So you had what about one block left of mail --
20   A.   Yes.
21   Q.   --to deliver.  And you went and delivered that mail?
22   A.   Correct.
23   Q.   And the 3500-block of Hampton is north of the residence
24   where you saw where the dog came from, right?
25   A.   Correct.
```

69

1    Q.  And it's that same block going east/west, correct?

2    A.  Right.

3    Q.  So you were continuing to deliver mail in the immediate

4    vicinity of where the man who had pointed the gun at you was

5    located?

6    A.  Correct.

7    Q.  And you didn't call 911?

8    A.  Not until I got back to the station.

9    Q.  And when you got back to the station, it wasn't even you

10   that called 911, is it?

11   A.  No.

12   Q.  It was a supervisor?

13   A.  Correct.

14   Q.  And when you -- Strike that.  Between that block, that last

15   block of mail on Hampton that you had to deliver, 30 minutes, is

16   that a rough estimate of how long it took to you do that block?

17   A.  No.  That block only takes about seven minutes, both sides

18   of the street.

19   Q.  And then you were done with your route?

20   A.  Correct.

21   Q.  And I think you testified on direct that this was about

22   5:00?

23   A.  Correct.

24   Q.  You were certain of that, correct?

25   A.  Correct.

```
 1   Q.  Your safety captain when you called him, he didn't tell you
 2   to come back to the --
 3   A.  He told me to call the police.  He said contact the post
 4   office first to see if you can get somebody to come out there.
 5   I called the post office several times.  No one ever picked up
 6   the phone.  Once I got back to the station, I made a big scene,
 7   and that's when he called the police because no one believed me.
 8   Q.  So even the people at the post office didn't believe you?
 9   A.  Correct.
10   Q.  Now, you knew that at the 4631 address, there were people
11   who lived there with the name Polnitz, right?
12   A.  To be honest, I didn't even know those people moved over
13   there.  They just may have moved off there.  When I first
14   started delivering mail, the house was vacant for months.
15   Q.  You told the police that you had mail from that residence,
16   correct?
17   A.  Correct.
18   Q.  And you provided them with the name?
19   A.  Correct.
20   Q.  And that name was Polnitz?
21   A.  Uh-huh.
22   Q.  In advance of your testimony today, you had a meeting with
23   the people seated at the table next to me, didn't you?
24   A.  That is correct.
25   Q.  That was on November 1st, right?
```

71

```
 1    A.  That is correct.

 2    Q.  And both of the prosecutors were there, right?

 3    A.  Yes.

 4    Q.  And Mr. York was there?

 5    A.  Yes.

 6    Q.  And that was at the post office where you currently work out

 7    of, correct?

 8    A.  That is correct.

 9    Q.  And they kind of prepared you for what you would be

10    testifying to, right?

11    A.  Correct.

12    Q.  They went over the questions they were going to ask you,

13    right?

14    A.  Correct.

15    Q.  They told you the type of questions that I would probably

16    being asking you, right?

17    A.  No.

18    Q.  You told them that you were probably going to lie when you

19    came in here, didn't you?

20    A.  That is correct.

21    Q.  Now, you haven't met with me?

22    A.  No.

23    Q.  You haven't met with anyone from my office?

24    A.  No.

25    Q.  When you talked to them, you told them that -- Do you
```

1  remember telling the prosecutors and the postal inspector that
2  you had to move?
3  A.  Yep.
4  Q.  Because of this?
5  A.  Yes.
6  Q.  Do you remember telling them that they made you deliver mail
7  in that area afterwards?
8  A.  That is correct.
9  Q.  Now, you've testified that you didn't deliver on this route
10 ever again after that day?
11 A.  Yes.
12 Q.  And they did move you?
13        THE COURT:  I'm sorry, you have to answer.
14        THE WITNESS:  Yes.
15 Q.  Now, you also indicated that you moved, right?
16 A.  Yes.
17 Q.  You didn't move, did you?
18 A.  Did I move?
19 Q.  Yeah.
20 A.  Yes, I did.
21 Q.  So you lived on 20th Street, right?
22 A.  Next door to my parents.
23 Q.  And that's where the police came and they spoke to you late
24 that night?
25 A.  That's correct.

1    Q.   That's where you did the photo array?

2    A.   That's right.

3    Q.   It's on 20th Street south of Fairmount?

4    A.   Correct.

5    Q.   You still live there?

6    A.   At that time, yes.

7    Q.   And today?

8    A.   No.

9    Q.   You don't live there anymore?

10   A.   No.

11   Q.   When did you move?

12   A.   I moved on the 1st of November.

13   Q.   So you moved the day that you were meeting with these

14   individuals?

15   A.   That is correct.

16   Q.   And your mail still gets delivered to that address on 20th

17   Street, doesn't it?

18   A.   No, goes to my new address.

19   Q.   You still work for the postal service, right?

20   A.   That's correct.

21   Q.   You know they forward mail?

22   A.   Yes.

23   Q.   And it's your testimony that your mail in November has been

24   going to your new address and not your address on 20th Street?

25   A.   That is correct.

```
 1    Q.   And you remember a few weeks ago having somebody come to
 2    your -- to the address on 20th Street to speak to you?
 3    A.   That is correct.
 4    Q.   And they asked you if you were Kevin Phillips?
 5    A.   No, I never spoke to anyone.  My neighbors's did.
 6    Q.   Your car was there, wasn't it?
 7    A.   No.
 8    Q.   You have a tan SUV?
 9    A.   No, I don't own a vehicle.
10    Q.   You don't drive a tan or gray SUV?
11    A.   No, I do not.
12    Q.   You're on Facebook, right, Mr. Phillips?
13    A.   That's correct.
14    Q.   This is a picture from your Facebook profile?
15    A.   Yes, it is.
16    Q.   It is a picture of a vehicle?
17    A.   That I am standing behind in my back yard.
18    Q.   Is that your vehicle?
19    A.   No, it is not.
20    Q.   Do you know whose vehicle that is?
21    A.   That's my neighbor's father's vehicle.
22    Q.   You were present when your supervisor called 911?
23    A.   That's correct.
24    Q.   And your recollection this was after 5 o'clock?
25    A.   Right, correct.
```

75

1    Q.  Do you remember her asking you when this happened?

2    A.  No.

3    Q.  You do not remember telling them it happened ten minutes

4    ago?

5    A.  I probably did.

6    Q.  You were present for the whole 911 call, correct?

7    A.  No.

8    Q.  Where were you?

9    A.  I was standing by the door.

10   Q.  By what door?

11   A.  By the back door by the security by the post office having a

12   smoke.

13   Q.  Did you start your cigarette before or --

14   A.  After she made the call.

15   Q.  And so you were not within earshot of her?

16   A.  No.

17   Q.  Did you at any time become near her while she was on the

18   phone with them?

19   A.  After she got off the phone.

20   Q.  After she got off the phone?

21   A.  Uh-huh, yes.

22   Q.  So it's your testimony you were not there while she was

23   talking to 911?

24   A.  No.

25   Q.  Mr. Phillips, you're aware that your supervisor called 911,

1   correct?

2   A.  Right.

3   Q.  That's Linda Witherspoon?

4   A.  Yes.

5   Q.  And it's your testimony that you weren't there --

6   A.  That is correct.

7   Q.  --when she made the call?

8   A.  That is correct.

9           Mr. Uller:  Your Honor, I'm going to play

10  Exhibit 25 -- pardon me -- Exhibit 23, the 911 call.  Permission

11  from the Court.

12          MR. COREY:  Your Honor, we object on hearsay grounds.

13      (Discussion off the record.)

14      (Back on the record.)

15          THE COURT:  I've overruled the objection.  You can --

16  I'm sorry, what is the exhibit number?

17          MR. ULLER:  It's 23 and 24.  There's a transcript that

18  we'll -- It'll just be Exhibit 23, Your Honor.

19          THE COURT:  23.  All right.

20      (Whereupon tape is played.)

21          MR. ULLER:  Your Honor, I move to admit Exhibit 23.

22          THE COURT:  I overruled the objection, hearsay.  Any

23  other objection?

24          MR. COREY:  No, Your Honor.

25          THE COURT:  I'll admit Exhibit 23.

1  Q.  Do you agree, sir, you were there while your supervisor was

2  talking to 911?

3  A.  Correct.

4         MR. ULLER:  Nothing further.

5         THE COURT:  Any redirect, Mr. Corey?

6         MR. COREY:  Yes, Your Honor.

7  **REDIRECT EXAMINATION BY MR. COREY:**

8  Q.  You testified about your use of dog spray.  Do you remember

9  that?

10  A.  Yes.

11  Q.  And you had never used dog spray on that part of the route,

12  correct?

13  A.  On that part of the route, yeah.

14  Q.  You used it in your career as a letter carrier before,

15  correct?

16  A.  That's correct.

17  Q.  After this incident, did you want to change routes?

18  A.  Not really.

19  Q.  And earlier on direct or on cross examination, you testified

20  about people not believing you?

21  A.  That is correct.

22  Q.  They didn't believe that you had called earlier.  Is that

23  what you meant?

24  A.  That is correct.

25  Q.  They believed you about the gun?

```
1    A.  Yes.
2    Q.  Okay.  I just wanted to clarify that.  Did you listen to
3    that recording that was just played?
4    A.  Yes.
5    Q.  Did you hear a description about what the individual was
6    wearing?
7    A.  Yes.
8    Q.  What was that?
9    A.  White T-shirt, orange shorts.
10   Q.  Could you have seen that when he was in the Dodge Caravan?
11   A.  Yes.
12   Q.  Could you have seen the shorts when he was in the Dodge
13   Caravan?
14   A.  I couldn't have seen the shorts until he got out.
15   Q.  You only saw the shorts in that second confrontation?
16   A.  That's correct.
17   Q.  Mr. Phillips, do you want to be here today?
18   A.  I sure do not.
19   Q.  Did you want to testify today?
20   A.  I sure did not.
21   Q.  Do you feel more safe having testified here today?
22   A.  I sure do not.
23   Q.  And you gave a statement to law enforcement shortly after
24   the incident occurred?
25   A.  That is correct.
```

79

1    Q.  And that was video recorded?

2    A.  That is correct.

3    Q.  And you've seen a video of that statement?

4    A.  That is correct.

5    Q.  That's an accurate video?

6    A.  Yes.

7    Q.  That's been marked as Exhibit 8?

8    A.  Yes.

9            MR. COREY:  Move to admit Exhibit 8, the statement.

10           THE COURT:  Mr. Uller.

11           MR. ULLER:  No objection.

12           THE COURT:  Without objection, I'll accept Exhibit 8.

13           MR. COREY:  I'll publish it, previously admitted

14   exhibit as well.

15           THE COURT:  Are we looking at two things at the same

16   time?

17           MR. COREY:  Yes, Your Honor.

18           THE COURT:  So Exhibit 3 is the previously admitted

19   exhibit?

20           MR. COREY:  Yes, Your Honor.

21           THE CLERK:  I'll turn up the voluntarily a little.

22   Q.  So that is the video of you giving the statement to law

23   enforcement?

24   A.  That is correct.

25   Q.  That was the same day?

1    A.  Yes.

2        (Whereupon tape is played.)

3    Q.  And you were describing the first confrontation there?

4    A.  Yes.

5    Q.  And what did you say that day?

6    A.  A white Dodge Caravan.

7        (Whereupon tape is played.)

8            MR. COREY:  Can we turn it up a little bit?

9    Q.  I will just go back to where we started, just so the jury

10   can hear.

11       (Whereupon tape is played.)

12   Q.  So that day you said he was wearing -- He had a beard?

13   A.  Yes.

14       (Whereupon tape is played.)

15   Q.  You said he had ear-length dreadlocks.  Can you give me a

16   verbal yes for the record, please?

17   A.  Yes.

18       (Whereupon tape is played.)

19   Q.  So royal Pepsi blue contacts.  Is that what you said?

20   A.  Yes.

21       (Whereupon tape is played.)

22   Q.  And you said white T-shirt and orange athletic shorts?

23   A.  Yes.

24   Q.  That's the same thing you said on the 911 call, correct?

25   A.  That is correct.

1   Q.  I'm going to skip ahead to the paragraph where he asked you
2   to identify the firearm.
3       (Whereupon tape is played.)
4   Q.  What did you say there?
5   A.  .380.
6   Q.  Small gun, looked like a .380?
7   A.  Yes, it did.
8           MR. COREY:  Nothing further.
9           THE COURT:  Anything else Mr. Uller?
10  **RECROSS EXAMINATION BY MR. ULLER:**
11  Q.  You know guns?
12  A.  Yes.
13  Q.  .380 is a small gun, right?
14  A.  Yes, it is.
15  Q.  It is a pretty common gun?
16  A.  Yes.
17  Q.  You have a C.C.W. permit?
18  A.  Yes.
19  Q.  It is a common conceal carry gun?
20  A.  Yes, it is.
21          MR. ULLER:  That's all.
22          THE COURT:  Anything else, Mr. Corey?
23          MR. COREY:  No, Your Honor.
24          THE COURT:  Mr. Phillips, thank you.  You are excused.
25      (Witness excused.)

```
 1          THE COURT:  Ladies and Gentlemen, how are we doing?
 2   Anyone need to take a break?  How long do you expect the next
 3   witness to take?
 4          MR. TAIBLESON:  Not very long, probably ten minutes.
 5          MR. ULLER:  Can we take five, Judge?
 6          THE COURT:  Sure.  Okay.  Let's do that now.  Why
 7   don't we take ten.  Hopefully everybody can do whatever they
 8   need to do.  Remember, let's not talk with each other or anybody
 9   else about the case.
10     (Jury excused.)
11     (Jury enters.)
12          THE COURT:  All right.  Mr. Corey, are you ready to
13   call your next witness?
14          MR. TAIBLESON:  We are, Your Honor.  The United States
15   calls Milwaukee Police Officer Andrew Wilkiewicz.
16          Andrew Wilkiewicz, being first duly sworn to tell the
17   truth, the whole truth, and nothing but the truth, testified as
18   follows:
19          THE CLERK:  Sir, can you please state your name for
20   the record and spell your last name.
21          THE WITNESS:  Sure.  My name is Andrew Wilkiewicz,
22   W-i-l-k-i-e-w-i-c-z.
23          THE COURT:  Thank you.  Mr. Taibleson.
24          MR. TAIBLESON:  Thank you, Your Honor.
25   **DIRECT EXAMINATION BY MR. TAIBLESON:**
```

1    Q.   Officer Wilkiewicz, how are you employed?

2    A.   I'm employed by the City of Milwaukee as a Police Officer.

3    Q.   For how long have you been employed as a police officer for

4    the City of Milwaukee?

5    A.   Approximately four-and-a-half years.

6    Q.   Is that in District 7?

7    A.   That is correct.

8    Q.   Sir, did you review anything before testifying here today?

9    A.   I did review the reports that I wrote as well as had met

10   with both you and Mr. Corey regarding the trial prep here.

11   Q.   Thank you.  Did you respond to a call on June 27th of last

12   year regarding a man threatening a postal service employee?

13   A.   Yes, I did.

14   Q.   And where did you go when you got that call?

15   A.   Originally I went to the post office where that postal

16   worker worked, which is 5995 N. Teutonia.

17   Q.   When you got there, did the victim describe what had

18   happened?

19   A.   He did.

20   Q.   What did you do then?

21   A.   Well, I took an initial statement from the victim at the

22   post office, and he described an incident that occurred in the

23   4600-block of North 35th Street where he was delivering his

24   route, delivering his mail.  And he observed a pit bull get

25   loose from a yard and come at him.  He felt that that dog was

1  going to be a potential threat to him, so he deployed his pepper
2  spray at the dog at which time the dog retreated and ran back
3  into the original yard that it came from.
4  Q.  Did you respond to 4631 N. 35th Street in Milwaukee?
5  A.  Yes, I did.
6  Q.  I'm going to show you a photograph that's been previously
7  admitted and published to the jury.  If you can publish that.
8  Is there a photograph on your screen?
9  A.  Yes.
10  Q.  Do you recognize that house?
11  A.  Yes.
12  Q.  Is that 4631 N. 35th?
13  A.  Yes, it is.
14  Q.  Officer Wilkiewicz, when you got to the house beyond looking
15  for -- Did you go to the house looking for a suspect?
16  A.  I did go to the house looking for a suspect.
17  Q.  We'll address that in a second.  Beyond looking for that
18  suspect, were you looking for a white Dodge Caravan as well?
19  A.  Yes, I did observe that there was a white Dodge Caravan
20  parked in the rear of this residence.
21  Q.  Let me show you two more photographs in sequence that have
22  previously been admitted.  Is that a photograph of the white
23  Dodge Caravan --
24  A.  Yes, it is.
25  Q.  --that you mentioned?  And one more.  Is that also a

1  photograph of that white Dodge Caravan?

2  A.  Yes, it is.

3  Q.  That was near 4631 N. 35th?

4  A.  It was parked in the rear of that address, yes.

5  Q.  I see this photograph has a license plate.  Did you run that

6  license plate to see to whom that car was registered?

7  A.  I did run that license plate, and it came back registered

8  owner of the Salvation Army.

9  Q.  In the course of your investigation, did you determine that

10  a man, David Polnitz, was a suspect in this case?

11  A.  Yes, I did.

12  Q.  Did you find out where Mr. Polnitz was employed?

13  A.  I did.  He was employed with the Salvation Army.

14  Q.  Okay.  Returning to the house, can you describe physically

15  the man you were looking for at 4631 N. 35th Street?

16  A.  Yeah, the victim in the case described the suspect as a

17  black male in his late thirties to early thirties.  He had

18  ear-length dreadlocks, dark complected.  He was wearing a white

19  T-shirt, orange basketball shorts, and he described his eyes as

20  being Pepsi blue.

21  Q.  And was a man that matched that description at the house

22  that day?

23  A.  I did locate a gentleman that matched that description that

24  was at that residence, yes.

25  Q.  Is he in the courtroom here today?

1    A.  He is.

2    Q.  Would you describe him by where he's sitting and what he's

3    wearing?

4    A.  He's seated at the table, the left -- my left side.  He's in

5    the middle wearing a suit.  He has a goatee.

6    Q.  Has he changed his appearance since you last saw him?

7    A.  Yes, he has.

8    Q.  How's that?

9    A.  He has cut his hair, and I do not see that his eyes are

10   Pepsi blue.

11   Q.  Okay.  I'll show you another photograph that's also been

12   admitted on your screen.  Is that the way the defendant appeared

13   on the day of the arrest?

14   A.  Yes, it is.

15   Q.  I should say you arrested Mr. Polnitz at that house?

16   A.  That is correct.

17   Q.  I show you one more photograph that's been previously

18   admitted.  Is that a full body photograph of the defendant?

19   A.  Yes, it is.

20   Q.  As he appeared on the day he was arrested?

21   A.  That's correct.

22           MR. TAIBLESON:  Your Honor, may I approach the

23   witness?

24           THE COURT:  You may.

25   Q.  Officer Wilkiewicz, I've handed you a disk that's been

1   previously marked as Government's Exhibit 9.  Have you reviewed
2   the video on that disk?
3   A.  Yes.
4   Q.  Is that a body cam video taken by a body cam of yours?
5   A.  Yes, that's the video from my camera.
6   Q.  Did it accurately capture the events of you interacting with
7   and arresting Mr. Polnitz on June 27th?
8   A.  Yes, it did.
9           MR. TAIBLESON:  Your Honor, the Government moves to
10  admit Exhibit 9 into evidence and to publish it to the jury.
11          THE COURT:  Mr. Uller.
12          MR. ULLER:  No objection.
13          THE COURT:  Without objection, I'll admit Exhibit 9.
14  You may publish.
15          MR. TAIBLESON:  Thank, you, Your Honor.
16  Q.  Officer Wilkiewicz, we'll watch the video once all the way
17  through.  And once we've done that, I may go back and ask you
18  about a few parts, in particular.
19     (Whereupon video was played.)
20  Q.  So as we were just saying, that's a video of you interacting
21  with Mr. Polnitz as he came out of his house June 27, 2017?
22  A.  Yes, sir.
23  Q.  Did you arrest him soon after that video stops?
24  A.  Yeah, well --
25  Q.  Took him to the squad car?

1    A.  Yes, that's correct.

2    Q.  I'm going to return to the back and forth you had with

3    Mr. Polnitz.  You asked him, I believe, do you have any firearms

4    on you; is that right?

5    A.  That is correct.

6    Q.  Why did you ask him that?

7    A.  Well, one, it's -- We conduct a search incident to any

8    arrest and additionally based on the information we had from the

9    victim that this is a subject that matched a description that

10   was armed earlier in the day.  So for officer safety, just asked

11   him immediately whether he had any weapons or firearms on him.

12       (Whereupon tape is played.)

13   Q.  All right.  He said, I had a water gun earlier.  Did that

14   get your attention?

15   A.  It did get my attention.

16   Q.  Why is that?

17   A.  Well, first of all, it seemed odd that somebody would have

18   to inform me that he had a water gun earlier.  And again based

19   on the nature of the incident where an actual firearm was used

20   in the commission of a crime, that kind of took me, like, took

21   me that this might be a clue here.

22   Q.  Had you told him at this point that you were investigating a

23   gun incident earlier?

24   A.  At this point, I made no mention about a gun or the incident

25   that preceded this interaction.

1  Q.  In fact, when he walks out of that door, that's the first
2  time you've ever spoken to him; is that right?
3  A.  That is correct.
4  Q.  But he nonetheless said, I had a water gun earlier?
5  A.  That's correct.
6  Q.  And you arrested him -- Took him to the squad car and
7  arrested him after that?
8  A.  That's correct.
9  Q.  Officer Wilkiewicz, did you conduct a photo array on the day
10 of the incident?
11 A.  Yes, I did.
12 Q.  So in layman's terms, is that sort of a photo lineup?
13 A.  Yes.  We take a photo of the suspect and take five
14 additional like photos, and we show them to the witness or the
15 victim, and they have to -- in an attempt to identify the
16 suspect.
17 Q.  And you showed six photographs to the victim, Mr. Phillips,
18 in this case?
19 A.  Yes, I did.
20 Q.  I'm going to pull up on your screen a document that's
21 previously admitted as Exhibit 13, and I'm going to -- Does this
22 appear to be a page from the photo array that you showed the
23 victim in this case?
24 A.  Yes.
25 Q.  Is this -- I take it this page has essentially a description

1    of the protocol for how you conduct a photo array?

2    A.   That's correct.

3    Q.   Scrolling down I see that an individual has circled yes for

4    one of the photographs; is that correct?

5    A.   That is correct.

6    Q.   Is this a photograph of the defendant?

7    A.   Yes, it is.

8    Q.   Is this the photograph that the victim identified as the

9    person who threatened him with a black .380?

10   A.   Yes, it is.

11   Q.   And that's the signature right there and the date?

12   A.   Yes.  After somebody makes an identification, we have them

13   sign and date the back of the photo to signify that that is the

14   photo they selected.

15   Q.   On the screen it says second page.  That is a function of

16   the scanning.  That signature is actually on the back?

17   A.   The signature -- We flip the page over and sign the back of

18   the actual photograph.

19   Q.   Okay.  How many tries did it take the victim to pick out the

20   defendant?

21   A.   One try.

22   Q.   One try.

23              MR. TAIBLESON:  Nothing further, Your Honor.

24              THE COURT:  Mr. Uller, any questions?

25              MR. ULLER:  Thank you, Judge.

1   **CROSS EXAMINATION BY MR. ULLER:**

2   Q.  You're a patrol officer?

3   A.  That's correct.

4   Q.  And as a patrol officer, you kind of respond to calls that

5   you are dispatched to?

6   A.  That's correct.

7   Q.  You're not a detective or an investigator?

8   A.  I'm not a detective.

9   Q.  So there are other -- There are detectives in the police

10  department?

11  A.  There are detectives, yes.

12  Q.  And it's a different role.  Those are the people who kind of

13  follow up and do more detailed investigation in cases?

14  A.  Yes.

15  Q.  You indicate you're with the 7th District?

16  A.  That's correct.

17  Q.  And that covers largely a part of the north side of

18  Milwaukee?

19  A.  Yes.

20  Q.  Largely lower income area?

21  A.  We have varying.  It varies on which side of the city you're

22  on or which side of the district.

23  Q.  Heavily minority?

24  A.  Again, it varies based on where you are in the district.

25  Q.  The area you were dispatched to on this day, June 27th of

1   2017, is that largely a minority area?

2   A.   That is a largely minority area.

3   Q.   Largely low income?

4   A.   Yes, sir.

5   Q.   Populated area?

6   A.   Yes, sir.

7   Q.   An area where the relationship between the police department

8   and the citizens maybe isn't the best?

9   A.   There are people, yes, that do not like the police, but that

10  covers everywhere I've been.  I can't say specifically this area

11  the people don't like the police.

12  Q.   As a patrol officer, you're kind of on the front line of

13  making contact with citizens, right?

14  A.   That's correct.

15  Q.   All over your district?

16  A.   That's correct.

17  Q.   So you respond to calls and you have that -- often have that

18  first contact with citizens who are reporting something to the

19  police?

20  A.   That is correct.

21  Q.   And you encounter a wide range of people in this -- in this

22  role, correct?

23  A.   Yes, sir.

24  Q.   Many are cooperative with you?

25  A.   Many are, yes.

1    Q.   Many are not?

2    A.   Some aren't, yes.

3    Q.   Many will give it to you straight?

4    A.   Yes.

5    Q.   Some don't?

6    A.   Some don't.

7    Q.   It's not uncommon for people to lie to the police, is it?

8    A.   No, it is not uncommon.

9    Q.   So you indicated you respond to calls, and that's what you

10   did in this case, right?

11   A.   That is correct.

12   Q.   You were -- You were dispatched to the post office, right?

13   A.   Yes, that's where the victim was at the time we were

14   dispatched.

15   Q.   And I think you indicated it was a 911 call that brought you

16   there?

17   A.   Well, this call was semi unique in the fact that it happened

18   earlier in the afternoon.  My shift did not start until

19   7:00 p.m.  My partner and I were specifically asked to go handle

20   this invest -- this call when we began our shift.

21   Q.   Sir, I've handed you Exhibit 30.  Is that a document you're

22   familiar with?

23   A.   Yes, it is.

24   Q.   Is it a C.A.D. Report?

25   A.   It's called our C.A.D. Report.

94

1    Q.  C.A.D. Report is an acronym for Computer Aided Dispatch?

2    A.  That's correct.

3    Q.  Would it be fair to describe a C.A.D. Report as kind of a

4    log of your department's events associated with an incident?

5    A.  Yes.

6    Q.  And does it indicate, like, when the call was initially

7    placed?

8    A.  Yes, it does.

9    Q.  And what time was that?

10   A.  The call was created at 16:19, 4:19 p.m.

11   Q.  16:19, that's military time?

12   A.  That's military time, yes.

13   Q.  Is this -- The C.A.D. Exhibit 30, is this the C.A.D. from

14   the incident on June 27, 2017?

15   A.  Yes, it is.

16   Q.  Involving your arrest of Mr. Polnitz?

17   A.  Yes, it is.

18          MR. ULLER:  Your Honor, I move Exhibit 30 into

19   evidence.

20          MR. TAIBLESON:  No objection.

21          THE COURT:  Under no objection, I'll admit Exhibit 30.

22   Q.  So this call came in at 4:19 you said, right?

23   A.  That is correct.

24   Q.  And it indicated there was a firearm involved?

25   A.  Yes, it does.

95

1    Q.  And that's a pretty high priority thing for the police to
2    get a call for a firearm related incident, is it not?
3    A.  Yes, it is.
4    Q.  And there's a priority level assigned to your call, correct?
5    A.  That's correct.
6    Q.  And the C.A.D. indicates the time you arrived on scene to
7    begin investigating, does it not?
8    A.  Yes, it does.
9    Q.  Accurate to say that you responded to that post office at
10   about 7:26 p.m.?
11   A.  We arrived on scene at 7:26 p.m.
12   Q.  That's over three hours after the initial call came in?
13   A.  Yes, it is.
14   Q.  That's a long time for a higher priority call, is it not?
15   A.  Well, initially the call was changed from priority one to a
16   priority two at 16:27, so it downgraded the priority of the call
17   to a priority two.
18   Q.  Still three-hour delay.  Is that normal for a call involving
19   a firearm?
20   A.  Unfortunately at the end of June in the middle of summer, it
21   can be normal for a call of that nature to wait that long.
22   Q.  There are benefits to police responding to a crime scene
23   quickly, right?
24   A.  There can be, yes.
25   Q.  There can be evidence around, right?

96

1  A.  Yes.

2  Q.  There can be witnesses in the area who saw the incident,

3  whatever it was?

4  A.  That's correct.

5  Q.  And the incident or the area where you went and arrested

6  Mr. Polnitz, 4600-block of North 35th Street, that's a

7  residential area?

8  A.  Yes.

9  Q.  Pretty populated?

10 A.  I believe on that street, the east side of the street is a

11 river going through it, so it's just houses on the west side of

12 the street.

13 Q.  To the east of that.  Well, so the corner -- You were able

14 to determine this kind of happened near a corner?

15 A.  Yes.

16 Q.  That is the corner of 35th and Courtland?

17 A.  That's correct.

18 Q.  And 35th and Courtland is on the, I guess, north side of

19 Courtland.  There's houses on both sides of the street, right?

20 A.  There are houses on both sides, yes.

21 Q.  And then on Courtland, both east and west on 35th Street,

22 there are houses there, correct?

23 A.  I believe so, at least on the north side for sure.  On the

24 south side, there's a school.  That wouldn't have been in

25 session at the time.  And on the east side of Courtland,

```
 1   southeast corner, I think is the woods.
 2   Q.  Not uncommon in Milwaukee's residential areas for there to
 3   be a lot of people out during the summer?
 4   A.  That is correct.
 5   Q.  So you get to the post office at about 7:26, and you took a
 6   report from Mr. Phillips?
 7   A.  That's correct.
 8   Q.  He kind of gave you a brief rundown of what happened, right?
 9   A.  I wouldn't say necessarily brief.  We went through a pretty
10   full interview with him, but, yes, he gave me a rundown of what
11   happened.
12   Q.  And gave you some details, didn't he?
13   A.  Yes, he did.
14   Q.  One of the details was that after he described two separate
15   encounters, correct?
16   A.  That's correct.
17   Q.  The first one he described the individual as driving up past
18   him or towards him and having words with him from the car?
19   A.  Yes.
20   Q.  And the second one was the one that you were probably a
21   little more interested in where he approached him with a
22   firearm?
23   A.  I was interested in both of them.  They are related, but
24   yes.
25   Q.  And specifically, I want to ask you a few questions about
```

1  the second encounter that he described. He, Mr. Phillips, told

2  you that the person ran towards him from the 4631 address, left

3  that address and ran towards him full speed. Do you remember

4  him telling you that?

5  A.  Yes.

6  Q.  Now, in -- You've watched a little bit of a body cam video

7  here today already, and that is when you arrested Mr. Polnitz.

8  You're aware there's also body cam of your encounter or your

9  interview with Mr. Phillips?

10  A.  Yes.

11  Q.  Have you reviewed that body cam at all?

12  A.  Not since the -- probably the day of the incident or right

13  around when this incident happened.

14  Q.  So you have reviewed it, right?

15  A.  Yes.

16  Q.  So you do remember your conversation with Mr. Phillips,

17  correct?

18  A.  Yes.

19  Q.  I'd like to show you what's been marked as Exhibit 25. Do

20  you see a video on your screen, sir?

21  A.  I do not.

22          THE COURT:  Before we show this --

23          MR. ULLER:  I wasn't going to publish it yet.

24  Q.  Do you see the video, sir?

25  A.  The video is on my screen, yes.

1   Q.  Is that a body cam video of your conversation with

2   Mr. Phillips?

3   A.  It's a body cam.  I believe that's me.  I can tell you once

4   it plays, but it is in the post office when I was talking to

5   Mr. Phillips.

6           MR. ULLER:  Your Honor, I would move to admit

7   Exhibit 25.  I believe it's similar to Exhibit 8 that's already

8   been admitted.

9           MR. TAIBLESON:  No objection.

10          THE COURT:  Okay.  Without objection, I'll admit

11  Exhibit 25.  You may publish.

12  Q.  Officer, there's a video playing, correct?

13  A.  It is paused, yes.

14  Q.  You're not able to hear any audio in this part of the video;

15  is that correct?

16  A.  Correct.  There's a 30 second buffer.

17  Q.  When a police officer activates his camera, it doesn't begin

18  recording and audio recording right away, right?

19  A.  Yes.

20  Q.  And it has a function where it will actually go back and

21  show the video from the 30 seconds leading up to that point,

22  right?

23  A.  That's correct.

24  Q.  It doesn't capture the audio from those 30 seconds leading

25  up to it?

```
 1    A.   Correct.

 2    Q.   Just the video.

 3         (Whereupon tape is played.)

 4    Q.   Is that an accurate account of the brief part of the

 5    conversation, Mr. Phillips?

 6    A.   Yes.

 7    Q.   This might seem obvious to you, but when you are dispatched

 8    to a crime scene to take a report, that is kind of the beginning

 9    of an investigation?

10    A.   Yes.

11    Q.   There are things that will happen after that, right?

12    A.   Yes.

13    Q.   And some of those things happened in this case, right?  You

14    made an arrest?

15    A.   Yes.

16    Q.   I guess you don't just take a report of a crime and take the

17    file to the local prosecutor's office and have it charged,

18    right?

19    A.   I guess it depends on the case and the incident.

20    Q.   So you -- Do you have some idea of the time of day when this

21    thing -- when this encounter supposedly took place?

22    A.   I believe it was somewhere around 3:30, 4 o'clock, if I

23    remember correctly, in the afternoon.

24    Q.   And by the time you got to Mr. Polnitz' house, it was about

25    8:00?
```

101

1    A.  If I can refer to the C.A.D., I can tell you exactly when we

2    came to the house.  We were on site at 8 o'clock, 8:01.

3    Q.  You went straight to Mr. Polnitz' house, right?

4    A.  That's correct.

5    Q.  And you --- He came to the door and you arrested him, right?

6    A.  That's correct.

7    Q.  And then you took him to the police station?

8    A.  That is correct.

9    Q.  You didn't speak to any other neighbors in the area?

10   A.  I did not, no.

11   Q.  As a police officer, sometimes when you are dispatched to a

12   crime scene, one of the things you'll do is knock on neighbors'

13   doors?

14   A.  Yes, it is called conducting a canvass.

15   Q.  There was no canvass conducted in this case, was there?

16   A.  I don't believe one was conducted, no.

17   Q.  You are aware eventually a firearm was recovered from

18   Mr. Polnitz' residence?

19   A.  Yes, I am.

20   Q.  And it was a .380?

21   A.  Yes, it was.

22   Q.  A smaller gun?

23   A.  Yes.

24   Q.  A smaller caliber gun?

25   A.  Smaller caliber gun.

```
1    Q.  A common concealed carry gun?

2    A.  I would say, yes.

3    Q.  Most semi -- semi-automatic guns came in usually one of two

4    colors, right?

5    A.  Yes.

6    Q.  Black or chrome?

7    A.  Pretty much, yes.

8    Q.  When you talked to Mr. Polnitz, he told you it was a .380,

9    right?

10   A.  He described the gun as being a black semi-automatic .380.

11   Q.  He didn't give you any other details about it, did he?

12   A.  No.

13   Q.  You went back and spoke to Mr. Phillips later that night,

14   right?

15   A.  Yes, we conducted a photo array with him.

16   Q.  And you didn't show him the firearm at any point, did you?

17   A.  Not at that time, no.

18   Q.  You never showed him the firearm?

19   A.  The specific firearm, no.

20   Q.  You didn't show him a photograph of it to see if that was

21   the gun that he had seen earlier in the day?

22   A.  Several days later, he was shown a photograph of the

23   firearm, and that was at the request the assistant district

24   attorney for Milwaukee County where this was originally

25   presented.
```

```
 1              MR. ULLER:  Nothing further.

 2              THE COURT:  Any follow up, Mr. Taibleson?

 3              MR. TAIBLESON:  Very briefly, Your Honor.

 4   REDIRECT EXAMINATION BY MR. TAIBLESON:

 5   Q.  Officer, you didn't conduct a canvass of the neighborhood,

 6   right?

 7   A.  That's correct.

 8   Q.  The victim told you that a man matching the defendant's

 9   description was at 4631 N. 35th Street; is that right?

10   A.  That's correct.

11   Q.  You went to that house.  Was that man there?

12   A.  Yes, he was.

13   Q.  The victim told you that he was threatened with a black .380

14   firearm; is that correct?

15   A.  Yes, it is.

16   Q.  Was that firearm recovered from that house?

17   A.  Yes, it was.

18   Q.  Was it necessary to conduct a canvass of the neighborhood at

19   that point?

20   A.  I did not believe at that point it was.

21              MR. TAIBLESON:  Thank you.

22              THE COURT:  Anything else, Mr. Uller?

23   RECROSS EXAMINATION BY MR. ULLER:

24   Q.  What is canvass?

25   A.  A canvass is where officers go door to door to check for
```

1  witnesses of an incident.

2  Q.  And you do that to determine if, it may seem obvious, but if

3  there are other people who saw a crime, right?

4  A.  That's correct.

5          MR. ULLER:  Nothing further.

6          THE COURT:  Anything else?

7          MR. TAIBLESON:  One more for clarity.

8  **RE-REDIRECT EXAMINATION BY MR. TAIBLESON:**

9  Q.  You were asked by my colleague whether the victim was shown

10  a photograph of the gun he was threatened with and you said,

11  yes.  I didn't catch, did the victim say whether that was the

12  gun he was threatened with?

13  A.  He did say that was the gun that was used in -- that he was

14  threatened with during that crime.

15          MR. TAIBLESON:  Thank you.

16          THE COURT:  Finished with the officer?

17          MR. TAIBLESON:  We're finished.  Thank you, Your

18  Honor.

19          THE COURT:  Thank you, officer.  You are excused.

20      (Witness excused.)

21          THE COURT:  Government, ready to call the next

22  witness?

23          MR. TAIBLESON:  Yes, Your Honor.  Government calls

24  Milwaukee Police Department Officer Stoltz.

25          Marcel Stolz, being first duly sworn to tell the

1   truth, the whole truth, and nothing but the truth, testified as
2   follows:
3            THE CLERK:  Can you, please, state your name for the
4   record and spell your last name, please.
5            THE WITNESS:  Name is Marcel Stolz.  My last name,
6   S-t-o-l-z.
7   **DIRECT EXAMINATION BY MR. TAIBLESON:**
8   Q.  Officer Stoltz, how are you employed?
9   A.  I'm employed with the City of Milwaukee Police Department.
10  Q.  For how long have you been employed with the City of
11  Milwaukee Police Department?
12  A.  Approximately three years.
13  Q.  Did you previously serve in the United States Army?
14  A.  That's correct.
15  Q.  In what capacity?
16  A.  I was active duty for four years.
17  Q.  Did you serve overseas at any point?
18  A.  I did.
19  Q.  Where was that?
20  A.  Afghanistan for one year.
21  Q.  Thank you.  Officer Stoltz, did you review anything before
22  testifying here today?
23  A.  Yes.
24  Q.  What was that?
25  A.  We went over the reports.

1    Q.   Okay.  And we met before today to discuss your role in this

2    investigation; is that right?

3    A.   Yes, sir.

4    Q.   Did you respond to a call regarding a man threatening a

5    postal service employee on June 27th of 2017?

6    A.   Yes, sir.

7    Q.   And when you got that call, where did you go?

8    A.   Initially we were dispatched to the address of 5995 N.

9    Teutonia, which is a post office.

10   Q.   Okay.  And why did you go there?

11   A.   We spoke to the victim regarding this incident at that

12   location.

13   Q.   The victim was no longer in danger at that point I take it?

14   A.   That's correct.

15   Q.   Did the victim describe what had happened?

16   A.   He did.

17   Q.   And did you then go to 4631 N. 35th Street in Milwaukee?

18   A.   Yes, sir.

19   Q.   I'm going to show you a photograph that was previously

20   admitted into evidence.  It should be on your screen in a

21   moment.  Is that on your screen?

22   A.   Yes, sir.

23   Q.   Did you take that photograph?

24   A.   I did.

25   Q.   Is that the house you responded to, 4631 N. 35th?

1    A.  Yes, sir.

2    Q.  I take it you responded to that house looking for a suspect;

3    is that right?

4    A.  That's correct.

5    Q.  Would you describe physically the suspect you were looking

6    for?

7    A.  We were provided with a description of a black male, middle

8    aged.  He was wearing a white T-shirt, orange basketball shorts,

9    had longer hair and the victim described Pepsi blue eyes.

10   Q.  I'm going to show you another photograph that's been

11   previously admitted into evidence.  Is this -- Let me ask you,

12   was there a man at the house that matched that description when

13   you responded?

14   A.  Yes, sir.

15   Q.  Is this a photograph of that man?

16   A.  Yes, sir.

17   Q.  Was this photograph taken before he was arrested?

18   A.  That is correct.

19   Q.  Did you take this photograph?

20   A.  I did, sir.

21   Q.  Why did you zoom in?  It appears to be zoomed in.  Why did

22   you zoom in on his face?

23   A.  We tried to get a -- Based on what the victim said, like he

24   said he had Pepsi blue eyes.  We tried to get the best photo we

25   could to depict that.

108

```
1    Q.  Are his eyes blue?

2    A.  Yes.

3    Q.  I should also ask when you responded to the house, were you

4    looking for -- to see whether there was a white Dodge Caravan

5    nearby?

6    A.  We did.

7    Q.  I show you two more photos.  Did you take this photograph?

8    A.  Yes, sir.

9    Q.  And why did you take this photograph?

10   A.  That was the vehicle described by the victim in this case.

11   He observed Mr. Polnitz get in that vehicle after the incident

12   and return back to that 4631 address.

13   Q.  One more photo.  Is this a second photo of that same

14   vehicle?

15   A.  Yes, sir.

16   Q.  Did you take it?

17   A.  I did.

18   Q.  Why did you take this photograph?

19   A.  We wanted to illustrate that it was, indeed, a white Dodge

20   Caravan, which was described by the victim.

21   Q.  Is this a particular photo of the license plate?

22   A.  That is correct.

23   Q.  So is the man who was at that house that day where you said

24   earlier matched the victim's description, is he in the courtroom

25   here today?
```

```
 1   A.   Yes, he is.

 2   Q.   Where is he sitting?

 3   A.   He is to my left and your right.

 4   Q.   Has he changed his appearance since that day?

 5   A.   He has.

 6   Q.   How so?

 7   A.   He has a hair cut.

 8   Q.   Would you recognize him anyway?

 9   A.   That's correct, sir.

10   Q.   And he was arrested on June 27th after he exited the house,

11   right?

12   A.   Yes, sir.

13   Q.   After he was arrested, did you stay back at 4631 N. 35th

14   Street?

15   A.   He was arrested, placed in the back of our squad car, and

16   then we did stay on scene a little bit longer.

17   Q.   Did you speak to his wife at the home?

18   A.   Yes, I did.

19   Q.   And did she retrieve a firearm from the house?

20   A.   Yes, sir.

21   Q.   After she -- And I take it she did that after telling you

22   she would retrieve the firearm?

23   A.   Yes, sir.

24   Q.   After she told you she would retrieve the firearm, about how

25   long did it take her to bring the firearm back?
```

110

1    A.  It took anywhere between three to five minutes for her to

2    retrieve that firearm for us.

3    Q.  Was that a large house?

4    A.  No, it was not.

5    Q.  What were you thinking when she was in the house retrieving

6    the firearm?

7    A.  Well, she initially told us there were two firearms in the

8    house, so we didn't know if she could be retrieving those for

9    any other purposes.  And we didn't know if she might be trying

10   to remove prints or DNA or anything like that.

11   Q.  Now, I'll show you a photograph of the house again.  Before

12   she went to retrieve the gun, did she tell you where she thought

13   where it was in the house?

14   A.  She did.  She said there was a shotgun in the house and a

15   small black handgun under a mattress upstairs.

16   Q.  And nonetheless after she said she retrieved it, it still

17   took three to five minutes to bring it back?

18   A.  Yes, sir.

19   Q.  Was the door open or closed when she did that?

20   A.  The door was closed.

21   Q.  I'm going to hand you an item.  Officer Stoltz, I've handed

22   you an item previously marked as Exhibit 7.  Do you recognize

23   that?

24   A.  Yes, sir, I do.

25   Q.  What is it?

111

1    A.    It is the black Taurus .380 handgun that we recovered

2    regarding this incident at the Polnitz residence.

3    Q.    And what's the serial number on that?

4    A.    Serial number for this firearm is 1D-David 014961.

5         MR. TAIBLESON:    Your Honor, the Government moves to

6    admit Exhibit 7 into evidence.

7         THE COURT:    Mr. Uller.

8         MR. ULLER:    No objection.

9         THE COURT:    Without objection, I'll admit Exhibit 7.

10   Q.    Officer Stolz, Ms. Polnitz gave that gun to you outside the

11   house?

12   A.    Yes, that's correct.

13   Q.    You ultimately logged that gun into evidence?

14   A.    I did.

15   Q.    Did you check that out of evidence today?

16   A.    Yes, I did.

17   Q.    And bring it to the courthouse today?

18   A.    Yes, I did.

19   Q.    Was Ms. Polnitz wearing gloves when she recovered the

20   firearm?

21   A.    She was not.

22   Q.    And did she recover bullets from the house as well?

23   A.    Initially she came down with just the firearm.  We asked her

24   if there were bullets inside the gun, and she eventually did

25   retrieve those for us.

1    Q.  Was she wearing gloves when she retrieved those bullets?

2    A.  No, sir.

3              MR. TAIBLESON:  Thank you.

4              THE COURT:  Mr. Uller, any questions?

5    **CROSS EXAMINATION BY MR. ULLER:**

6    Q.  So you reviewed your report before testifying today, right?

7    A.  That's correct, sir.

8    Q.  And you met with the prosecutor's before testifying today?

9    A.  Yes, sir.

10   Q.  And did you go over your report with them?

11   A.  Yes.

12   Q.  You don't say anything in your report about having concerns

13   about wiping down evidence for fingerprints or DNA, do you?

14   A.  I do not.

15   Q.  Had you had that concern, you would have put that in your

16   report, right?

17   A.  I depicted the time that it took to retrieve that firearm.

18   In my opinion, like I said, it was a smaller house.  Based on

19   those three to five minutes, it seemed like a long time to

20   retrieve that firearm for that small of a residence.

21   Q.  You're aware that your encounter with Ms. Polnitz was being

22   recorded, right?

23   A.  Yes, sir.

24   Q.  You had a body cam?

25   A.  That's correct, sir.

113

```
1    Q.  And you activated the body cam?

2    A.  Yes, sir.

3    Q.  And you're required to activate your body cam when you have

4    these kind of citizen encounters, right?

5    A.  That's correct.

6    Q.  You haven't been a police officer that long, but body cam is

7    relatively new to your work, right?

8    A.  Yes, sir.

9    Q.  When did you get yours?

10   A.  I believe I got it in December of 2015, I believe.

11   Q.  And so your -- You get to the residence.  You're with your

12   partner, Officer Wilkiewicz?

13   A.  That's correct.

14   Q.  He was your partner?

15   A.  Yes, sir.

16   Q.  There are a few other officers on scene as well, right?

17   A.  Us and a supervisor sergeant.

18   Q.  And there were some people from the post office there as

19   well?

20   A.  That's correct.

21   Q.  Now, you -- So Mr. Polnitz was -- came to the door, right?

22   A.  I was covering the door on the south side.  I was not

23   actually at the door located on the east when he did come to the

24   door.

25   Q.  When you say east, you mean the front door?
```

```
1    A.  Correct.

2    Q.  You are on the side of the house.  What are you doing on the

3    side of the house?

4    A.  Seeing if there might be any escape route, looking at any

5    entry points, exit points, making sure that no one flees from

6    the residence, stuff like that.

7    Q.  No one fled from the residence?

8    A.  That's correct.

9    Q.  No one tried to escape?

10   A.  No one did.

11   Q.  And you're aware that someone who matched the description

12   had come to the front door?

13   A.  That's correct.

14   Q.  And that person was arrested?

15   A.  That's correct.

16   Q.  And your partner arrested him and basically took him back to

17   the squad car?

18   A.  Yes, sir.

19   Q.  And you remained at the front door, right?

20   A.  Yes, sir.

21   Q.  And you're there with a supervisor?

22   A.  Yes, sir.

23   Q.  Do you remember who that was?

24   A.  Sgt. Dave Skonetski.

25   Q.  And the two of you had a conversation with Ms. Polnitz?
```

1    A.  That is correct.

2    Q.  And you learned during that conversation she told you -- she

3    was asked whether she had any guns in the house, right?

4    A.  Yes, sir.

5    Q.  And she told you there was a shotgun and a handgun?

6    A.  That's correct.

7    Q.  And your supervisor told her that you guys wanted to

8    retrieve the handgun, right?

9    A.  Yes, sir.

10   Q.  Your supervisor asked Ms. Polnitz whether her husband was a

11   convicted felon, do you remember that?

12   A.  I cannot say for certain.

13   Q.  Your -- Have you reviewed your body cam video?

14   A.  Just from when we went over the -- when I met with the

15   attorneys.

16   Q.  When was that?

17   A.  June 21st.

18   Q.  June 21st of 20 --

19   A.  I'm sorry, November 21st of this year.

20   Q.  So last week?

21   A.  Yes, sir.

22   Q.  And you watched your body cam video?

23   A.  Portions of it.

24   Q.  Did they provide it to you?  Did they play it for you?

25   A.  Yes, they played a clip of it.

```
 1   Q.  What clip did they play you?

 2   A.  I believe when we first made contact with Ms. Polnitz.

 3   Q.  And you're the person who actually went in and retrieved the

 4   gun, correct?

 5   A.  Yes.

 6   Q.  And you cleared it, made sure it wasn't loaded?

 7   A.  Yes, sir.

 8   Q.  And, in fact, it wasn't loaded, right?

 9   A.  It was not loaded.

10   Q.  You asked her if she had removed the bullets from it?

11   A.  Yes, sir.

12   Q.  And she had removed the bullets from it?

13   A.  That is correct.

14   Q.  You indicate she said that it was under -- that she kept the

15   handgun under a mattress?

16   A.  Yes, sir.

17   Q.  You put that in your report, right?

18   A.  I did.

19   Q.  When your -- You didn't write your report on scene, did you?

20   A.  I did not.

21   Q.  You wrote it later that day when you got back to the police

22   station?

23   A.  Yes, sir.

24   Q.  And you weren't taking notes while you were conversing with

25   Ms. Polnitz, were you?
```

1    A.   I do not recall.  I believe I took a few notes, yes.

2    Q.   And -- But you had your body cam going, too?

3    A.   Yes, sir.

4    Q.   And that's something that you guys can use to follow up to

5    get information from interviews that you have?

6    A.   Yes, sir.

7    Q.   But you didn't do that in this case before you wrote your

8    report, did you?

9    A.   I believe I did have it pulled up, and I was reviewing it as

10   I was writing my report.

11   Q.   Okay.  In your interview with Ms. Polnitz, she said nothing

12   about being under a mattress, did she?

13   A.   I believe she did.

14   Q.   I'd like to open up for you what's been marked as

15   Exhibit 35.  Do you see an image in front of you?

16   A.   I do.

17   Q.   Does that appear to be a side of your face?

18   A.   Yes, sir.

19   Q.   And does that appear to also be the front of 4631 N. 35th

20   Street?

21   A.   Yes, sir.

22   Q.   From June 27, 2017?

23   A.   That's correct.

24           MR. ULLER:  Your Honor, I would move Exhibit 35 into

25   evidence.

1          THE COURT:  Can I see the parties at sidebar for just

2   a second?

3       (Discussion off the record.)

4       (Back on the record.)

5          THE COURT:  Thank you all for your patience.  Ladies

6   and Gentlemen, the parties have stipulated that the camera

7   footage taken by Officer Stolz body camera that day does not

8   show Ms. Polnitz mentioning a gun being under a mattress.

9   That's a fact that you can accept in your consideration.

10  Mr. Uller.

11  Q.  You didn't have any other conversations with Ms. Polnitz?

12  A.  No, sir.

13         MR. ULLER:  Nothing further.

14         THE COURT:  Any redirect, Mr. Taibleson?

15         MR. TAIBLESON:  No, Your Honor, thank you.

16         THE COURT:  Officer, you are excused.  Thank you.

17      (Witness excused.)

18         THE COURT:  Government ready for your next witness?

19         MR. TAIBLESON:  Yes, sir, Your Honor.  The Government

20  calls Milwaukee Forensic Investigator Dawn Veytsman.

21         THE COURT:  Okay.

22         Dawn Veytsman, being first duly sworn to tell the

23  truth, the whole truth, and nothing but the truth, testified as

24  follows:

25         THE COURT:  Once you get settled if you could make

119

```
 1    sure that mic is positioned right in front of you.  That would
 2    help.
 3              THE CLERK:  Can you, please, state your name for the
 4    record and spell your last name, please.
 5              THE WITNESS:  Dawn Veytsman, V as in Victor,
 6    e-y-t-s-m-a-n.
 7    DIRECT EXAMINATION BY MR. TAIBLESON:
 8    Q.  Forensic Investigator Veytsman, how are you employed?
 9    A.  City of Milwaukee Police Department.
10    Q.  What exactly is your job title?
11    A.  Currently I work in the forensic lab within the Milwaukee
12    Police Department.
13    Q.  Are you a Forensic Investigator?
14    A.  Yes.
15    Q.  And for how long have you worked for the Milwaukee Police
16    Department?
17    A.  A total of 25 years now.
18    Q.  And for how long have you been a Forensic Investigator?
19    A.  Approximately 15.
20    Q.  I'm going to hand you a document that was previously marked
21    as Government's Exhibit 11.  Ms. Veytsman, is that your resume?
22    A.  It is, yes.
23    Q.  Does it appear to be an accurate summary of your
24    professional experience?
25    A.  Yes, it is.
```

120

1        MR. TAIBLESON:  Your Honor, the Government moves to

2   admit Exhibit 11 into evidence.

3        THE COURT:  Mr. Uller.

4        MR. ULLER:  No objection.

5        THE COURT:  With no objection, I will admit

6   Exhibit 11.

7   Q.   Forensic Investigator Veytsman, what are your job duties?

8   A.   Currently, I work in the lab.  We accept any property,

9   basically any property that's brought down to us from detectives

10  and/or officers to process for DNA, photographing and

11  fingerprints.

12  Q.   Okay.  I take it you received training to be a Forensic

13  Investigator and work in the lab?

14  A.   That's correct.

15  Q.   Am I right that your training is centered on kind of an

16  apprenticeship; is that correct?

17  A.   That's correct.

18  Q.   And I take it it was a promotion when you became a Forensic

19  Investigator?

20  A.   Yes.

21  Q.   Ms. Veytsman, are you familiar with the term latent

22  fingerprints?

23  A.   Yes.

24  Q.   What is a latent fingerprint?

25  A.   A latent fingerprint is basically a hidden print, something

121

1    you cannot see with your eye.

2    Q.  And how many items in your entire career, all items, do you

3    think you processed for latent fingerprints?

4    A.  Thousands.

5    Q.  And how many guns do you think you processed in your career?

6    A.  Well over 500 by now.

7    Q.  Based on your recollection and your experience, what

8    percentage of the firearms you processed, on what percentage of

9    them were you able to recover fingerprints?

10   A.  It's a very low percentage.  At least, I'd say, under ten

11   percent of the time.

12   Q.  Why, in your opinion, is that number so low?

13   A.  In reference to firearms, it's because of the numerous

14   factors.  It has to do with the environmental factors, whether

15   it's hot or it's cold; the material of the gun; the surface

16   area, I should say, not the material; how it's handled; how it's

17   bagged.

18   Q.  Is the surface of a gun an ideal surface for recovering

19   fingerprints?

20   A.  A portion of it, yes.

21   Q.  Are portions not?

22   A.  Yes.

23   Q.  What make those two portions different?

24   A.  Referring to the gun, the grip is usually not the best area

25   for the fingerprints because it's a grooved handle, rough

1    surface.

2    Q.   And how long would it take to wipe fingerprints off a gun?

3    A.   How long would it take?

4    Q.   Yeah, how long would it take?

5    A.   Seconds.

6    Q.   Did you process a firearm that was seized on June 27, 2017

7    and submit it to your laboratory?

8    A.   That's right.

9    Q.   And did you -- I should ask, did you review anything before

10   testifying here today?

11   A.   Just my report.

12   Q.   Okay.  Those are reports from case number 17-178-152?

13   A.   Yes.

14   Q.   And we spoke before today to discuss your role of processing

15   that firearm, correct?

16   A.   That's correct.

17   Q.   You have in front of you an item that's been previously

18   admitted as Government's Exhibit 7.  Do you recognize that item

19   as the firearm?

20   A.   Yes, I do.

21   Q.   And did you process that firearm for fingerprints in June of

22   last year?

23   A.   Yes, I did.

24   Q.   Did you also swab that firearm for DNA?

25   A.   Yes.

1    Q.  Now, you don't do DNA testing, I take it.  You just take

2    swabs of the gun and submit them elsewhere?

3    A.  I just did the collection, yes.

4    Q.  Okay.  Returning to the fingerprints.  Can you, please,

5    describe the process of checking a firearm for fingerprints?

6    A.  On checking a firearm for fingerprints when it's first

7    brought down, we will look at it to see if with a magnifying

8    glass and/or a flashlight to see if we can see anything.

9              Then, the process -- next process after that would be

10   we would collect DNA from it first, and then we would use the

11   superglue in the chamber with the moisture to process to see if

12   any fingerprints visibly show up after that.

13   Q.  And were there any recoverable fingerprints on that firearm?

14   A.  Not on this one, no.

15   Q.  You said earlier that over 90 percent of guns you examine

16   don't have fingerprints on them that can be recovered?

17   A.  In group comparable, yes.

18   Q.  So does that mean when you found no comparable fingerprints

19   on that firearm, does that mean no one has ever touched that

20   firearm?

21   A.  No.

22   Q.  Does it tell you in anyway whether anyone has touched that

23   firearm?

24   A.  No.

25              MR. TAIBLESON:  Nothing further.

```
1           THE COURT:  Questions, Mr. Uller.

2   CROSS EXAMINATION BY MR. ULLER:

3   Q.  So you've been in the forensic lab for a few years now?

4   A.  Almost four years, yes.

5   Q.  And you examined this piece of evidence back in summer of

6   2017?

7   A.  That's correct.

8   Q.  And so first thing you did was you looked at it for any

9   visible signs of fingerprints, right?

10  A.  That's correct.

11  Q.  And you didn't see anything?

12  A.  No.

13  Q.  And then you -- That's not uncommon, right?

14  A.  That's not uncommon, no.

15  Q.  You began a process of collecting DNA?

16  A.  Correct.

17  Q.  And to do that, you basically get a Q-tip, right?

18  A.  Specifically, we use two cotton swabs, sterile, with

19  distilled water to collect any DNA from the firearm, yes.

20  Q.  And you know how DNA gets onto a gun, right?

21  A.  Basically, yes.

22  Q.  Everyone has skin cells, right?

23  A.  What's that?

24  Q.  Every person has skin cells?

25  A.  Yes.
```

125

1    Q.   Right.  And when you're looking for DNA, that's what you're
2    looking for are skin cells?
3    A.   It might not be seen, but possible.
4    Q.   And this is called touch DNA, right?
5    A.   A form of it, yes.
6    Q.   And there are -- So what you're looking for are places where
7    someone's skin might have come into contact with an item you're
8    examining?
9    A.   Are you referring to how I collect the DNA from the firearm?
10   Q.   Yes.
11   A.   There are specific areas on the firearm, per Wisconsin Crime
12   Lab, that we collect the DNA from.  It's not random.
13   Q.   Like the grip is one?
14   A.   Is one, yes.
15   Q.   The trigger?
16   A.   Correct.
17   Q.   The slide?
18   A.   Front and back sights, the magazine release, the slide lock,
19   the trigger and guard, and the grip and the magazine as well.
20   Q.   And certain people release more skin cells than other
21   people, right?
22   A.   It's possible.
23   Q.   You guys in your department, you have a term for people who
24   are heavy producers of skin cells, right?
25   A.   It's possible or sweat.

1  Q.  Have you heard the term snuffer or snufter or something like
2  that?
3  A.  I have not, no.
4  Q.  You have no idea what happens to the sterile swabs that you
5  take after they are sent out from the office, do you?
6  A.  No, I don't inquire about those, no.
7  Q.  And DNA can transfer from one object onto a firearm,
8  correct?
9  A.  It's possible, yes.
10 Q.  It's possible for someone's DNA to end up on something that
11 they've never touched?
12 A.  It's possible.
13 Q.  Fingerprints are a little bit different?
14 A.  That's correct.
15 Q.  If someone's fingerprint is on something, that means their
16 finger touched an object?
17 A.  I believe so, yes.
18 Q.  Now, you indicate that you didn't recover any latent prints
19 from the evidence that you examined?
20 A.  That's correct.
21 Q.  You have talked about there being certain factors that might
22 make it more or less likely for fingerprints to be recovered on
23 an item?
24 A.  That's correct.
25 Q.  Talked about moisture, things like that?

127

1   A.  Correct.

2   Q.  You have no idea what the circumstances of this particular

3   firearm are or the manner in which it was obtained, do you?

4   A.  I do not, no.

5           THE COURT:  I apologize to everybody.  They are

6   supposed to wait until after business hours to make really loud

7   noises out there.  Apparently, they didn't.  So if everybody

8   will speak up, that will probably be helpful.  You're competing

9   with a buzz saw.

10          MR. ULLER:  Well, Judge, I'm done.

11          THE COURT:  That is easier, Mr. Uller.  Any redirect?

12          MR. TAIBLESON:  No, Judge.

13          THE COURT:  Okay.  Thank you so much.

14      (Witness excused.)

15          THE COURT:  Government's next witness.  I am assuming

16  that won't take us too much past 5 o'clock?

17          MR. COREY:  Correct.

18          Pamela Taylor, being first duly sworn to tell the

19  truth, the whole truth, and nothing but the truth, testified as

20  follows:

21          THE CLERK:  Ma'am, can you please state your name for

22  the record and spell your last name, please.

23          THE WITNESS:  My name is Pamela Taylor, T-a-y-l-o-r.

24  **DIRECT EXAMINATION BY MR. COREY:**

25  Q.  Ms. Taylor, how are you employed?

A.   I'm employed with the Wisconsin State Laboratory in
Milwaukee as a DNA Analyst.
Q.   I will place in front of you what's been previously marked
as Exhibit 12.  Do you recognize the document I just put in
front of you?
A.   Yes.
Q.   What is it?
A.   This is my statement of qualifications.
Q.   Could you take a look at it and see if it is an accurate
statement of those qualifications?
A.   Yes, this is the most current.
          MR. COREY:  Move to admit Government's Exhibit 12.
          THE COURT:  Mr. Uller, any objection?
          MR. ULLER:  No Judge.
          THE COURT:  I'll admit Exhibit 12.
Q.   What is your current position?
A.   I am currently employed as a Senior DNA Analyst at the crime
lab.  I'm also a part of the Crime Scene Response Team.
Q.   And how long have you been a Senior DNA Analyst?
A.   Approximately two years.
Q.   And did you hold a position before that?
A.   Yes, I held a DNA Analyst position previous to that for
about two-and-a-half years.
Q.   So total, how long have you been a Senior DNA Analyst and
DNA Analyst?

1    A.   Approximately four-and-a-half years.

2    Q.   What are your duties as a DNA Analyst or Senior DNA Analyst?

3    A.   My primary duties include taking custody of evidence of

4    cases that were assigned.  I take that evidence and screen it

5    for either biological fluids or in some cases touch DNA.  I then

6    take those samples in an attempt to extract DNA from those

7    samples, I run it through instrumentation and attempt to develop

8    a DNA profile from any evidence that we may have.  And then also

9    do the same with any standards or known profiles from any

10   standards that are submitted in that case and make comparisons

11   to those evidence profiles.

12   Q.   You mention touch DNA.  What's touch DNA?

13   A.   Touch DNA is a type of DNA that can't be tested for.  We

14   have other types that we test for.  We use what's call serology,

15   which is the identification of bodily fluids.  And touch DNA,

16   there is no test to confirm the presence of these cells.  We

17   just assume that those are present, and we continue on with the

18   DNA process and develop DNA profiles from those for comparison.

19   Q.   How many DNA samples have you analyzed?

20   A.   Actual profiles or --

21   Q.   Samples.

22   A.   I would say over 10,000.

23   Q.   And how many cases?

24   A.   Over a thousand, 1500, somewhere around there.

25   Q.   How many times have you testified regarding DNA findings in

1   court?

2   A.   This will be the 26th time testifying for DNA.

3   Q.   And DNA analysis, there's kind of a primary person and a

4   peer reviewer; is that correct?

5   A.   That is correct.

6   Q.   Can you describe what the peer-review process is?

7   A.   Each DNA analyst basically works their own case, does all

8   the analysis, writes the report for those cases.  Then, each

9   case is reviewed by peer reviewer, which is another trained DNA

10  analyst that goes through each page of the report and the case

11  file that's been presented to them to verify that there are no

12  typos, any errors, and the conclusions that the reporting

13  analyst has written are consistent with the technical reviewer.

14  Q.   And the peer reviewer looks at the underlying data?

15  A.   Correct.

16  Q.   And looks at the DNA profile developed?

17  A.   Yes.

18  Q.   Do you have a college degree?

19  A.   Yes, I hold a Bachelor of Science Degree in Physiology from

20  the University of Wisconsin, Whitewater.  I also have a Minor in

21  Chemistry and a Minor in Forensic Science.

22  Q.   Do you do any other training and education in your field?

23  A.   Upon being hired at this Wisconsin State Crime Laboratory, I

24  completed a year-long training program with the laboratory.  The

25  first four months were in serology, which is the identification

1  of bodily fluids, and DNA analysis, which includes the processes

2  of sampling different parts for DNA or different items for DNA,

3  running those to develop profiles, running comparisons.  And

4  we're also trained in statistics for report writing and court

5  testimony.

6  Q.  And your C.V. lists 29 different trainings you've attended

7  since 2014?

8  A.  Correct.

9  Q.  Can you just explain the most recent one?

10  A.  The most recent was, it's called 3500 Validation, the

11  instrument we use to develop our DNA profiles, which typically

12  looks like a graph.  We have a new instrument that we have just

13  put on line so we have to go through a validation to verify that

14  it clears certain parameters for our type of testing that we do.

15  This replaces the previous testing, which is the 3130 XL Genetic

16  Analyzer that we were previously using up until a couple months

17  ago.

18          MR. COREY:  Your Honor, I request permission to read

19  the party's stipulation regarding this witness.

20          THE COURT:  Mr. Uller, any problem with reading the

21  stipulation now?

22          MR. ULLER:  No.

23          THE COURT:  Go ahead.

24          MR. COREY:  I will read a stipulation reached by the

25  parties, that the data and DNA profile that Pamela Taylor relied

1  upon at the Wisconsin Department of Justice State Crime Lab came

2  from the same samples that were obtained from the firearm

3  identified as Exhibit No. 7, a Taurus, Model PT378, .380 pistol

4  bearing serial number is 1D014961.

5      THE COURT:  So Ladies and Gentlemen, that's a

6  stipulation, which means, again, that the parties have agreed on

7  that, and you may accept that as a fact when you're considering

8  the facts in this case.

9  Q.  In this case, you received three potential DNA swabs from

10  the firearm at issue, your office received?

11  A.  Correct.

12  Q.  And one was from the slide lock magazine?

13  A.  Yes.

14  Q.  One was from the trigger guard area?

15  A.  Yes.

16  Q.  One was from the grip?

17  A.  Yes.

18  Q.  And you also received -- And so those were the three swabs

19  your office received, correct?

20  A.  Correct.

21  Q.  And you were the peer reviewer for this case?

22  A.  Yes, I was.

23  Q.  That's case number -- The submitting agency case number is

24  17178152?

25  A.  0152.

1    Q.   And what was the conclusion that you reached based upon
2    reviewing the data from the three swabs?
3    A.   From the Items A, B and C, which were the gun swabs that we
4    received, all of the samples were found to be insufficient for
5    comparisons.
6    Q.   So for all three, there was some DNA there; is that correct?
7    A.   Correct.
8    Q.   But just not enough to form a comparison?
9    A.   Correct.
10   Q.   And this was a touch DNA case?
11   A.   Yes, it was.
12   Q.   Based on your experience, how often is touch DNA located in
13   cases like this?
14   A.   Through my --
15            MR. ULLER:   Objection, calls for speculation.
16            THE COURT:   Overruled.  She was asked in her
17   experience, so you answer in your own experience.
18            THE WITNESS:   In the experiences for the cases I
19   worked, I recover, approximately, 20 percent of -- 20 percent of
20   my cases develop a profile that is able to be used for some kind
21   of comparison.
22   Q.   And the rest don't have enough DNA to compare to anyone?
23   A.   Yes.  Either the profiles are too complex, meaning there's
24   multiple people in the profile or that no comparisons can be
25   made or there's not enough DNA where the profile is too low.

1   Q.   What is the reason or could you explain why the rate of

2   recovery is 20 percent?

3   A.   In touch DNA cases, it's very common that environmental

4   conditions have a factor on the recovery of DNA.  It can include

5   moisture, which can dilute the sample.  Heat can destroy the

6   DNA.  Also rubbing off, if something that's wrapped up in a

7   towel, per se, it can rub off DNA in a profile.  So it typically

8   doesn't have a very good recovery rate based on the sensitivity

9   it has to being recovered.

10          MR. COREY:  No further questions.

11          THE COURT:  Mr. Uller.

12  **CROSS EXAMINATION BY MR. ULLER:**

13  Q.   You don't have any familiarity with any of the specific

14  facts of this case, this firearm, do you?

15  A.   No.

16  Q.   You just get these swabs in your lab and determine whether

17  you're able to extract a profile off of those?

18  A.   We typically get a brief scenario.  In this case because I

19  was the technical reviewer, I didn't have any background

20  information about the case.  I just went through the data to

21  verify that the conclusions that the analyst has written in the

22  report were consistent with what mine would have been had I

23  worked the case myself.

24  Q.   That was that there was no profile that you could use for a

25  comparison?

1    A.  Correct.

2    Q.  You had a profile that you were going to be comparing it to

3    in the event you were able to extract a profile; is that

4    correct?

5    A.  Could you rephrase the question?

6    Q.  Yeah.  You had a known profile, correct?

7    A.  Yes.  If we have standards in a case, we run those standards

8    separately, and we don't -- We are not able to look at those

9    standards or those profiles until we have analyzed the evidence

10   profiles to prevent any bias.

11           MR. ULLER:  Thank you, that's all.

12           THE COURT:  Any redirect?

13           MR. COREY:  No, Your Honor.

14           THE COURT:  Thank you, Ms. Taylor.  You are excused.

15      (Witness excused.)

16           THE COURT:  Mr. Corey, Mr. Taibleson, any other

17   witnesses on behalf of the Government?

18           MR. COREY:  No, Your Honor.

19           THE COURT:  Does the Government rest at this point?

20           MR. COREY:  Yes, Your Honor.

21           THE COURT:  Ladies and Gentlemen, if I can take a few

22   minutes with the attorneys at a sidebar, I can have a better

23   sense of what the plan is for tomorrow.

24      (Discussion off the record.)

25      (Back on the record.)

136

1          THE COURT:  All right.  Thank you, folks, for your

 2    patience.  I don't think it makes any sense, based on talking to

 3    the attorneys, to ask you all to stay.  There's nothing that

 4    will take, like, five minutes left for this evening, so we're

 5    going to go ahead and let you all go home tonight and ask you to

 6    be ready to be in your seats at 9 o'clock tomorrow.  We fully

 7    anticipate, just as the lawyers said, that the case will come to

 8    you tomorrow, so we're right on schedule.

 9          I would only ask that tonight you not talk to anybody

10    about the case, not each other, not anybody in your family that

11    begs to know.  We'll see you tomorrow morning ready to go at

12    9 o'clock.  Thank you all.  Have a good night.

13       (Jury excused.)

14          THE COURT:  If it's okay with you all, I propose that

15    we take a few minute break.  I have extra sets of jury

16    instructions that we talked about so far.  I'll get those so

17    everybody is going off the same thing, and we can talk about

18    those.  We can talk about any motions that we might have,

19    anything of that nature, but I need to go back and grab them.

20    Be back in a few minutes.

21       (Brief recess taken.)

22       (Back on the record.)

23          THE COURT:  Let's go back on the record.  And let me

24    first ask Mr. Uller, now that the Government has closed or

25    rested its case, do you have any objections you would like to

1   make?

2           MR. ULLER:  Yes, Judge.  We would under Rule 29 move

3   for acquittal.

4           THE COURT:  Any argument?

5           MR. ULLER:  No, we'll reserve all argument until we

6   review a transcript.  But to preserve the record, we make that

7   oral motion now.

8           THE COURT:  All right.  Thank you.  Any response from

9   the Government?

10          MR. TAIBLESON:  Your Honor, the Government asks that

11  this Court deny that motion.  As Your Honor is aware, the burden

12  here is nearly insurmountable.  The District Court must view the

13  evidence, as You Honor's aware, in the light most favorable to

14  the Government.  And the jury has seen more than enough evidence

15  to rationally conclude the defendant is guilty, including the

16  testimony of Mr. Phillips well as Officer Wilkiewicz, Officer

17  Stolz and recovery of the firearm, which is in evidence as

18  Exhibit 7.  Thank you.

19          THE COURT:  Thank you.  Of course the standard is

20  whether or not a reasonable juror could based on the evidence

21  that's come in to this point have a basis for finding the

22  defendant guilty.  And at this point, certainly without having

23  heard the defense case, I understand that we don't have

24  everything in front of the jury.  But at this point, I don't

25  think there's a basis for granting the Rule 29 Motion.  There

has been evidence with regard to both of the counts and so because of that, I'll deny the motion at this point subject, of course, to any argument the defense might make at a later date or after the trial.

Second thing is that -- And Mr. Corey, you mentioned before Mr. Uller got back that once he got back, there are a couple of issues the Government wanted to take care of.

MR. COREY:  Your Honor, to date the United States has not received an alibi witnesses from the defendant.  So to the extent it sounds like there's going to be witness testimony saying Mr. Polnitz was at work during the time of the incident, that the second confrontation couldn't have happened, that he was at his house or at work or driving to or from there, that's excluded via Motion in Limine.  So unless the defendant, obviously, himself testifies --

THE COURT:  I think -- I was going to say preventually, I did rule saying that unless the defense provided notice of an alibi, that I would grant that motion.  I don't have one either, Mr. Uller.

MR. ULLER:  No.  Your Honor, I think the defense's theory of the case is pretty clear at this point.  It's not that my client was somewhere else when this crime happened, it's that the crime didn't happen.  And --

THE COURT:  Okay.  During your opening statement, you made comments about Mr. Polnitz being at work.  And then you got

1   into discussing the encounter.  So I'm trying to delineate

2   between those.  The alibi would, obviously, be he couldn't have

3   done it because he was at work.

4          MR. ULLER:  Right.  That's, clearly, not the case.

5   The work -- And, obviously, we haven't gotten to the defense

6   case yet.  The defense isn't going to be presenting any alibi

7   witness.

8          THE COURT:  All right.

9          MR. COREY:  Right.

10         THE COURT:  So noted.

11         MR. COREY:  Thank you, Judge.

12         THE COURT:  All right.  Second issue.

13         MR. COREY:  That was it.  That covers it.  Thank you,

14  Judge.

15         THE COURT:  The third thing I wanted to do before we

16  got to the jury instructions was to put on the record --

17  Normally, it is -- The attorneys know I have a microphone over

18  here at sidebar.  Whenever we take our sidebars, the court

19  reporter is able to hear those and record them.  But with the

20  new system, something is not working here.  We're not quite sure

21  what it is.  We called the I.T. guys.  They are going to check

22  it out.

23         In the meanwhile, I want to put on the record the

24  sidebar discussions that we had.  First of all during jury

25  selection, we spoke with three venire persons at sidebar.

140

1          The first one was Juror No. 25.  And Juror No. 25
2    indicated at sidebar that she wanted us to know that she might
3    have -- I think she put it religious objections.  I didn't get
4    the sense it was so much to sitting on the jury, but she
5    basically said that if I gave instructions and then she
6    consulted the Bible and the Bible told her something different
7    or she believed God told her something different, that she would
8    have to follow that imperative and not the instructions.

9          And after we finished talking to her, the parties
10   agreed that she should be excluded for cause because she
11   basically indicated that she wouldn't be able to follow the
12   instructions on the law if they conflicted with something that
13   she believed in.

14         The second juror was Juror No. 18 who asked to be
15   heard at sidebar, indicated she described a series of incidents
16   in her life that had involved guns.  One was with a relative who
17   had a husband who sounded like put -- basically put a hit out on
18   her and asked to have her killed with a firearm.

19         I think she was, if I am recalling correctly, and
20   there were several other incidents she described.  And the
21   upshot of it was that she said that she was really, really
22   scared of guns; that she was scared of the idea of guns.
23   Mr. Uller even asked her if you saw a gun presented as evidence,
24   would that cause you a problem, and she said one time her
25   husband brought home an antique gun, she was so upset about it

1    she hid and she is really, really scared of guns.

2          I think to be fair, she didn't specifically say I

3    wouldn't be fair if on the jury, but she reiterated over and

4    over again how scared she was of guns.

5          The last sidebar we took is with Juror No. 20.  Juror

6    No. 20 is the person who in answer to the question have you read

7    or seen anything or heard anything about this case before you

8    came to the courtroom, he was the only juror who said yes.  In

9    front of everyone, he said, well, I got the e-mail and I clicked

10   on the link and I went to the case file.  And I didn't want to

11   ask him anymore in front of the jurors because I, frankly,

12   didn't know what he was talking about.

13         So we spoke to him at sidebar.  And at sidebar, he

14   said that he got the e-mail telling him he needed to show up for

15   jury duty today.  It had a link on it.  He clicked on the link.

16   It took him to a place where you could see if somebody else had

17   a trial next week or something like that, and he clicked on it

18   and opened the document or he referred to it as the document or

19   the case file.  That was about as clear as we got.

20         I think Mr. Uller asked him if he opened up any other

21   document, and he seemed a little confused.  He said, I think

22   there was only one document that I could open.  But he described

23   to us what he had seen.  He, clearly, had read a number of

24   details.  It seemed to me like probably he had somehow read the

25   Motion to Suppress or the ruling for the Motion to Suppress.

1    We talked about it after he went back to sit down and
2    concluded that one of two things could happen.  We could either
3    bring him back and ask him if he could be fair in spite of what
4    he read, and we agreed the safer thing was simply to exclude him
5    from the jury, and so that's what we did.
6         There was also some discussion of whether or not to
7    exclude Juror No. 10.  He was the one who said he had been
8    pulled over several times for being profiled, and they were
9    unpleasant experiences, and he said a couple times they were
10   unpleasant experiences.  I did not exclude him for cause despite
11   the Government's request because he did say he would try to be
12   fair.  He would try to set those experiences aside.
13        And finally we talked about Juror No. 26, who had been
14   with the postal service for a number of years, been a postal
15   employee.  And although the Government suggested he ought to
16   be -- I mean the defense suggested he ought to be excused for
17   cause, I did not think -- He said several times that he could be
18   fair.  In response to almost every question, he answered in the
19   positive, which was almost every one of them.  So those were the
20   sidebars with regard to jurors.
21        With regard to the evidence that came in after we
22   started the case, the Government objected when the defense
23   proposed to play the 911 call.  The objection was on hearsay
24   grounds.  At the sidebar, I asked Mr. Uller, and he indicated he
25   was not seeking to introduce the 911 call for the truth of the

matter asserted but instead was seeking to try to impeach

Mr. Phillips on his statement that he was not present next to

his supervisor when she was making that call.  So I overruled

the Government's objection, and I did allow the 911 call to be

played.

And the final sidebar is one that I called with regard

to Officer Stolz.  Officer Stolz had given testimony something

to the effect of Ms. Polnitz mentioning the handgun was under a

mattress.  Mr. Uller asked a couple questions about that and

then proposed to play the video from Officer Stolz' body cam

recording his fairly extended discussion with Ms. Polnitz to try

to demonstrate, as he indicated at sidebar, that nowhere in that

audio or nowhere in that video, I should say, did Ms. Polnitz

mention anything about the gun being under the mattress.

I expressed concern at sidebar that I had ruled in the

Motion in Limine that we were not going to get into how it came

to be that Ms. Polnitz allowed the officers to come in and take

the firearm because that had been the subject of pretrial

motions.  So I expressed concern that if I had admitted the

entire videotape and the whole thing got played, that would

basically bring in all that evidence that I had ruled on in the

Motion in Limine.

And so the upshot of that is that the Government

stipulated to the fact that nowhere in that body cam footage did

Ms. Polnitz say that the gun was under a mattress.

144

```
 1              Any corrections or additions or anything from the
 2    Government to that recount?
 3              MR. COREY:  No, Your Honor.
 4              THE COURT:  Mr. Uller, from the defense?
 5              MR. ULLER:  No, Judge.
 6              THE COURT:  Okay.  All right.  So I think then that
 7    gets us to the jury instructions, many of which there were no
 8    objections to and handful of which we may need to plug in some
 9    information in here and there.  If we could just walk through
10    them.
11              The first one, and you should each now have a draft of
12    the instructions.  The first --
13              MR. ULLER:  Judge, does Mr. Polnitz have to be here
14    for the discussion?
15              THE COURT:  Not unless he wants to.  You don't have to
16    stay unless you want to.  Mr. Graham, is the door downstairs
17    still open?
18              MR. ULLER:  He can go to my office and someone from my
19    office can escort him out.
20              THE COURT:  All right.  1.01 is the functions of the
21    Court and the jury.  I'm going to take out the bracketed
22    information because I generally send back one copy of the jury
23    instructions.  I don't think they each need one.  They can all
24    refer to the same copy, so I will remove the bracketed
25    information in Paragraph 1.
```

1          Paragraph 3, we take out the plural.  We have only one
2    defendant.  And there's not an affirmative defense here to be
3    proved by a preponderance, so I don't think we need the second
4    parenthetical in the third paragraph.
5          I usually do include the second sentence in the fourth
6    paragraph, don't let anybody's race, religion influence you.  If
7    anybody has an objection, I will leave that in.
8          MR. COREY:  No objection, Your Honor.
9          THE COURT:  The last one is standard language.  Okay.
10    The second 1.02 the charge, we need plural language in the first
11    paragraph.  And I usually do send back a copy of the Indictment,
12    unless anyone has an objection.  However, we do redact the
13    foreperson's name and all that.
14          MR. COREY:  No objection, Your Honor.
15          MR. ULLER:  That's fine.
16          THE COURT:  All right.  So we'll leave in that second
17    sentence.  With regard to the second paragraph, may I just use
18    the same language that I used in the preliminary instructions to
19    describe the two offenses?
20          MR. COREY:  Yes, Your Honor.
21          MR. ULLER:  That's fine.
22          THE COURT:  All right.  We just need to -- I will go
23    through and fix the singular and plural and take out the word
24    information in that one.
25          1.03, I'll fix the singular and plural.  And the first

paragraph and in the third paragraph, it should be instead of A,
I will fix that. I don't think we need the alternative because
we don't have an affirmative defense. I will take that out.

        The next one is 2.01. I have not taken judicial
notice of anything yet, so I'll leave a mark by that. If for
some reason I do tomorrow, we can leave that in. Otherwise,
we'll take that out assuming there's no judicial notice
requested. I think the rest of that is pretty standard, unless
anybody has any objections. Okay.

        2.02, considering the evidence is standard. I don't
think -- There's been no objection to that. There's nothing to
personalize or customize in that one.

        2.03, direct and circumstantial evidence. Nothing to
be customized in that one.

        2.04, we can leave it for now. But if Mr. Uller's
prediction is correct tomorrow and he calls two witnesses, we'll
probably need to leave in that second paragraph. We'll see how
that plays out tomorrow, whether that needs to be changed at
that point.

        2.05, I think we talked about this already at the
final pretrial conference. Mr. Uller objected in the title of
it to the defendant's, quote, failure to testify or present
evidence. And I think if--

        MR. COREY: We have no objection to that minor change.

        THE COURT: That's what I thought. I'm just trying to

1    remember what language.  Mr. Uller, you had proposed right?

2              MR. ULLER:  Right.

3              THE COURT:  Thank you.  So we'll change the word

4    failure in the title to right.  We'll take out or present

5    evidence, assuming that Mr. Uller will call witnesses tomorrow.

6              The next one is 3.01, the credibility of the

7    witnesses.  Obviously, we'll change, including that of the

8    defendant depending on whether or not Mr. Polnitz testifies.  I

9    don't think there's been any issue with regard to any witness'

10   age.  I don't recall any questioning so far.  Unless something

11   comes up tomorrow, I don't think we need anything about any

12   witness' age.

13             In regard to the last bullet point, inconsistent or

14   consistent statements or conduct by the witness.  I've usually

15   given both of those, inconsistent or consistent statements.

16             MR. COREY:  We'd like both.

17             THE COURT:  Some people hammer on the inconsistent

18   statements of a witness and some people come back and say why,

19   this was consistent.  Mr. Uller, you did have an objection to

20   that one.  At least my notes say that you did.

21             MR. ULLER:  Judge, I had proposed I believe a longer

22   credibility instruction.

23             THE COURT:  Yeah.  And a lot of that is stuff that I

24   gave in the opening, so I'm not -- Where does this come from,

25   Mr. Uller?

1        MR. ULLER:  The -- I guess there's a couple different

2    sources.  One is, it's common for us to request or for me at

3    least to request the -- that the instruction indicate that one

4    of the factors be any differences between a witness' behavior

5    when responding to questions by the party sponsoring the

6    witness' testimony and questions asked by the witness is cross

7    examined by the other party.

8        THE COURT:  That seems to me that's included in

9    demeanor.

10        MR. ULLER:  And then in terms of police officer

11   testimony, that's language that I've created.

12        THE COURT:  Government, response to that?

13        MR. COREY:  We prefer the pattern instruction.  We

14   agree with the Court that you covered in voir dire, especially

15   are you going to believe police officers more than any other

16   witness.  So almost all of what Mr. Uller is requesting has

17   already been covered.  And there's a pattern instruction on

18   this, so we think the pattern instruction is appropriate.

19        THE COURT:  I'm inclined to give the pattern

20   instruction number one.  As I indicated, I think whether a

21   witness acts differently from the defence or prosecution or with

22   who called them or who is crossing them is an issue of demeanor.

23   And in this particular case -- not in this particular case but

24   with this particular language, you should not include that a

25   police officer is credible or that an officer is more credible

merely because they are a police officer.  I think -- I don't
think that's actually accurate.  They should judge the
credibility of a police officer just like any other witness, and
that's already been covered in the voir dire.

All right.  Next one is 3.02.  And there have been
questions about whether attorneys interviewing witnesses ahead
of the trial, and so I think we should include that one.

MR. COREY:  We agree, Your Honor.

THE COURT:  It's applicable.  3.06, impeachment by a
prior conviction.  So far we don't have -- I guess I will play
it by ear and see if this comes up.  If it doesn't come up
tomorrow, we will pull it out.  If it does, we will discuss it
in the context in which it comes up.

3.09, there is evidence, obviously, that Mr. Polnitz
made statements both to Mr. Phillips and to the police officers.
I guess it's bolstered testimony and received evidence.  They
both heard human beings testify, plus they saw the video.  So I
think other than pulling out the brackets, I think that whole
instruction is appropriate, unless somebody has different views.

MR. COREY:  No objection.

THE COURT:  Okay.  Then, we have 312, identification
testimony.  There has been testimony as to identification of
Mr. Polnitz, and I think in this case we leave in of the
offense.  We left in the instructions to remind us the reason of
the offense is bracketed cause sometimes you might have

```
 1    testimony of an identification, but the person wasn't an
 2    eyewitness to the event.  But here we have at the time of the
 3    offense, so I think we should leave in of the offense.  Any
 4    objection?
 5              MR. COREY:  No objection.
 6              MR. ULLER:  That presupposes that there was an
 7    offense.
 8              THE COURT:  It certainly does.  Do you want me to put
 9    the alleged offense?
10              MR. ULLER:  Sure.
11              MR. COREY:  No objection to that.
12              THE COURT:  All right.  I'll add the word at the time
13    of the alleged offense.
14              MR. COREY:  That's fair.
15              THE COURT:  3.14.  This one is a little bit weird in
16    this case because we do have a recorded conversations, audio and
17    we have seen video recordings.  They've seen the transcriptions
18    of those.  The second paragraph is sort of, like, it assumes
19    that they actually got a paper copy of a transcript.  They
20    didn't, but the rest of it I think kind of applies.  They should
21    rely on what they heard and not on what was typed on the screen.
22    So maybe we should say something like, you saw transcripts of
23    some of the recordings.  Does that work?
24              MR. COREY:  For us, Your Honor, yes.
25              MR. ULLER:  Yeah, that's fine.
```

THE COURT:  Okay.  You saw transcripts of the

conversations on the video recording, and the rest of it is I

think appropriate.  The last bracketed paragraph, you may

consider a person's actions, facial expressions, lip movement

that you were able to observe on a video recording to help you

determine what was said and who said it.  I'm not sure there is

a lot of confusion on who said anything, but that remains true.

We may as well leave that in.

        MR. COREY:  Yes, Your Honor.

        THE COURT:  The recordings themselves, I generally

have not assumed that we're going to send those back.  If they

ask for them, then we figure that out.  But we send it back,

obviously, we've got to figure out some equipment to be able to

view and listen to the recordings.  If you all want to do that,

I'm happy to try to make those arrangements in the morning.

        MR. ULLER:  I don't think we need it.

        MR. COREY:  We would like them to have it if they want

it.

        THE COURT:  If they want it.  The question is, are we

going to automatically send it back or wait to see.  Sometimes

they send out a note asking can we see them.

        MR. COREY:  We are okay with waiting to ask.

        THE COURT:  Thanks.  So the last paragraph, if you

wish to have an opportunity to view them, let Mr. Graham know.

        MR. COREY:  We'll prepare for that tonight, Your

Honor.

THE COURT: I will leave in the last paragraph then. 3.18, juror note taking. Standard instruction. I don't think anybody has objected to that.

The next one is the substantive elements of Count 1, and this is possession not received, alleged possession. I don't think -- The second bracket in the first paragraph, we usually put the language exactly as it comes from the statute. A person who has been convicted of a crime subject to whatever the language is in the statute. We'll put that statutory language in.

Again, this is knowingly possessed a firearm. I think there's been testimony about an issue, but I don't think the Indictment charges it.

MR. COREY: It does not charge.

THE COURT: Okay. Given that, I think we don't refer to admission -- to match what the Indictment says. Any disagreement with that, anybody?

MR. COREY: No, Judge.

MR. ULLER: I don't want to jump ahead out of order, but I think 4.13, the definition of possession, is probably apt to discuss that within the context of the instructions for Count 1.

THE COURT: Hang on a second. Okay. Can we at least get through the elements, and then talk about possession?

153

1           MR. ULLER:  Sure.

2           THE COURT:  In Paragraph 2, again I'll put the

3    statutory language, and then I think the appropriate language is

4    the firearm had been shipped or transported in interstate or

5    foreign commerce.  I'll take out the first.  Such possession

6    was, in effect, in interstate commerce, is when I think the

7    possession actually effectuating interstate commerce, and we

8    don't have that here.

9           MR. COREY:  Correct.  The second clause after the or

10   is what we want.

11          THE COURT:  Right.  And then in the last paragraph, I

12   think we take out as to the charge you are considering and of

13   that charge because we don't have more than one felon in

14   possession charge.  I think that language applies when you have

15   multiple of the same charge, multiples of the same charge, to

16   tell the jury that they have to focus in each instance.

17          So I think we should take out as to the charge you are

18   considering of that charge.  Mr. Uller made a general objection

19   in any elements instruction to the language in the if

20   paragraphs.  If you find from your consideration of all the

21   evidence that the Government has proved these elements beyond a

22   reasonable doubt, then you should find the defendant guilty.  If

23   on the other hand you find in your consideration of all the

24   evidence the Government has failed to prove any of these, then

25   you should find the defendant not guilty.  And the defense has

1    argued that that should be must.  I have used the must language,
2    and I think other judges in the building have used the must
3    language there.

4              MR. COREY:  No objection.

5              THE COURT:  All right.  Then, we'll change in a second
6    that paragraph to must.  Okay, before we move to the next
7    substantive charge, Mr. Uller had suggested that we discuss the
8    definition of possession.  That's on Page 22 of your packet at
9    4.13.

10             MR. ULLER:  So -- Thank you.  It's apparent to me that
11   the Government's theory of their prosecution is that Mr. Polnitz
12   possessed a firearm in connection with the incident between the
13   mailman.  And so I guess I would ask that the elements for Count
14   No. 1 indicate something to the effect of during the incident
15   described in Count 2, the defendant possessed, you know, and
16   then go through the elements.  You know, the Indictment alleges
17   on or about a specific date, but the evidence, obviously, has
18   related to a very discrete set of facts on a specific date at a
19   specific time in a specific place.

20             What I am worried about is the Government or the jury
21   thinking that the possession of a firearm in a residence by
22   Ms. Polnitz is a sufficient basis under which Mr. Polnitz can be
23   said to have possessed those items.

24             And **United States v. Griffin**, 684 F.3rd 691, I have
25   copies for the Court and for the Government.  There's been

1    absolutely no evidence that Mr. Polnitz had possession of a

2    firearm in the house separate and apart from the allegations

3    that he came from the house with the gun, and I guess went back

4    towards the house with a gun.  Aside -- Outside of that, there's

5    no suggestion that the day before he was illegally in possession

6    of the gun.  And the day after if there was still a shotgun in

7    the house, that he was illegally in possession of that.

8              What I don't want to see happen is, you know, the

9    Government to kind of shift its argument on culpability that

10   Mr. Polnitz isn't allowed to have a gun and he's got one in the

11   house, therefore, he's guilty of Count 1 because there's been no

12   evidence presented in the Government's case that that's what

13   happened.  And *Griffin* -- The *Griffin* case provides some good

14   language about -- I think could be instructive in a specific

15   definition about possession.  In the alternative, I think it can

16   be -- don't have to use that language if we can kind of narrow

17   the -- narrow the language in the elements of Count 1 to the

18   time of the incident alleged.

19             THE COURT:  Government.

20             MR. COREY:  Your Honor, we have a strong objection to

21   including an additional -- what we view as essentially an

22   additional element to the felon in possession language.  An

23   element that it be possessed relating to the incident with the

24   confrontation with the mailman.  You heard testimony today the

25   initial confrontation, the van was seen parked in front of that

house.  There's certainly an inference he went into the house,
got the gun, came out, confronted Mr. Phillips and went back to
the house.  There's certainly evidence that he possessed the
firearm in the house, at least a reasonable inference for that.

     The Indictment already says on or about June 27th and,
you know, we obviously haven't seen this case until Mr. Uller
just handed it to us.  But just looking at it briefly at
Paragraph 4 or note 4, says there is no evidence of his
fingerprints on those items nor did any witness testify that
they had seen *Griffin* holding or using it.

     So it just seems like this case is quite
distinguishable from the instant case.  And adding that this
must be in connection with this assault, impediment or
interference or intimidation is adding an element to felon in
possession, so we strongly oppose and suggest the pattern
instruction.

     THE COURT:  Well, I think there are two separate
issues.  I agree that I don't think there should be a change to
the instruction on the elements.  There's nothing in the
Indictment that says that the only instance in which the
Government alleges that Mr. Polnitz possessed a firearm, which
he couldn't legally possess, was during a confrontation with the
postal employee, with Mr. Phillips.  And if the Government is
able to prove possession, as it's defined in the residence, then
there's a basis for the jury to find that.

157

1          I'm curious, Mr. Uller, why your concern is not

2     addressed by the first sentence of the definition of possession,

3     which says a person possesses an object if he has the ability

4     and intention to exercise direction or control over the object,

5     either directly or through others.

6          So this -- This goes beyond saying it happened to be

7     in the same location that he was.  And as I read, if you look at

8     a man went through with it the same way as the Government is but

9     if you look at headnote 8 on Page 697 of *Griffin*, after the

10    Court's gone through a number of circumstances where all there

11    was was proximity to the contraband, the Court says that proof

12    of constructive possession requires a substantial connection

13    between the defendant and the contraband itself, not just the

14    residence.  The simple fact that it's in the same location as

15    the defendant is not enough.

16         And so I'm not sure why you're not completely free to

17    argue that.  You could think of a million arguments, I'm sure,

18    to say, you know, the gun may have been in the house where

19    Mr. Polnitz came out of, but the Government hasn't proved, you

20    know, that he had the ability and the intention to exercise

21    direction or control over it.

22         MR. ULLER:  Judge, I don't have any problem with that.

23    What I'm asking then is that the Court include in the definition

24    of possession some of the language from *Griffin* that

25    specifically addresses possession of contraband in a jointly

```
 1    occupied residence because I don't think that the pattern

 2    possession instruction is clear enough on that point, and I

 3    think *Griffin* makes it substantially clear that, you know, where

 4    one person possesses an item in a jointly occupied residence,

 5    that's not enough to -- for there to be proof of the defendant's

 6    possession of that item, and the paragraph that the Court just

 7    read actually is what I had included in my proposed instruction.

 8              THE COURT:  Okay.  Here's what I'm going to do.  I

 9    think the Government ought to have an opportunity to read

10    *Griffin* and consider whether there are any other cases they

11    might want to consider.  They have the proposed instruction.  I

12    do.  Let's table that one until tomorrow until everybody has had

13    a chance to look at the decision.

14              Thank you for bringing copies, Mr. Uller.  I

15    appreciate that.  Then, we have Count 2, 18 U.S.C. 111, and I

16    think that's the one you borrowed from the 8th Circuit; is that

17    correct?

18              MR. COREY:  Yes, Your Honor.

19              THE COURT:  And I will cut out the case citation in

20    there.  I just -- We left it in there for the purposes of my

21    review of it and discussion today.  And so again I think the

22    only issue, unless there's something I don't know about, is

23    changing the should to must in the second paragraph and taking

24    out the as to that charge language, just like we did in the last

25    one.
```

1          MR. COREY:  Your Honor, we requested in the

2     preliminary instructions in that third element to be changed

3     from the assault to include all of the things imminent or at the

4     time of the incident just so --

5          THE COURT:  Right, right.  And we used incident in the

6     preliminary instructions.  To be consistent, we should use that

7     again.  Thank you for that reminder, Mr. Corey.

8          The third element will read at the time of the

9     incident, United States Postal Service Letter Carrier Kevin

10    Phillips was engaged in the performance of official duties.

11         Then, the next one we have is the instruction telling

12    the jury punishment is not their concern, and that's the

13    standard instruction.  Nobody has objected to that.

14         4.10, the definition of knowingly.  I think there are

15    two bracketed issues.  The first one is the bracketed portion of

16    the first paragraph.  I think that does apply here in deciding

17    whether the defendant acted knowingly.  You may consider all of

18    the evidence, including what the defendant did or said.

19         MR. COREY:  Yes, Your Honor.

20         THE COURT:  But the second one is the ostrich

21    instruction, and I don't think that's an issue here.

22         MR. COREY:  We agree.

23         THE COURT:  Do you agree, Mr. Uller?

24         MR. ULLER:  Yes.

25         THE COURT:  So we'll take out the second paragraph.

1    We've already talked about possession.  Everybody's going to
2    marinate on that overnight.

3          7.01 is deliberations instruction, and I just need to
4    -- I just need to correct Mr. Graham, foreperson, and I have
5    already told them they are not going to have transcripts or the
6    testimony from today or testimony.  There's that bracketed
7    information in the third paragraph at the bottom reminding of
8    that again.  I am six and one half dozen of the other in terms
9    of whether I need to tell them again.  Anybody think we need to
10   include it?  Government is shaking its collective head no.

11         MR. ULLER:  No.

12         THE COURT:  Okay.  So I'll take that out.  They
13   already know they are not getting transcripts.  And the last
14   paragraph is part of the standard instruction.  And finally, I
15   will read the verdict form to them.  Then, we have unanimity
16   instruction at the end, 7.03.

17         And again at the very bottom, the last paragraph, I'll
18   take out the language about affirmative defense.  There is not
19   one.  And then finally, at least I think finally for the moment,
20   Mr. Uller had made a request for an additional instruction
21   that's not a pattern instruction.  It's from Judge Mark Bennett
22   on the West Cost, and it's implicit bias instruction.  I think
23   we talked about this at the final pretrial conference.  I didn't
24   go back to check my notes about where I ended up on that or if I
25   intend to --

1    MR. ULLER:  Judge, my recollection was that the Court

2    indicated that it read its implicit bias instruction in the

3    opening instructions.  You know there are other instructions

4    that were also read that are being reread in the closing

5    instructions, and I don't see any reason why that one shouldn't.

6    You know, Judge Bennett is, I think, the recognized leader from

7    the bench on issues of implicit bias.  That's the instruction

8    that the ABA recommends from Judge Bennett, and that's why I

9    proposed that one.  If the Court, you know, likes its

10   instruction better, I don't have a problem with that.

11        THE COURT:  Far be it from me to choose one

12   instruction over one of the judges in another circuit, but

13   anyway.

14        MR. TAIBLESON:  Your Honor, we believe the implicit

15   bias instruction you gave in the preliminary instructions

16   covered it.  It's also true the instruction at 1.01 states,

17   don't let any person's race, color, religion, national ancestry,

18   gender influence you.  We think that is well and succinctly put

19   and covers the issue.  We do not think an additional implicit

20   bias instruction is necessary.

21        THE COURT:  I'm sorry, I am just reading over.  I

22   think it is restating what I said already.  Mr. Uller is right,

23   there are many instructions that we read already.  I'm willing

24   to give the Judge Bennett instruction; however, not the last

25   sentence.  I think the last sentence sort of implies we're

expecting them to make a decision based on biases, which I like
to hope are not.  I outlined we all have them, we don't always
know what they are.  I don't want to take the next step and go
to what our system of justice is counting on, so I will give the
instruction but absent the last sentence.

All right.  So other than the possession issue, which
we're going to take up I think tomorrow and any of these
instructions that we really can't decide on until we see how
testimony goes, anything else with regard to instructions,
Mr. Corey, Mr. Taibleson?

MR. COREY:  No.

THE COURT:  Mr. Uller?

MR. ULLER:  No, Judge, thank you.

THE COURT:  I know you all have been keeping admitted
exhibits down there on the table.  I ask that the firearm go
back to its home to return tomorrow.  But other than that,
continue the admitted pile down there.

Just real briefly since we're all here, I have
admitted Exhibits 5 -- if you have your list in front of you.  I
have 5, 2, 2-B as in boy, 3, 4, 7, 13, 23, 8, 9, 30, 25, 11 and
12.  Anybody else have anything I don't have?

MR. TAIBLESON:  Your Honor, you did say 13?

THE COURT:  I did.  Anything else?  All right.  I
forgot about we should take a glance at the verdict form, I
apologize.  I think you all submitted an agreed verdict form.  I

1    just want to make sure we got what you all submitted.  And,

2    obviously, we'll change the date to tomorrow.

3            To everyone's credit, everyone worked hard to move

4    this quickly.  They knew it could go into tomorrow.  Mr. Uller,

5    okay with the verdict form?

6            MR. ULLER:  Yes.

7            THE COURT:  That will be the form of verdict.

8    Anything else we need to take up at any time before we break?

9            MR. COREY:  If we can nail down when we will read the

10   stipulations.

11           THE COURT:  You've already read one in, I think.  You

12   have the other two?

13           MR. COREY:  Yep.

14           THE COURT:  That's right.  You know, we can read them

15   tomorrow before the defense starts its case.  It doesn't really

16   matter.  They don't come in one case in chief or the other.

17   They are joint.  Unless you have an objection to that,

18   Mr. Uller, we can start with the stipulations and then your

19   first witness.

20           MR. ULLER:  You know, the Government did rest.

21           THE COURT:  It's a stipulation, Mr. Uller.  It's not

22   their evidence.

23           MR. ULLER:  Yeah.

24           THE COURT:  You all agreed to it before we came in.

25   So you can read them tomorrow as we start before the defense

                                                              164

1  brings out its first witness.  So if you all want to show up,
2  you know, a little bit before 9:00, I'd say maybe quarter to, we
3  can see if we've reached any -- if we want to have any further
4  discussion on the possession discussion.  We can also wait and
5  do that after the close of the defense case if we want to.  But
6  be here a little bit before 9:00.
7            MR. ULLER:  Judge, I have a final pretrial before
8  Judge Stadtmueller at 8:30.
9            THE COURT:  Will that take eight or seven?
10           MR. ULLER:  Probably seven-and-a-half.  I just wanted
11 to let the Court know that.
12           THE COURT:  You'll just come straight here when you
13 finish there?
14           MR. ULLER:  Yeah.
15           THE COURT:  We'll be here.  All right.  Thank you all.
16 We will lock the courtroom.  So if there's anything that you
17 need, take it with.
18      (Whereupon proceeding was concluded.)
19
20
21
22
23
24
25

C E R T I F I C A T E

        I, Susan Armbruster, RPR, RMR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified January 11, 2019.

/s/Susan Armbruster

Susan Armbruster

                     Susan Armbruster, RPR, RMR
               United States Official Reporter
              517 E Wisconsin Ave., Rm 200A,
                  Milwaukee, WI 53202
          Susan_Armbruster@wied.uscourts.gov